## W. F. & JOHN BARNES CO. et al. v. INTERNATIONAL HARVESTER CO. et al.

Civil Action No. 2907.

District Court, N. D. Illinois, E. D.
June 17, 1943.

Spencer; Marzall, Johnston & Cook and Haight, Goldstein & Hobbs, all of Chicago, Ill., for plaintiffs.

C. Paul Parker, Ira J. Wilson, Alwin F. Pitzner, Richard Russell Wolfe, and Parker, Carlson, Pitzner & Hubbard, all of Chicago, Ill., for defendants.

BARNES, District Judge.

This consolidated cause came on for hearing on two amended complaints, both filed on February 16, 1942, one by W. F. & John Barnes Company and Odin Corporation against International Harvester Company and Ex-Cell-O Corporation, and the other by John S. Barnes Corporation and Odin Corporation against the same defendants, and on an amended answer thereto, filed June 19, 1942, and two amendments to said amended answer filed, respectively, on July 2, 1942, and August 29, 1942.

The amended complaints charge infringement of eleven United States patents on certain machine tools, hydraulic systems used in machine tools, and valves for directing the flow of fluid in such systems.

The patents involved are:

1. Svenson 1,924,422, for a "Valve Construction," issued August 29, 1933, on an application filed November 16, 1929, and containing 43 claims, of which 16 are in suit;

2. Svenson 1,986,862, for a "Fluid Controlling Means," issued January 8, 1935, on an application filed November 16, 1929, and containing 29 claims, of which 22 are in suit;

3. Svenson 2,036,162 for a "Machine Tool Unit," issued March 31, 1936, on an application filed September 13, 1930, and

containing 28 claims, of which 11 are in suit;

4. Svenson 2,178,364 for a "Material Working Apparatus," issued October 31, 1939, on an application filed September 13, 1930, and containing 15 claims, of which 3 are in suit;

5. Svenson 2,174,850, for an "Hydraulic Control and Actuator Mechanism," issued October 3, 1939, on an application filed December 21, 1931, and containing 37 claims, of which 2 are in suit (two were dismissed out during the trial);

6. Barnes, Guirl & Johnson 2,098,220 for a "Material Working Apparatus," issued November 9, 1937, on an application filed August 12, 1932, and containing 48 claims, of which 7 are in suit;

7. Svenson 2,078,695 for an "Automobile Lathe and Fluid Circuit," issued April 27, 1937, on an application filed March 27, 1930, and containing 219 claims, of which 18 are in suit;

8. Svenson 2,215,257 for a "Material Working Apparatus and Control Therefor," issued September 17, 1940, on an application filed August 11, 1933, and containing 90 claims, of which 13 are in suit;

9. Barnes & Guirl 2,020,868 for a "Boring Machine and the Like," issued November 12, 1935, on an application filed January 18, 1930, and containing 35 claims, of which 21 are in suit;

10. Walker 1,493,301 for a "Power Control for Boring Machines," issued May 6, 1924, on an application filed July 30, 1921, and containing 43 claims, of which 6 are in suit; and

11. Barnes & Guirl 2,042,379 for a "Metalworking Apparatus," issued May 26, 1936, on an application filed February 14, 1931, and containing 44 claims, of which 10 are in suit.

The principal subject of study during the trial has been the hydraulic systems used in machine tools. A hydraulic system may be a volumetric system or a constant pressure system. A volumetric system is one in which all the fluid that is pumped by the pump goes to the actuator or actuators, and in such a system the speed of the actuator may be controlled by means of a variable delivery pump. Figure 1, hereinafter set forth, illustrates a simple volumetric system.

A constant pressure system is one in which a certain maximum pressure is not permitted to be exceeded. This result is accomplished by placing in the system between the pump and the actuator a working pressure relief valve set to let liquid pass out of the system at the predetermined maximum pressure. In such a system the speed of the actuator may be controlled by means of a restricted orifice and the working pressure relief valve. The restricted orifice may be in the flow line, as in Figure 2 hereinafter set forth.

The restricted orifice may be in the return line, as in Figure 3, hereinafter set forth:

FIGURE 1

FIGURE 2

FIGURE 3

A simple hydraulic system comprises a sump or tank, a pump, and (in the jargon of the machine tool trade) an actuator, which may be a cylinder and piston, together with the pipes or conduits connecting all of the foregoing. A slightly less simple system might include (in addition to the foregoing) a reversing valve to direct the fluid to one end or the other of the actuator. A slightly less simple system might include (in addition to the foregoing) a restricted orifice in the flow line either between the pump and the reversing valve, or between the reversing valve and the actuator, or in the return line either between the actuator and the reversing valve, or between the reversing valve and the sump, and a "working pressure relief valve." A less simple system might include (in addition to the foregoing) a selector valve for cutting the restricted orifice into or out of the system. A less simple system.

might include (in addition to the foregoing) a larger or smaller orifice (so as to provide two feed rates) and a selector valve to cut one or the other of them in and out of the system. The system may be made somewhat more complicated by using two pumps —a large volume, low pressure pump and a small volume, high pressure pump—the former for the purpose principally of supplying a large quantity of liquid at low pressure for moving the tool head in so-called "rapid forward traverse" or "rapid reverse traverse," and the latter for the purpose principally of supplying a small quantity of liquid at high pressure for moving the tool head in "feed forward" or "feed reverse." The relationship of the flows of the two pumps may vary in respect of volume, pressure, and particularly, source of supply and time of flow. Different systems may have different so-called "cycles" and a given system may be so devised that its "cycle" may be changed. A simple cycle might have the following sequence: Neutral, rapid forward traverse, feed forward, rapid reverse traverse, and neutral. A single actuator may advance ,and retract the tool head in a machine having a single tool head. A system may be greatly complicated by adding one or more additional actuators. Many actuators may each advance and retract a tool head in machines having many tool heads. An actuator may advance and retract the platen holding the work piece (jargon for the material to be worked). The relationship of the movements of the tool head to the movements of the platen holding the work piece may be varied in many particulars.

With so many elements which may be put together, it is obvious that the possible combinations or aggregations which may be assembled are innumerable.

Many of the questions of validity in the case at bar are questions as to whether or not the putting together in one system or machine of a few or many of the foregoing elements involved invention at the time the patentee put them together and claimed them in the patents in suit.

*Of the Effect as Estoppels or Otherwise of Certain Interference Proceedings in the Patent Office.*

On the facts next hereinafter set forth, plaintiffs contend that the defendant Ex-Cell-O Corporation suffers the constraints and embarrassments of (a) inconsistency, (b) admissions, and (c) estoppel in its arguments as to validity and infringement of Svenson 1,924,422 and 1,986,862.

Svenson 1,924,422 issued August 22, 1933, on an application filed November 16, 1929. Svenson 1,986,862, issued January 8, 1935, on an application filed November 16, 1929. Alden application Ser. No. 690,525, was filed September 22, 1933, as a division of Alden 2,000,553, filed March 17, 1932, and issued May 7, 1935. The filing date of each of the Svenson patents is, therefore, prior to the effective filing date of Alden, namely, March 17, 1932. The Svenson patents were assigned to John S. Barnes Corporation, one of the parties, and were owned by that corporation during all of the interference and until recently, when they were assigned to Odin Corporation, another of the plaintiffs. The Alden application was assigned to Ex-Cell-O Corporation, one of the defendants. The Alden application in interference makes substantially the same disclosure as does Alden 2,000,553, the parent. Generally speaking, the unissued application makes claims to hydraulic features, while the issued patent claims mechanical features. Alden 2,000,553 is conceded by the defendants to be a correct representation of their so-called First Senior System. So far as infringement of Svenson 1,986,862 is concerned, there is no substantial difference between the First Senior System and other structures accused under that patent.

An interference, No. 71,653, was declared by the Patent Office between Svenson 1,924,422, on the one hand, and the Alden application 690,525, on the other. The record in that interference has been made, briefed, and was argued on May 26, 1942, but no decision by the Primary Examiner has been rendered. Svenson 1,924,422 was cited against the Alden application on December 12, 1933, four months after the Svenson patent issued. On June 18, 1934, Alden filed an affidavit under Rule 75 of the Patent Office to swear back of Svenson's filing date. In its action of May 27, 1935, the Patent Office again cited Svenson 1,924,422, stating that reference could not be overcome by affidavit under Rule 75 because certain claims of Svenson 1,924,422 were readable upon the disclosure of the Alden application. Alden was given until June 27, 1935, to make the claims of Svenson if he desired to contest the issue of priority. On June 22, 1935, and again on July 8, 1935, Alden filed request for extension of time, and, after three months' extension of time, on September 17, 1935, an amendment was filed copying Svenson 1,924,422, claims 5, 33, 38 and 40 to secure a declaration of interference. The defend-

ant, Ex-Cell-O Corporation, has taken no steps to change its position on this matter. in the Patent Office. As to Svenson 1,986,-862, Alden and his assignee, Ex-Cell-O Corporation, copied claims 1, 2, 3, 4, 6, 7, 8, 12, 15 and 16 on April 27, 1936. In Svenson 1,924,422, an interference was suggested to Alden and Ex-Cell-O Corporation, but Alden and Ex-Cell-O Corporation sought the interference as to Svenson 1,986,862. When the claims were copied from Svenson 1,986,862, there was added to the Alden application Fig. 4-A to show specifically the structure of the relief valve 120, which theretofore had been shown only by a conventional rectangle. The reason assigned for adding the figure was so that the internal structure of the relief valve might be shown.

Under the Patent Office rules, when claims are copied to provide an interference at the initiation of the copier, that applicant must apply the copied claims to his disclosure. This Alden and Ex-Cell-O Corporation did. There has been no decision in the Patent Office.

In August, 1941, an answer was filed in the suit at bar denying validity and infringement of Svenson 1,924,422 and 1,986,-862.

On the facts above set forth, the plaintiffs contend:

(1) That the inconsistency of attempts to secure a patent and later pleading invalidity of the patent which a junior inventor secures is an evidentiary fact which courts consider, that which is equitable or inequitable being determined on the facts of each case (citing: Hutchins Car Roofing Co. v. Standard Ry. Equipment Co., 7 Cir., 259 F. 226, 228; Cutler-Hammer Mfg. Co. v. General Electric Co., 7 Cir., 6 F.2d 376, 377; Russell v. J. P. Seeburg Corp., 7 Cir., 123 F.2d 509, 511; and Penn Electric Switch Co. v. United States Gauge Co., 7 Cir., 129 F.2d 166, 169);

(2) That the naked fact of inconsistency on the question of validity does not pursue the offender to afford a basis for estoppel at some later date (citing: Paramount Publix Corporation v. American Tri-Ergon Corp., 294 U.S. 464, 476, 55 S.Ct. 449, 79 L.Ed. 997); and

(3) That a party is estopped to shift position in respect of infringement (citing: Allbright-Nell Co. v. Autosteam Process Co., 7 Cir., 70 F.2d 959, 962; Jones v. Morehead, 68 U.S. 155, 158, 1 Wall. 155, 17 L.Ed. 662; Cheatham Electric Switching Device

Co. v. Brooklyn Rapid Transit Co., 2 Cir., 238 F. 172, 175; and Overland Motor Co. v. Packard Motor Car Co., 7 Cir., 30 F.2d 497). The plaintiffs contend that the foregoing. principles bind the defendant, Ex-Cell-O Corporation, the assignee of Alden.

The Ex-Cell-O Corporation says that it is not estopped to deny either validity or infringement of Svenson 1,924,422 and 1,986,862, and it denies that any word or act of it or of its assignor in the Patent Office interferences should be held here to be an admission of either validity or infringement.

It is well settled, as the Ex-Cell-O Corporation contends, and as the plaintiffs concede, that, under the circumstances here disclosed, Ex-Cell-O Corporation is not estopped to deny validity. Paramount-Publix Corporation v. American Tri-Ergon Corp., 294 U.S. 464, 477, 55 S.Ct. 449, 79 L.Ed. 997; Haughey v. Lee, 151 U.S. 282, 285, 14 S.Ct. 331, 38 L.Ed. 162; and Allbright-Nell Co. v. Autosteam Process Co., 7 Cir., 70 F.2d 959-961.

In order to determine the effect here, by way of admission, of what the Ex-Cell-O Corporation did in the Patent Office, it will be well to determine, with some accuracy, what it could do there and what it did do. Svenson 1,924,422 had issued when the Patent Office declared an interference between it and the Alden application, and Svenson 1,986,862 likewise had issued when Alden and his assignee Ex-Cell-O Corporation copied claims from it. The only issue that there could be in the interference was as to priority of invention (Sec. 52, 35 U.S.C.A.; United States ex rel. Lowry v. Allen, 203 U.S. 476, 27 S.Ct. 141, 51 L.Ed. 281; Hendrickson & Nelson v. Ronning & Ronning, 76 F.2d 137, 140, 22 C.C.P.A., Patents, 1040; McElrath v. Industrial Rayon Corp., D.C., 35 F.Supp. 198, 209, 210, affirmed 4 Cir., 123 F.2d 627; Campbell v. Dyson v. Dunham, 1917 C.D. 56, 58; Dunkley Co. v. Central Cal. Canneries, 9 Cir., 7 F.2d 972, 977; Westinghouse v. Hien, 7 Cir., 159 F. 936, 941, 24 L.R.A.,N.S., 948; Hillard v. Remington Typewriter Co., 2 Cir., 186 F. 334; Dooley Improvements v. Motor Improvements, D.C., 18 F.Supp. 340), and the question of validity of the claims in interference over the prior art could not be put in issue (Patterson v. Neher, 1913 C.D. 143; Campbell v. Dyson v. Dunham, 1917 C.D. 56, 58). In the last mentioned case, it is said: "An interference is not a proceeding to determine whether the parties have a right to

a patent. It starts with the assumption that both parties have a clear right to a patent except for the simultaneous claim of the other. Each party is presumed to have a right to the patent otherwise, but to be barred by the claim of the other. The contest is therefore as to which of two inventors, each with a clear right, was the first to invent. * * *"

When the Patent Office declared the interference between Svenson 1,924,422 and the Alden application, Alden and his assignee were confronted with the necessity either of conceding priority to Svenson or of joining in the interference. The plaintiffs suggest that some sort of moral turpitude attaches to Alden and his assignee Ex-Cell-O Corporation because they chose to contest priority in the interference and because they did not there concede priority and await suit for patent infringement. The court cannot find bad morals there. And it is suggested that a greater degree of moral turpitude attaches to Alden and his assignee because of their action as regards Svenson 1,986,-862 since they there sought the interference. But they were already involved in a law suit not of their seeking involving patent claims on devices used in hydraulic systems on machine tools, which devices included orifices, and the claims of Svenson 1,986,862 which they copied described devices of that general class. The court cannot find moral turpitude in those facts. Having been forced into a law suit, it was but natural that Alden and his assignee Ex-Cell-O Corporation should desire to have all like issues between the parties to that law suit decided in that law suit. However, the plaintiffs say that the interference proceeding in the Patent Office cost them a large sum of money, and that they are now having to fight this (another) law suit. The court can well believe that the interference proceeding cost each side large sums of money. Litigation usually costs money. But why the plaintiffs should complain of this law suit, the court cannot understand. They started it. Had they refrained from suing here and awaited the action of the Patent Office they would doubtless, in the course of time, have had a decision of the issues submitted to the Patent Office and would, in that way, have received consideration for the money they spent in fighting the interference. The court does not mean to infer that the plaintiffs have done wrong by filing and prosecuting this law suit. They were at liberty to do so, but, doing so, they indulge in the luxury of two law suits. So far as morals are concerned in the matters now under consideration, the parties are on the same plane. They are rival manufacturers, competing with each other by means of patent claims and patent litigation, each seeking to establish and maintain the monopolies which patents grant and to prevent its rival from establishing and maintaining like monopolies. The court certainly cannot say that the defendants have been more active in these respects than the plaintiffs.

 It is well to remember the sort of alleged admissions that are by the plaintiffs said to have been made by Alden and Ex-Cell-O Corporation and that are relied on by the plaintiffs. The alleged admissions of validity are not direct admissions of validity; on the contrary, they are a sort of implied admissions which are claimed to have arisen out of the failure of the defendants, when interferences were declared, to concede priority and await suit for infringement. Likewise, the alleged admissions of infringement are not direct admissions of infringement; on the contrary, they are a sort of implied admissions which are claimed to have arisen out of the application by the defendants of claims of Svenson 1,986,862 to the disclosure of the Alden application, coupled with evidence here that the defendants' First Senior System is an exemplification of the disclosure of the Alden application and that, so far as infringement of Svenson 1,986,862 is concerned, there is no substantial difference between the First Senior System and other structures accused under this patent. These are both rather long journeys which the plaintiffs are compelled to take to spell out admissions. Furthermore, the alleged admissions are as to the validity of patent claims for complicated devices and machines and as to infringement of certain of those claims. When one says that any one of those claims is either valid or invalid, or that it is or is not infringed, he expresses a conclusion, which, if it be a considered conclusion, has been arrived at only after a consideration of many, many facts which it has taken expert counsel many weeks to put before this court, and which conclusion will be at odds with the opinion of an expert on one side or the other. Questions as to the validity of patent claims are questions of fact (Thomson Spot Welder Co. v. Ford Motor Co., 265 U.S. 445, 447, 44 S.Ct. 533, 68 L.Ed. 1098; Williams Mfg. Co. v. United Shoe Machinery Corp., 316

U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537; Sturtevant Co. v. Massachusetts Hair & Felt Co., 1 Cir., 122 F.2d 900, 906; Gilchrist v. F. B. Mallory Co., D.C., 281 F. 350, 352), and questions as to the infringement of patent claims are likewise questions of fact (Stilz v. United States, 269 U.S. 144, 147, 46 S.Ct. 37, 70 L.Ed. 202; Aluminum Co. v. Thompson Products, 6 Cir., 122 F.2d 796, 799; Wilson v. Haber Bros., 2 Cir., 275 F. 346; Laclede Christy Clay Products Co. v. St. Louis, D.C., 270 F. 338), and one may, of course, make admissions of fact. But an expression of validity or invalidity or of infringement or non-infringement of any one of the patent claims now under consideration is a conclusion of fact, based upon many, and some conflicting, evidentiary facts. And, accordingly, it seems to the court that, aside from all authority, except some fundamental authority, which points out the reason for permitting the use of admissions in evidence and the limitations upon such use, admissions, if they are admissions such as those now under consideration, should be permitted to be relied on only with great caution.

One authority which may be regarded as fundamental is Greenleaf's Evidence. There, in Vol. I, 15th Ed., Section 204, it is said: "With regard, then, to the conclusiveness of admissions, it is first to be considered, that the genius and policy of the law favor the investigation of truth by all expedient and convenient methods; and that the doctrine of estoppels, by which further investigation is precluded, being an exception to the general rule, founded on convenience, and for the prevention of fraud, is not to be extended beyond the reasons on which it is founded." The "convenience" there referred to, whether it be that of the court or of counsel or of both, cannot be served here. Counsel have put in all of the evidence bearing on the issues of both validity and infringement and the court has heard it all. No time will be saved by recourse to admissions. The court has expressed the opinion that the conduct of the defendants has not involved bad morals, and, accordingly, there can be no fraud to warrant recourse to admissions by the defendants. In this connection, if there has been any inequitable, as distinguished from fraudulent, conduct on the part of either side, it has been on the part of the plaintiffs in failing to await the decision of the Patent Office on the issue of priority and in instituting and prosecuting this suit without awaiting the decision of the Patent Office. Had the plaintiffs awaited the action of the Patent Office on the issue of priority and had they won on that issue, then when they sued the defendants for making, using or selling machines made in accordance with the disclosures of defendants' application which had been in interference one could come nearer figuring out a reason why (the rights of the public being disregarded) the defendants should be estopped to deny both validity and infringement. But when the plaintiffs refuse to await the action of the Patent Office on the issue of priority and bring suit as they have here, prior to the decision of the Patent Office, then they have refused to pay the consideration for the implied admissions of the defendants which they rely upon.

Furthermore, the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, seem to the court to indicate a policy against extending the doctrine of estoppel by reason of mere pleadings and admissions in testimony in another law suit which has never been determined. The rules which should be considered in this connection are:

Rule 8(e) (2), which provides that "A party may * * * state as many separate claims or defenses as he has regardless of consistency * * *;"

Rule 15(a), which provides that leave to amend pleadings "shall be freely given when justice so requires;" and

Rule 15(b), which provides: "If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

The question whether a party should be estopped to shift position in respect of infringement is an interesting one. It will probably be conceded that, with the exception of the question of interest or lack of interest by the public in the question, the question of infringement is much like the question of validity so far as estoppels and admissions are concerned. The public is said to have an interest in the question of validity, so that a person who has

sought a patent on a device which is covered by a patent issued to another is not estopped to deny validity of the other's patent. Haughey v. Lee, 151 U.S. 282, 285, 14 S.Ct. 331, 38 L.Ed. 162; Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997; Allbright-Nell Co. v. Autosteam Process Co., 7 Cir, 70 F.2d 959; Kellogg Switchboard & Supply Co. v. Michigan Bell Tel. Co., 6 Cir., 99 F.2d 203, 205; McElrath v. Industrial Rayon Corp., 4 Cir., 123 F.2d 627, 629. But there remains the exceedingly interesting question as to whether or not the public has an interest in the question of infringement.

■ When one is considering the question of validity of a patent claim from the viewpoint of anticipation or invention, one compares the claim with the pertinent prior art, and when one is considering the question of infringment of a patent claim one compares the accused machine with the patent claim after first determining the breadth of the claim by a consideration of the pertinent prior art. It is difficult to see why the public should be more interested in striking down an invalid patent claim as invalid than it should be in having a patent claim, which in the light of the pertinent prior art is narrow in scope, adjudged to be narrow in scope. From the viewpoint of the public, exactly the same principles are applicable in both cases. The public is interested in seeing that a monopoly not based on an invention is destroyed, and it should be interested in seeing that a monopoly is no broader than the invention. If the court did not feel itself bound by precedent in this circuit, it would be inclined to hold that the public has an interest in the question of infringement so that one may not be estopped to deny infringement (consider the analogy of Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316).

However, in considering the questions of infringement of Svenson 1,986,862, the court will bear in mind the rule, announced in Allbright-Nell Co. v. Autosteam Process Co., 7 Cir., 70 F.2d 959, that a party may be estopped to shift position in respect of infringement, and what appears to be an exception to the rule, expressed by Judge Baker in L. P. Larson, Jr., Co. v. William Wrigley, Jr., 7 Cir., 253 F. 914, 918, as follows: " * * * unless the court can find an absolute demonstration from other evidence in the case or from facts within judicial notice, like the laws of physics, etc., that under no circumstances could the averments and admissions be true."

In considering the question of alleged estoppels and admissions arising out of interferences, the court has not ascended into the rarified atmosphere that seems to be ncessary for the consideration of the alleged differences in construction of patent claims in interferences and in infringement suits. The defendants' contend that there are such differences. The plaintiffs have not argued the subject. The court contents itself with observing that, if there are the differences as contended by the defendants, then there is an additional reason why the defendants should not be bound by alleged estoppels and admissions.

Since writing the foregoing on the question of estoppels, the court has read Gilbert v. General Motors Corp., 2 Cir., 133 F.2d 997, at page 1002, decided February 23, 1943, where it is said (Italics supplied): "Although the foregoing would ordinarily require the affirmance of the decree the plaintiff insists that in the interference proceedings Dyer, whose application was then owned by the defendant, admitted that his invention was identical with that of the plaintiff. For the purposes of those proceedings the adoption by Dyer of a claim identical with that of the plaintiff was an admission that their conceptions were the same. Ewing v. United States ex rel. Fowler Car Co., 244 U.S. 1, 37 S.Ct. 494, 61 L.Ed. 955. But in those proceedings the sole issue was priority of invention. United States ex rel. Lowry v. Allen, 203 U.S. 476, 27 S.Ct. 141, 51 L.Ed. 281; Ewing v. United States ex rel. Fowler Car Co., supra. Neither Dyer nor the plaintiff prevailed and *no authority has been called to our attention, and we have found none, to the effect that either was thereby estopped from later asserting as against the other such rights as might be his on the actual facts under the law.*"

### Of the Status, as Prior Art, of Patents Issued on Earlier Filed Applications Co-pending with That of a Patent in Suit.

■ An issue in the case has been the question as to the status, as prior art, of patents issued on earlier filed applications co-pending with that of a patent in suit. Plaintiffs' position is "that a patent resulting from an earlier filed but co-pending application with that of a patent in suit is not prior art, cannot be considered as showing the state of the art, and cannot be con-

sidered in combination with prior art or other co-pending applications;" and that "such an application is relevant only on the question of prior invention." Defendants' position is that "plaintiffs' contention must be rejected in so far as it attempts to set up any different standard for appraisal of a co-pending reference as prior art, as distinguished from any other prior art patent."

A leading case on this general subject is Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. There, the defendants relied upon a patent of Clifford to defeat a patent of Whitford, the Clifford patent having been issued upon an application filed earlier than that of Whitford. The court said Clifford's application gave a complete and adequate description of the thing patented to Whitford, but did not claim it. The court held the later filed Whitford patent invalid, and said, at page 401 of 270 U.S., at page 325 of 46 S.Ct. (Italics supplied):

"The delays of the patent office ought not to cut down the effect of what has been done. The description shows that Whitford was not the first inventor. Clifford had done all that he could do to make his description public. He had taken steps that would make it public as soon as the Patent Office did its work, although, of course, amendments might be required of him before the end could be reached. We see no reason in the words or policy of the law for allowing Whitford to profit by the delay and make himself out to be the first inventor when he was not so in fact, when Clifford had shown knowledge inconsistent with the allowance of Whitford's claim, (Webster) Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177, and when otherwise the publication of his patent would abandon the thing described to the public unless it already was old. McClain v. Ortmayer, 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800; Underwood v. Gerber, 149 U.S. 224, 230, 13 S.Ct. 854, 37 L.Ed. 710.

"*The question is not whether Clifford showed himself by the description to be the first inventor.* By putting it in that form it is comparatively easy to take the next step and say that he is not an inventor in the sense of the statute unless he makes a claim. *The question is whether Clifford's disclosure made it impossible for Whitford to claim the invention at a later date.* The disclosure would have had the same effect as at present if Clifford had added to his description a statement that he did not claim the thing described because he aban-

doned it or because he believed it to be old. *It is not necessary to show who did invent the thing in order to show that Whitford did not.*

\* \* \* \* \*

"As to the analogies relied upon below, the disregard of abandoned patent applications however explained cannot be taken to establish a principle beyond the rule as actually applied. As an empirical rule it no doubt is convenient if not necessary to the Patent Office, and we are not disposed to disturb it, although we infer that originally the practice of the Office was different. The policy of the statute as to foreign inventions obviously stands on its own footing and cannot be applied to domestic affairs. The fundamental rule we repeat is that the patentee must be the first inventor. The qualifications in aid of a wish to encourage improvements or to avoid laborious investigations do not prevent the rule from applying here."

The Milburn case decided that a patent issued on a co-pending earlier filed application was prior art, as of its filing date, despite the failure of the earlier applicant to claim the subject matter in question. It has been contended, and is contended at bar, that the Milburn case left open the question as to whether or not the disclosure of the earlier filed application may be supplemented by reference to the general state of the art in the manner customary in construing other prior art patents, and particularly left open the question as to whether the doctrine of equivalents may be applied in considering the effect of the earlier filed but co-pending application upon the later filed application. In Minnesota, etc., Co. v. Coe, 100 F.2d 429, 431, 69 App.D.C. 256 certiorari denied 306 U.S. 662, 59 S.Ct. 788, 83 L.Ed. 1059, it was contended that patents issued on earlier filed but co-pending applications could not be combined with each other and with other references to defeat the claimed invention, and that the Milburn case is authority solely for the proposition that a co-pending reference may be relied upon to defeat a claim of first invention, only, when it, alone, gives a "complete and adequate description" of the thing for which the later applicant seeks a patent. The United States Court of Appeals for the District of Columbia, 69 App. D.C. at pages 258 and 259, 100 F.2d at pages 431 and 432, said:

"\* \* \* But such a conclusion cannot properly be drawn from that case, even though it chanced that the application there-

in did give a complete and adequate description of the thing patented to the later applicant. The important consideration was that the co-pending application disclosed knowledge upon the part of the earlier applicant inconsistent with the allowance of the later applicant's claim.

\* \* \* \* \* \*

"Whether or not the co-pending applications could properly be considered, therefore, to show the prior art in the technical sense, they were properly considered to determine whether they disclosed knowledge upon the part of the prior applicants inconsistent with appellant's claim of first invention. Stelos Co., Inc., v. Hosiery Motor-Mend Corp., 2 Cir., 72 F.2d 405, affirmed 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414; In re Youker, 77 F.2d 624 [22 C.C.P.A., Patents, 1294]. They did disclose such knowledge and, hence, Brown and Klein were not the first inventors.

\* \* \* \* \* \*

"The question has been considered and decided adversely to appellant's contention, also, by the United States Court of Customs and Patent Appeals in Re Youker, supra; by the Circuit Court of Appeals for the Sixth Circuit in Ottinger v. Ferro Stamping & Mfg. Co., 59 F.2d 640, 643; by the Circuit Court of Appeals for the Second Circuit in Hazeltine Corp. v. Abrams, 79 F.2d 329; and by the Circuit Court of Appeals for the Fourth Circuit in Denaro v. Maryland Baking Co., 50 F.2d 1074, which adopted the opinion of the lower court reported in, D. C., 40 F.2d 513, 515, 516."

The same court, in 1941, in the case of Dyer v. Coe, 75 U.S.App.D.C. 125, at page 129, 125 F.2d 192, at page 196, adhered to its earlier holding, and said: " \* \* \* We think it can be regarded as settled law that co-pending applications which, either singly, or in combination with previous patents or other co-pending applications, or both, disclose knowledge inconsistent with a claim of first invention, are available as references."

The Court of Customs and Patent Appeals, in Re Youker, 1935, 77 F.2d 624, 22 C.C.P.A., Patents, 1294, the Circuit Court of Appeals for the Sixth Circuit in Ottinger v. Ferro Stamping & Mfg. Co., 1932, 59 F.2d 640, 643, and the Circuit Court of Appeals for the Fourth Circuit in Denaro v. Maryland Baking Co., 1931, 50 F.2d 1074 (affirming and adopting opinion of the court in Denaro v. Maryland Baking Co.,

D.C., 40 F.2d 513) have all made decisions in accord with the decision in Minnesota, etc., Co. v. Coe, supra.

Two cases have been decided by the Circuit Court of Appeals for the Second Circuit which refer to the question now under discussion. The first of these cases is Stelos Co. v. Hosiery Motor-Mend Corp., 72 F.2d 405. The other is Penmac Corp. v. Esterbrook, etc., Co., 108 F.2d 695, 696. The references to the principle under discussion are both said, with reason, to be obiter. The obiter in the Stelos case favors the contention of the plaintiffs, and that case was followed by some of the trial courts in the Second Circuit whose opinions are cited by the plaintiffs, but the Penmac case indicates that Court's adherence to the view that has now been adopted by a considerable number of courts.

The plaintiffs cite three cases (Farmers' Handy Wagon Co. v. Beaver Silo & Box Mfg. Co., 7 Cir., 1916, 236 F. 731; Hamilton Beach Mfg. Co. v. P. A. Geier Co., 7 Cir., 1916, 230 F. 430; and Camp Bros. & Co. v. Portable Wagon Dump & Elevator Co., 7 Cir., 1918, 251 F. 603), all decided in the Circuit Court of Appeals for this circuit prior to the decision by the Supreme Court of the Milburn case, supra. The plaintiffs say that these cases hold that a prior co-pending application is not prior art and is pertinent on prior invention only as to subject matter actually claimed therein. The plaintiffs also say that the Milburn case goes no further than to hold that an earlier filed co-pending application is pertinent on prior invention if the subject matter is completely disclosed though not claimed, that the law of the Seventh Circuit is clear, and that it is claimed by them.

The defendants finally say that in at least three recent cases the Circuit Court of Appeals for this circuit has considered, on the issue of lack of invention, patents issued on earlier filed but co-pending applications. These cases are: Ajax Hand Brake Co. v. Superior Hand Brake Co., 132 F.2d 606 decided January 6, 1943; Triplett v. Line Material Co., 133 F.2d 533, decided February 8, 1943; and Curtis Companies, Inc., v. Master Metal Strip Service, Inc., 125 F.2d 690, decided February 16, 1942.

The court is of the opinion that the statutes of the United States declare a public policy, which has been recognized by the Supreme Court in the Milburn case and by

the Circuit Court of Appeals of this circuit in its recent decisions, and which requires that the disclosures of the earlier filed application may be supplemented by reference to the general state of the art in the manner customary in construing other prior art patents, and which requires that the doctrine of equivalents may be applied in considering the effect of the earlier filed but co-pending applications upon the later filed application.

*Of Facts, Establishing Personal Knowledge by the Patentee of Prior Public Uses of Machines Which Constitute Statutory Bars to the Validity of Claims, Giving Rise to the Necessity for Disclaiming.*

The defendants contend that Svenson 1,924,422, Barnes, Guirl & Johnson 2,098,220, Svenson 2,215,257 and Barnes & Guirl 2,042,379, are void for failure to disclaim. The defendants say that the circumstances giving rise to the necessity for disclaiming in the cases of the four patents referred to are facts establishing personal knowledge by the patentee of prior public uses of machines which constitute statutory bars to the validity of claims of each of the four patents referred to.

The defendants say in respect of Svenson 1,924,422, that claims 23 and 25 read squarely in terms and in substance on the prior Oilgear QR1x2 valve or system, which was known to and used by Svenson before his alleged invention disclosed in this patent; and that Svenson's own alleged conception drawing, Exhibit A-72, makes acknowledgment in the title block of the Oilgear QR system. The plaintiffs say that claims 23 and 25 do not read on the QR, that in that system the gear pump is so directed that part of the fluid is used to charge the plunger pump, that because of this connection from the gear pump to the plunger pump in the QR there is never delivered to the actuator any more fluid than that pumped from the reservoir to the gear pump, and that, therefore, the QR system does not meet the requirement of claims 23 and 25 that in one position of the valve the combined delivery of a plurality of pumps is dispatched to the actuator.

In respect of Barnes, Guirl & Johnson 2,098,220, the defendants say claims 1, 2, 3, 4, 7, 11 and 12 are completely anticipated by a machine admittedly manufactured in part by W. F. and John Barnes Company and sold to Universal Products Co. more than two years prior to the filing date of this patent, and that these facts were known to John S. Barnes, one of the joint patentees, who visited the Universal Products plant and doubtless saw the entire machine, including those portions which were supplied by H. R. Krueger & Co. The plaintiffs say that unless, as a matter of law, a claim is invalid in covering the making of a machine and providing the controls therefor to do automatically what had theretofore been done manually, the disclaimer issue should be decided in favor of the plaintiffs.

Concerning Svenson 2,215,257, the defendants say claim 67 reads squarely in terms and in substance on the Oilgear QR1x2 system and is, therefore, plainly invalid. Additionally, it is asserted that all of the claims of this patent are invalid because claims 55 and 56 read upon Barnes & Guirl 2,042,379 and that the patentee knew that the claims so read. The plaintiffs say that the Oilgear QR does not meet the requirement of the last element of claim 67 which calls for shifting of the actuator by the action of fluid from two sources of supply and which further calls for the positive continued movement of the actuator under the influence of fluid from only one of said sources. The plaintiffs further say, referring particularly to claims 55 and 56, that Barnes & Guirl 2,042,379 and Svenson 2,215,257 are not for the same invention; that generally speaking, so far as similarity of subject matter is concerned, the former relates to spindle indexing, and the latter to sudden stopping of the spindle, that plugging a motor is neither disclosed nor claimed in Barnes & Guirl 2,042,379, and that it is required in claims 55 and 56 of Svenson 2,215,257.

Concerning Barnes & Guirl 2,042,379, the defendants say claims 18, 20, 43 and 44, for example, are clearly anticipated by the Barnes Company's own machines admittedly sold to the Paige and Reo automobile companies more than two years prior to the filing of the application for this patent. The plaintiffs say that the claims and the "means" elements thereof are directed to an automatic machine which needs only to be supplied with a workpiece and energized by an electric current; that for the many steps performed by hand in the machines sold, including indexing of the spindle and shifting of the workpiece, automatic means are provided; that these "means" cannot be

an operator's hand; and that the "means" provided are permanently functioning elements of the combinations claimed.

As authority for the proposition that personal knowledge by the patentee of prior public uses of machines which constitute statutory bars to the validity of claims gives rise to the necessity for disclaiming the defendants cite three cases. They are: Marconi Wireless Telegraph Co. v. United States, 81 Ct.Cl. 671; Holzhauer Products Corporation v. Zaiger, D. C., 15 F.Supp. 1006; and Bresnick et al. v. United States Vitamin Corporation, D.C., 47 F.Supp. 993. In Marconi Wireless Telegraph Co. v. United States, supra, the patentee had given a public lecture some fifteen years before his patent in which he disclosed as public knowledge the "feature" set forth "in his patent specifications as new and patentable." The patentee, therefore, did know, as the court said he did, that he was claiming something which could not be sustained. In Holzhauer Products Corporation v. Zaiger, supra, the patentee on April 6, 1931, filed an application for reissue stating under oath that certain claims were too broad and that he was not the original and first inventor thereof. The reissue was denied. He did not file a disclaimer for more than two and a half years. Here, there was a specific admission under oath of invalidity. The sole question involved, as far as disclaimer went, was whether there had been undue delay in filing. In Bresnick v. United States Vitamin Corp., supra, the plaintiffs and patentee had admitted through the medium of a corresponding British patent that all substantial parts of the composition of the claims sued upon were old.

It may be inferred from a consideration of the statute and the foregoing cases that the obligation to disclaim arises only through positive knowledge of facts giving rise without doubt to the conclusion of invalidity. In none of the instances in which the defendants say that disclaimer was required is there established definite and certain knowledge of invalidity on the part of the patentee or plaintiffs. Accordingly, there was no duty to disclaim.

Before proceeding with an expression of views on the individual patents, it may perhaps be permissible to state some reasons that move the court to express, in respect of each patent, conclusions both as to infringement and validity.

Logically, there is very little difference between the question of the breadth of a claim (matters of mere grammar and terminology being disregarded) and questions of anticipation and lack of invention. A determination that a particular claim is anticipated is, in a sense, a determination that it has no breadth, because something in the prior art has appropriated the place which it would occupy. A determination that a claim does not disclose invention over the prior art, is, in a sense, a determination that it has no breadth, because something in the prior art has so nearly appropriated the place which it would occupy that it cannot be said that there is any invention disclosed in the claim. A determination that a claim is entitled to a narrow construction is a determination that the prior art is such that the claim must be narrowly construed, otherwise it would include a portion of the prior art. A determination that a claim is entitled to a broad construction is a determination that it may be given a broad construction without including portions of the prior art. The questions are closely related, require consideration of the same facts, and the court can see no good reason for trying to segregate them.

The parties have, by evidence and argument, in the case of each patent in suit contested the question of invalidity by reason of anticipation or lack of invention or both. In the cases of only a few of the 129 claims in suit have the defendants conceded infringement. Accordingly, it has been necessary in most cases to determine the breadth of the claim and then to determine the question of infringement. In the cases of all of the claims in suit the court has accordingly considered the prior art on the question of validity (including anticipation and lack of invention) and in the cases of most of the claims in suit the court has considered the same prior art on the question of the breadth of the claims. Evidence has been received and arguments have been heard and both have been considered on each issue,—that of validity and that of infringement. Conclusions have been reached on these issues, and there does not seem to be any compelling reason why they should not be expressed, particularly in view of the fact that reviewing courts frequently arrive at conclusions different from those of the trial court, and, if the trial court has expressed conclusions

on both issues, infringement and validity, there is no occasion for sending the case back for an expression by the trial court on either of those issues and the waste of time, effort and expense in a second trial and second appeal is prevented. From the viewpoint of one who desires the speedy and efficient administration of justice, there is much to be said for the view which would permit a trial court to make findings in respect of both infringement and validity, regardless of whether or not it finds the patent infringed or not infringed, or whether it finds it valid or invalid. This opinion is ventured after a consideration of: Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263; Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736; Altvater v. Freeman, 63 S. Ct. 1115, 87 L.Ed. ——; Cover v. Schwartz, 2 Cir., 133 F.2d 541; Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290; Richard Irvin & Co. v. Westinghouse Air Brake Co., 2 Cir., 121 F.2d 429.

1. *Svenson 1,924,422, for a "Valve Construction," Issued August 29, 1933, on an Application Filed November 16, 1929, and Containing 43 Claims, of Which 16 Are in Suit.*

In the case of Svenson 1,924,422, which is said to be a patent on a "Valve Construction," it is necessary to quote at length from the specifications and the claims in order that the inventions claimed may be understood. The inventor says:

"My present invention relates generally to fluid control mechanisms and more particularly to valves for automatically controlling the distribution of fluid which is used as a propelling medium.

"In general, one of the primary objects of this invention is to provide a valve of improved practical and simple construction which is adapted to efficiently and automatically control the distribution of high pressure and low pressure fluids.

"More specifically, it is an object of my present invention to provide a unique valve arrangement for accurately and positively controlling the distribution of high and low pressure fluids to a plurality of fluid operated actuating mechanisms as for example those mechanisms used for effecting the actuation of machine elements.

"Another object is to provide an improved fluid valve construction which will preclude the necessity of employing any auxiliary devices for controlling or effecting the reversal of the valve and to this end I propose to provide a self-contained valve unit which may be shifted in response to the action of the fluid medium.

"Another object of my present invention is to provide a valve mechanism which will enable the combining of fluids under low and high pressures to permit increased displacement of said fluid for high speed transmission.

"Still more specifically, my present invention contemplates the provision of a novel fluid valve arrangement in which a valve unit within a housing may be shifted by unbalancing the fluid pressure on said valve, said unbalancing being occasioned in response to the displacement of fluid from the valve chamber.

"Still another object of the present invention is to provide a self-contained valve mechanism which may be effectively employed for distributing fluid to a plurality of fluid actuated mechanisms and to this end I propose to provide a plurality of adjustable and non-adjustable orifices which are directly associated with the valve unit, said orifices serving to direct fluid to said actuating mechanisms.

"It is also an object of my present invention to provide a valve mechanism of the above mentioned improved construction which may be manually or automatically actuated and in this connection I contemplate the provision of simple means whereby certain of the automatic controlling devices may be rendered inoperative to effect complete manual control of the main valve unit.

"These and numerous other objects and advantages will be more apparent from the detailed description which is to follow. In accordance with the general features of the invention, one embodiment thereof includes a main cylindrical valve which is longitudinally slidable within a housing. One extremity of this valve is adapted to be connected to a control lever whereby manual reciprocation of the valve may be effected. When the control lever occupies a central or neutral position, fluid such as oil which is directed into the chamber, associated with the valve, circulates therethrough without causing the distribution of fluid to various machine elements with which the valve may be connected. In this connection it is to be noted that said valve is connected to a source of high pressure and low pressure fluid supply. When the

control lever is shifted to an extreme position as for example to the left, ports within the valve unit are so positioned as to cause the high and low pressure fluids to be directed through properly gauged, fixed passages to the machine actuating mechanisms. This rapid displacement of the fluid causes said mechanisms to be actuated at high speed. Thus, if these mechanisms were used for moving machine tools, said tools would be caused to rapidly move into operative association with the work. This movement might be referred to as a rapid approach movement. At a predetermined stage of the operation of these fluid actuated mechanisms, the main valve is automatically or manually shifted to a position in which only the high pressure fluid is directed to the machine actuating mechanisms and at this time said fluid is directed to restricted or adjustable orifices associated directly with the housing of the main valve. The reason for employing these adjustable restricted orifices will be apparent when it is understood that a variable amount of fluid must be displaced to give the desired speed to the parts which are propelled by the fluid actuated mechanisms. That is, the speed of these parts or members is controlled by means of these adjustable orifices. In other words, the fluid is now displaced at a feeding rate to the actuating mechanisms. At a subsequent predetermined interval, as for example when the machine tools have reached the limit of their cutting stroke, the main valve is automatically or manually shifted to the opposite extremity of the valve chamber. This shifting movement may be occasioned in response to an unbalanced condition of the fluid associated with the valve. This unbalanced condition is caused by a balancing member which serves to effect the decrease in pressure of fluid at one extremity of the main valve. This unbalancing of the valve serves to carry the same past the neutral point to a position in which high pressure and low pressure fluids are delivered in a reverse direction to the machine actuating mechanisms. This rapid delivery of the fluid may continue until the machine actuating mechanisms have reached the limit of their reversing stroke, at which time the valve will be automatically or manually shifted to its neutral position. If it is desired to impart a feeding reverse movement to the actuating mechanisms, it is only necessary to manually or automatically shift said main valve from its rapid reverse position to a reverse

feeding position. In connection with the shifting of the main valve for the purpose of reversing the delivery of fluid, it should be understood that I contemplate the provision of improved means whereby the positive reversal of the valves is timed with extreme accuracy. In other words, the reversing operation will not take place until all of the fluid actuated mechanisms have reached the limit of their advancing stroke and said reversal may be very accurately controlled for each cycle of the machine operation.

\* \* \* \* \*

"Before discussing in detail the structural characteristics of the embodiment of my invention which is disclosed in the drawings, it is to be understood that the present invention relates to subject matter similar to that set forth in my co-pending application, Serial No. 391,130, filed Sept. 9, 1929. In said co-pending application I have disclosed a complete automatic lathe construction equipped with a fluid control valve, and the present invention relates to fluid control valves which are adapted for use in connection with such automatic lathes. However, the present invention represents certain improvements in valve construction and controlling mechanism therefor.

\* \* \* \* \*

"A pipe line 40, Figures 4 and 15, serves to introduce low pressure fluid such as oil into branch passages 42 and 44, while a pipe line 46, Figures 6 and 15, serves to introduce fluid at high pressure into annular passage 48 which is provided in the housing 24. This high pressure and low pressure fluid may be supplied from any suitable source and for the purpose of illustrating the practical application of the valve I have shown the same connected to a variable displacement pumping mechanism which is shown diagrammatically in Figure 15. This pumping mechanism includes a variable displacement high pressure pump designated generally by the numeral 50 and a low pressure gear pump designated by the numeral 52. Fluid at high pressure is directed from the pump 50, Figure 15, through the pipe line 46 and thence into the annular passage 48, while fluid at low pressure is supplied from the pump 52 through the pipe line 40 which commmunicates with the branch passages 42 and 44.

\* \* \* \* \*

"Thus, fluid at high and low pressures which is associated with the valve when

said valve occupies its neutral position, circulates therethrough without being displaced for the purpose of propelling mechanisms later to be described.

&ast; &ast; &ast; &ast; &ast;

"Consider now that the valve 26 is manually shifted to its extreme left position as shown in Figure 9 through the agency of the control lever 34. With the valve in this position, high pressure fluid from the annular passage 48 is directed through the valve passage 54 into a passage 86 and thence through a plurality of fixed orifices 88, 90 and 92, Figures 8 and 9. The low pressure fluid is also directed through the fixed orifices 88, 90 and 92, together with the high pressure fluid. In other words, the combined high and low pressure fluid mediums are unrestrictedly passed through these orifices and thence through suitable pipe lines 94, 96 and 98.

&ast; &ast; &ast; &ast; &ast;

"With the foregoing description of these various machine elements and the pipe lines connected therewith, it should be apparent that when the main valve 26 occupies the position shown in Figure 9, the combined high and low pressure fluids will be dispatched through these various pipe lines so as to cause the various machine mechanisms to be moved rapidly. In other words, this position of the valve 26 might be called the forward rapid traverse position because it permits of an increased displacement of the fluid through the pipe lines which results in a rapid forward traverse of the pistons in the actuating mechanisms. In this connection attention is directed to the size of the fixed orifices 88, 90 and 92. The cross sectional areas of each of these orifices must be properly gauged in order to effect proper movement of the fluid actuated mechanisms. Thus, when a plurality of orifices such as those disclosed in the drawings are employed, the machine tools which are propelled by the fluid actuated mechanisms, are subjected to varying resistances and consequently the pressure of the fluid in the circuit must exceed the maximum necessary for propelling these machine tools in order to obtain unison in operation. Therefore it is important that the size of these fixed orifices 88, 90 and 92 be gauged so as to insure proper pressure conditions and thereby enable the control of a plurality of machine tools from a single source of fluid supply and by means of a single valve.

"Consider now that the valve is shifted to the position shown in Figure 10, which position will hereinafter be referred to as the forward feed traverse position. It will be noted that when the valve occupies this position, the section 32 thereof closes the fixed orifices 88, 90 and 92 and sections 138 and 140 of said value prevent the low pressure fluid from entering the passage 86. This low pressure fluid is diverted from the branch passages 42 and 44 through the radial ports 60 and 66 and thence into the annular passage 64 which is connected with the reservoir 78. The high pressure fluid, however passes through the valve passages 54 and 86 and thence through adjustable orifices 88a, 90a and 92a. The size of these orifices is adjustably determined by suitable needle valves 142, 144 and 146 as clearly shown in Figure 7. These adjustable orifices 88a, 90a and 92a are companion with the above mentioned fixed orifices 88, 90 and 92 respectively, and it will be seen that the adjustable as well as the fixed orifices communicate respectively with the pipe lines 94, 96 and 98. Thus, when the valve 26 occupies the position shown in Figure 10, high pressure fluid will be directed through the restricted or adjustable orifices and thence into the various pipe lines which are connected with the actuating mechanisms. These restricted orifices may be adjusted to permit any desired displacement of the fluid, this displacement being employed to effect a forward feeding stroke to the pistons in the actuating mechanisms. In other words, when the valve occupies the position shown in Figure 10, fluid will be distributed to the various actuating mechanisms at a feeding displacement as distinguished from the increased displacement which takes place in the manner described above in connection with the forward rapid traverse position of the valve (Figure 9). It is to be noted that the fluid supplying mechanism or pump shown in the drawings is of the type which may be varied to increase or decrease the displacement of fluid. Thus, by the restricted adjustable orifices 88a, 90a and 92a, I am able to adjust these orifices in accordance with the speed at which fluid is displaced by the rotary plunger pump. In this manner I am able to positively control the speed of travel of the fluid actuated mechanism to which each of said adjustable orifices is connected.

"Consider now that the control lever 34 is swung from its forward feed position past the neutral point to its extreme position to the right. This will position the valve as shown in Figure 11. With the

valve in this position, the combined high pressure and low pressure fluids are directed through the valve passages 54 and thence outwardly in a reverse direction through the pipe lines 105, 122 and 134. That is to say, the high and low pressure fluids are displaced in a reverse direction so as to cause a rapid reverse movement of the various actuating mechanisms. The pipe lines 94, 96 and 98, under these circumstances, serve as return conduits and direct the fluid medium through the fixed orifices 88, 90 and 92 and thence into the valve chamber 68. Fluid from this chamber 68 is directed through the passage 70, Figure 6, and thence into the annular passage 64 which is connected by the return pipe 80 to the reservoir 78. The position of the valve as shown in Figure 11 will hereinafter be referred to as the rapid reverse position. By returning the control lever 34 to its neutral position as shown in Figure 4, both high pressure and low pressure fluids will be circulated through the valve mechanism without effecting any movement to the actuating pistons.

"In some instances it might be necessary to subject the actuating pistons to a reverse feeding movement as distinguished from the rapid reverse movement and in such instances it is only necessary to shift the valve to the position shown in Figure 12. In this position the section 32 of the valve closes the orifices 88, 90 and 92 and the sections 138 and 140 of the valve prevent the low pressure fluid from entering the valve passages 54. The high pressure fluid, however, is directed through the return pipe lines and fluid is forced in a reverse direction through the adjustable orifices 88a, 90a and 92a. Passing the fluid through these adjustable orifices causes a decrease in displacement and thereby enables the pistons of the actuating mechanisms to be moved in a reverse direction at a feeding speed. The position of the valve shown in Figure 12 will be hereinafter referred to as the feeding reverse position.

"From the foregoing it will be apparent that my improved valve may be shifted to five different positions within its housing through the agency of a manually operable lever. I will now proceed to describe the mechanism for automatically effecting the shifting of said valve.

\* \* \* \* \*

"Summarizing the foregoing description, it will be understood that in the operation of my improved valve mechanism, the dogs on the slide 148 are first positioned in accordance with the various shifting movements which are to be experienced by the tool carriages or other movable elements with which the valve is associated. After these dogs have been properly positioned and the work set up in the machine, the control lever 34 is shifted to its extreme left position, Figure 4, so as to move the valve 26 from its neutral position shown in Figure 4 to its rapid approach or forward position shown in Figure 9. In this position fluid at high pressure from the pipe line 46 enters the annular passage 48 and is directed through the valve passages 54, the passage 86 and thence through the orifices 88, 90 and 92. The low pressure fluid is directed from the pipe line 40 and passes through the branch passage 42 and joins the high pressure fluid in the passage 86. From this point it is introduced within the orifices. From these orifices the combined fluid is displaced through the pipe lines 94, 96 and 98 which are connected with the actuating mechanisms. The increased displacement resulting from the combination of the high and low pressure fluids causes these actuating mechanisms to be moved at relatively high speeds. The movement of the carriage 130 causes the slide 148 to be actuated, and the dog 160 carried thereby is eventually moved into engagement with the pin 170. This causes the shifting of said pin from the position A to the position B shown in Figure 4. The valve 26 is thus moved to the forward or approach feeding position shown in Figure 10. The high pressure fluid alone is then directed through the adjustable orifices 88a, 90a and 92a thereby causing the actuating mechanisms to be moved at a feeding speed. The dog 158 engages the arm 164 of the bell-crank 166 and this causes communication to be established between the pipe lines 94 and 104 as clearly shown in Figure 4. As the various tool carriages approach the limit of their approach or advancing movement, the lug 192 is carried into engagement with the arm 190 and this causes the bar 194 to be shifted, thereby causing rotation of the member 74. The port 202 of the member 74 is thus carried into registration with the pipe line 204 and fluid from the chamber 38 is dispatched through said pipe line and into the reservoir 78. If the abutment surface 182 of the block has been moved past the pin 170, the valve 26 will be moved to the right, Figure 4, as a result of the unbalancing of the fluid pressure. The valve is thus carried to the position

shown in Figure 11 and at this time the combined low and high pressure fluids will be dispatched in a reverse direction through the pipe lines, said fluid being returned to the chamber 68 through the unrestricted orifices. This increased displacement causes rapid reverse movement of the actuating mechanisms and as the slide 148 continues to move rearwardly, the dog 158 engages the bellcrank arm 206 so as to shift the valve 114. The dog 162 is eventually carried into engagement with the pin 170, thereby causing said pin to be moved from the position C to the neutral solid line position shown in Figure 4. Additional dogs may be provided if it is desired to cause the valve to be moved to its feeding reverse position shown in Figure 12.

"From the foregoing it will be apparent that my invention contemplates the provision of a valve mechanism of improved practical construction in which increased displacement of the fluid medium is accomplished by combining high pressure and low pressure fluids. This is accomplished by the simple and unique arrangement of the passages in the valve mechanism. One of the distinct advantages of my present invention resides in the manner in which the valve is shifted to its reverse position in response to the unbalancing of the fluid pressures to which it is subjected. This is accomplished in a very simple and expeditious manner. Another feature which represents a decided improvement in valve construction is the manner in which I directly associate the fixed and adjustable orifices with the valve housing. By this arrangement no auxiliary units are needed and the entire valve mechanism is rendered self-contained in every respect. It is also to be noted that I employ the restricted or adjustable orifices for effecting the delivery of fluid at a feeding rate in both forward and reverse directions. By means of the abutment surface 182 which co-operates with the mechanism for oscillating the member 74, a distinct improvement is presented in that I am able to positively and accurately control the period of reversal of fluid flow. This problem of accurately controlling the reversal of fluid valves has been one which has confronted those interested in this particular art for some time. To my knowledge, no accurately operable control mechanism has thus far been developed and therefore I believe that my present arrangement represents an improvement long sought for in this particular art. As pointed out above, the valve may be rendered manually operable by simply withdrawing a connector pin and this greatly facilitates the ease with which a machine may be set up. The connection may be established with equal ease by merely reinserting the pin so as to render the valve completely automatic in operation. As shown in the diagrammatic representation of Figure 15, I employ suitable relief valves in association with the fluid circuit so as to positively preclude the building up of pressures to an extent which would tend to cause damage to any of the operating parts."

\*　　\*　　\*　　\*　　\*

The claims in issue are the following:

"5. A valve construction including a housing, a shiftable valve in said housing, said valve and housing having cooperative passages for variously directing fluid, means for directing a fluid medium into association with said valve, said passages being associated with a restricted orifice and another unrestricted orifice, said passages being disposed so as to direct fluid to the second mentioned orifice when the valve occupies one shifted position to permit of increased fluid displacement, and to close said second orifice and direct fluid to the restricted orifice when the valve occupies another shifted position to permit of decreased fluid displacement.

\*　　\*　　\*　　\*　　\*

"8. A valve construction including a housing, a shiftable valve in said housing, said valve and housing having cooperative passages for variously directing a fluid medium, said valve being adapted in one shifted position, to effect the delivery of fluid in a given direction and when in another shifted position, to effect the delivery of fluid in another direction, a pair of spaced chambers, said chambers communicating with each other through a passageway whereby fluid pressure in one chamber will be substantially equal to the fluid pressure in the other chamber, and means for withdrawing fluid from one of said chambers, whereby said valve will be automatically shifted from one position to another.

"9. A valve construction including a housing, a shiftable valve in said housing, said valve and housing having cooperative passages for variously directing fluid, said valve being adapted in one shifted position, to effect the delivery of fluid in a given direction and when in another shifted posi-

tion, to effect the delivery of fluid in another direction, a chamber at each extremity of said valve for receiving fluid, said chambers being connected by means of a passageway, and a mechanism for effecting the withdrawal of fluid from one of said chambers to cause said valve member to be shifted from one position to another.

"10. A valve construction including a housing, and a reversing valve shiftable within said housing, said valve and housing having cooperative passages for directing fluid to either end of a hydraulic actuator, a restricted orifice, and another larger orifice to permit of increased fluid displacement, said orifices being included within said housing and adapted to receive fluid discharged from an actuator to which said valve may be connected in accordance with various shifted positions of said valve within said housing.

"11. A valve construction including a housing, and a shiftable reversing valve in said housing said valve and housing having cooperative passages for directing fluid to either end of a hydraulic actuator, a restricted orifice and another larger orifice to permit of increased fluid displacement, said orifices being provided within said housing and adapted to receive fluid discharged from the actuator with which said valve may be connected, said valves serving when in one position to open one of said orifices and when in another position to close one of said orifices.

\* \* \* \* \*

"23. A valve construction including a housing, a unitary valve shiftable within said housing, said valve and housing having cooperative passages for variously directing a fluid medium, said valve being adapted to receive fluid from a plurality of sources and when in one shifted position, to effect the dispatching of fluid from one of said sources and when in another shifted position, to receive and effect the dispatching of combined fluids from said sources, the communication with said sources being maintained during the shifting of said valve.

\* \* \* \* \*

"25. In combination with a fluid actuated mechanism for propelling machine elements and the like and a plurality of fluid supplying devices, a valve construction including a unitary valve member shiftable with-

in a housing, said valve having an orifice which is of a size corresponding to the fluid displacement requirements of the fluid actuated mechanism so as to effect uniform delivery to said mechanism, said valve when in one position being adapted to effect the delivery of fluid from one of said sources of supply to said fluid actuated mechanism, and when in another shifted position, to effect the delivery of combined fluids from said sources through said gauged orifice to said fluid actuated mechanism.

\* \* \* \* \*

"33. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cylinder and piston construction, pumping means for delivering fluid for propelling purposes to said actuator, and a unitary fluid control means including a restricted orifice for receiving fluid discharged from said actuator during the feeding movement thereof in a given direction, means for rendering said restricted orifice functionally ineffective when the actuator is moving at a faster rate in the same direction, and means for directing fluid to either end of said actuator.

"34. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cylinder and piston construction, a relatively low pressure pump for delivering fluid at a relatively rapid rate to said actuator, a relatively high pressure pump for delivering fluid at a slower feeding rate to said actuator, fluid control means including a restricted orifice for receiving fluid discharged from said actuator during the feeding movement thereof in a given direction, and means for rendering said restricted orifice functionally ineffective when the actuator is moving at a faster rate in the same direction.

"35. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cylinder and piston construction, a relatively low pressure pump for delivering fluid at a relatively rapid rate to said actuator, a relatively high-pressure pump for delivering fluid at a slower feeding rate to said actuator, fluid control means including a restricted orifice for receiving fluid discharged from said actuator during the feeding movement thereof in a given direction, means for rendering said restricted orifice

functionally ineffective when the actuator moves at a faster rate in the same direction, and a relief valve connected with the discharge side of at least one of said pumps.

"36. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cylinder and piston construction, a relatively low pressure pump for delivering fluid at a relatively rapid rate to said actuator, a relatively high-pressure pump for delivering fluid at a slower feeding rate to said actuator, fluid control means including a restricted orifice for receiving fluid discharged from said actuator during the feeding movement thereof in a given direction, a relief valve connected with the discharge side of at least one of said pumps, and means for controlling the delivery of fluid to either end of said actuator.

"37. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cylinder and piston construction, a rapid traverse pump for delivering propelling fluid to said actuator, a feed pump for delivering propelling fluid to said actuator, fluid control means including a restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a feeding rate, a less restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a faster rate, means for controlling the operative functioning of said orifices, and means for directing fluid to either end of said actuator.

"38. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cylinder and piston construction, pumping means for delivering fluid under pressure for propelling purposes to said actuator, and a unitary fluid control means including a restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a feeding rate, a less restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a faster rate, and means operable in timed relation with the movement of said actuator for controlling the operative function of said orifices.

"39. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cylinder and piston construction, a rapid traverse pump for delivering fluid to said actuator, a feed pump for delivering fluid to said actuator, fluid control means including a restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a feeding rate, and a less restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a faster rate, and means for selectively controlling the operative functioning of said orifices whereby when the fluid passes through the less restricted orifice the actuator will experience rapid traverse rate and when said fluid passes through the other orifice said actuator will experience a feeding rate of travel.

"40. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cylinder and piston construction, pumping means for delivering fluid under pressure for propelling purposes to said actuator, and a unitary fluid control means including an adjustable restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a feeding rate, a less restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a faster rate, and means for controlling the operative functioning of said orifices.

"41. In combination with a hydraulic actuator for propelling machine parts and the like which includes a cyclinder and piston construction, a rapid traverse pump for delivering fluid to said actuator, a feed pump for delivering fluid to said actuator, fluid control means including a restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a feeding rate, and a less restricted orifice for receiving fluid discharged from said actuator when said actuator moves at a faster rate, and shiftable valve means for closing the less restricted orifice to render the other orifice functionally operable to receive fluid discharged from said actuator, said valve means in another shifted position serving to open said less restricted orifice and thereby render the same functionally operable to receive fluid discharged from said actuator."

The plaintiffs contend that the claims in suit are valid and that they are infringed by the machines next enumerated. Defendants' First Senior Hydraulic System is said to infringe claims 5, 33, 38 and 40. Defendants' Second Senior Hydraulic System is said to infringe claims 5, 8, 10, 11, 33, 38 and 40. Defendants' Junior Hydraulic System is said to infringe claims 33, 38 and 40. Defendants' 61 Heavy Duty Cyl-

inder Boring Machine is said to infringe claims 10, 11, 33, 38 and 40. Defendants' Oldsmobile Boring Machine is said to infringe claims 10, 11, 23, 25, 33, 34, 35, 36, 37, 38, 39, 40 and 41. Defendants' 2-way 8-Station Hand Index Machine is said to infringe claims 10, 11, 33, 38 and 40. Defendants' Frankford Arsenal Machine is said to infringe claims 5, 10, 11, 38 and 40. Defendants' Self-contained Unit No. 21 is said to infringe claims 10, 11, 33, 38 and 40. Defendants' Self-contained Unit Nos. 23 and 25 is said to infringe claims 5, 8, 9, 10, 11, 33, 38 and 40. Defendants' Thread Grinder is said to infringe claim 5.

The defendants summarize their defenses as follows: (1) The presumption of validity normally attaching to a patent is here destroyed by the applicant's false affidavit filed in the Patent Office; (2) the entire patent is invalid for failure to disclaim claim 23 which defines the very valve that Svenson bought from Oilgear in starting his work; (3) the entire patent is invalid for failure to disclaim claim 25 which also defines the very apparatus that Svenson bought from Oilgear in starting his work; (4) all of the claims in issue are invalid under U.S.C.A. Title. 35, Section 33, because of their functionality; (5) claims 5, 10, 11, 33, 34, 35, 36, 37, 38, 39, 40 and 41 are invalid under U.S.C.A. Title 35, Sec. 33, for failure to find support in the disclosure of the patent; (6) claims 34, 35, 36, 37, 39 and 41 (the so-called two pump claims) are invalid on the ground of aggregation; (7) each and every one of the claims in issue is invalid on the prior art; (8) claims 23, 25, 34, 35, 36, 37, 39 and 41 are not infringed by the accused Oldsmobile machine with its Vickers pump; and (9) although the elements of the remaining claims are found in the respective accused machines, those claims are not "infringed" for the reason that the claims find more complete response in the prior art.

■■ Of defendants' first contention that the presumption of validity normally attaching to a patent is here destroyed by the applicant's false affidavit filed in the Patent Office:

When the patentee Svenson began his work in anticipation of the filing of an application which eventuated in the issuance of Svenson 1,924,422, he first purchased from The Oilgear Company an Oilgear QR1x2 system. A diagram of the circuit of the Oilgear QR1x2 system in simplified form is shown in Figure 4.

FIGURE 4

FIGURE 5

Diagram of hydraulic system shown in application for Svenson Patent 1,924,422 as originally filed. Restricted orifices added, simply connecting two additional actuators in parallel with first one.

The diagram shown in Figure 5 is that of the circuit shown in the application as filed on November 16, 1929, and no doubt as it appeared when the patentee Svenson signed the application on October 28, 1929. It will be observed that there is a complete

identity between the circuit of the Oilgear QR1x2 system purchased by the patentee Svenson and the basic circuit (shown in heavy lines) of the application as filed. To the Oilgear QR1x2 system, which the patentee Svenson bought, he did two things, and two things only, *in metal*. He had three actuators in his lathe. So he had to have a distribution or divider arrangement to divide the flow of fluid from the one pair of pumps to the three actuators. He chose to do this by connecting the three actuators all in parallel and providing sets of orifices which would divide the flow of fluid between them, in proportions deter-mined by the setting of the orifices. That was one thing he did. The second thing the patentee Svenson did was to provide a different fluid actuating arrangement for operating the plunger of the main valve. This second item we can lay aside from the other because it enters only into claims 8 and 9 and makes a completely distinct issue from the matter of orifices.

The diagram shown in Figure 6 shows the orifice distribution arrangement. The patentee Svenson desired to use one Oil-gear QR1x2 system to operate the three actuators of a lathe, so he put three un-restricted orifices 88, 90 and 92 and three

**FIGURE 6**

Diagram illustrating principle of orifice control for regulating the relative speed of a plurality of parallel actuators during feed in a volumetric hydraulic system as used in Svenson 1,924,422.

restricted orifices or needle valves 88a, 90a and 92a in his valve and by adjusting the openings of those three restricted orifices he proportioned the areas through which the oil could flow and thereby the relative amounts of oil displaced to the three respective actuators. This was the patentee's contribution in the way of mechanism.

The patentee first operated his lathe at approximately the end of October, 1929, and he signed his application on October 28, 1929, so that it may be assumed the two acts were simultaneous. Svenson 1,924,422 refers to a "copending application Serial No. 391,130, filed September 9, 1929," disclosing "a complete automatic lathe construction equipped with a fluid control valve." The September application shows an Oilgear QSA system, three actuators and restricted orifices or needle valves but the restricted orifices are shown in a separate block which the September application calls the distributor unit. The rea-

**FIGURE 7**

Diagram of hydraulic system shown in Svenson 1,924,422 as changed in 1932 and finally issued. Eliminated connection from gear pump to feed pump, changed valve construction and added intake line for feed pump from valve. This change produced R. T. quantity of liquid-sum of capacities of both pumps. Formerly R. T. capacity was limited by capacity of gear pump alone.

son the patentee substituted the Oilgear QR1x2 for the Oilgear QSA was that the latter system had the main valve built into the box that had the pumps in it and the patentee wanted it placed at a distance. Sometime before October 28, 1929, and probably after September 9, 1929, the patentee redesigned his circuit, using now an Oilgear QR1x2 system and moving the restricted orifices from the separate block of the September application down into the housing of the valve and, having done so, inquired of himself, "What have I done?" and answered by making application for a patent on a "Valve Construction."

A diagram of the circuit of the patent as issued in simplified form is shown in Figure 7. The change in the pump connections should be noted particularly. In order to procure the change in the drawings in the application, a drawing amendment was first filed without any verified showing and its entry was refused by the Patent Office because, as they said, there was no support in the original application for the amendment. After an interview with the Examiner, the patent solicitor wrote to the Patent Office and enclosed an amended Figure 15 (making a change in pump connections) and an affidavit of the patentee Svenson. The solicitor's letter is as follows:

"Amendment.

"Honorable Commissioner of Patents,
"Washington, D. C.

"Dear Sir:
"In response to the Office Action dated June 23, 1932, please amend the above entitled application as follows:

\* \* \* \* \*

"Remarks.

"This amendment is being filed after applicant's attorney had a very much appreciated interview with the Primary and Assistant Examiners. It will be recalled that said interview was had for the purpose of considering the amendment of Figure 15 of the drawing by the addition of the conduit 85 and severing direct communication between the discharge of the pump 52 and the intake of the pump 50. It will also be recalled that the Assistant Examiner stated that the reason for his refusal to approve these corrections to the drawing was based on the theory that the original specification did not warrant such a change. Applicant's attorney pointed out those portions of the specification setting forth that the valve

278

mechanism and circuit connected therewith were designed for the purpose of employing the combined low and high pressure fluids for rapid traverse purposes, and that this could not be accomplished if the circuit diagram, as shown in Figure 15, was not amended. It was tentatively agreed by both the Primary and Assistant Examiners, after these facts were pointed out by applicant's attorney that the specification did show that the invention as originally presented contemplated this combined action of the low and high pressure fluid, and that therefore the correction in the drawing was in order. In order that the record may more clearly show the inadvertence in preparing the original circuit diagram of Figure 15, we are attaching hereto an affidavit by applicant which clearly explains the error and verifies our contention to the effect that the invention as originally disclosed centemplated a circuit arrangement as indicated by the amendment to the drawing.

"It will be clear from applicant's affidavit that the error in Figure 15 resulted from confusion on the part of the draftsman in preparing this drawing in the light of some of the disclosures in the circuit diagram shown in an earlier filed co-pending application.

\* \* \* \* \*

"With the foregoing explanation, together with applicant's affidavit attached hereto, it is respectfully requested that the Examiner withdraw his objections with respect to the proposed corrections in the drawing and with respect to the balancing action of the fluid upon the valve.

"In view of the fact that no art was cited against the claims under rejection and that said claims have been rejected only on grounds that have been met in the foregoing argument and during the interview with the Examiner as referred to above, a favorable action on the merits of the claims under rejection is respectfully solicited.

"Respectfully submitted,
"December 8, 1932."

The patentee's affidavit is as follows:

"Affidavit of Ernest J. Svenson.

"State of Illinois, County of Winnebago, ss.

"I, Ernest J. Svenson, being first duly sworn, depose and say that I am the applicant in the application, Serial No. 407,781, filed November 16, 1929, for Valve Construction. I personally supervised the making of all shop drawings of the structure disclosed in the above mentioned applica-

tion. Attached hereto, as Exhibit 'A,' is the original of the drawing made by me, which forms one of a series of four similar drawings disclosing various shifted positions of the valve member. These drawings were submitted to my attorneys, Cheever, Cox· & Moore, for the purpose of illustrating how I proposed to employ the combined low and high pressure fluids for rapid traverse purposes. In the drawing I indicated in blue the high pressure fluid from the pump 50, and the low pressure fluid from the pump 52 in red. This drawing was completed by me on July 15, 1929, and upon completing same I placed the date, July 15th '29, with my initials thereon, as shown in Exhibit 'A.'

"Exhibit 'A' shows the manner in which the high and low pressure fluids combine to propel the actuator in a reverse direction at a rapid rate, and conforms in every detail with Figure 11 of my application drawing. To accomplish this result, it was necessary to have the discharge of the low pressure or gear pump 52 directed independently of the intake of the plunger pump 50 into the branch passages 42 and 44. However, when the drawing for the patent application was prepared, the intake of the high pressure pump 50 was inadvertently coupled with the discharge of the pump 52, which would result in a circuit arrangement that would not permit the combined low and high pressure fluids to function in the manner disclosed in Exhibit 'A' and as described in my above mentioned application.

"This application, Serial No. 407,781, aforementioned, was in process of preparation by my patent lawyers shortly after my co-pending application, Serial No. 391,130, filed September 9, 1929, for Material Working Apparatus, was prepared, and, due to the fact that the drawings of the above co-pending application were used as a general guide in laying out some of the views in the present application, some slight confusion resulted in laying out the circuit diagram in Figure 15 of the present application. In this connection, I make specific reference to Figure 22 of my above mentioned co-pending application, a photostat of which is attached hereto and designated as Exhibit 'B,' wherein the discharge of the gear pump 218 is continuously coupled with the intake of the high pressure pump 204. In this co-pending application the valve is not designed nor adapted to combine low and high pressure fluids for the purpose of propelling an actuator at a rapid rate, nor is the

same system of valve balancing disclosed in said co-pending application. In laying out the circuit diagram in Figure 15 of the present application, a return line to the high pressure pump 50 was inadvertently omitted, which return line is essential to the operative functioning of the valve. In my co-pending application, the return line 318 communicates with the discharge side of the gear pump 218, which arrangement conforms with the valve construction coupled therewith and which circuit arrangement was never intended to be shown in the present application because it would not accomplish the purpose of my present invention. In addition to providing means for returning fluid to the high pressure pump 50 independently of the gear pump 52, it will be obvious that some means was necessary to permit the egress of fluid from the chamber 68 in order to shift the valve member and to maintain said valve member in balance, as clearly described in my specification.

"I supervised the construction of the device corresponding with the details in the present application, and in so doing coupled the valve with the pumps in the manner indicated by the added conduit shown by the red line 85 on the photostat submitted with the amendment dated February 13, 1932.

"The subject matter disclosed in Exhibit 'A' shows that it was my intention originally to cover in the present application a valve structure whereby low and high pressure fluids could be combined for the purpose of propelling a hydraulic actuator at a rapid rate. These facts are also set forth in the body of the specification of the present application, and in order to accomplish this result by use of the structure shown in the diagram of Figure 15, it is necessary that the connection of the discharge side of the gear pump 52 with the intake of the plunger pump 50, be corrected, as indicated by the red line 85. This is the manner in which I originally constructed and successfully employed my invention in practice.

* * * * *

"Ernest J. Svenson.
"Subscribed and sworn to before me this 10th day of......, 1932.

"Victor E. Ingwalson,
"(Seal) Notary Public."

It has been observed that the affidavit covers three points: First, it purports to substantiate the argument that the specification as originally filed was descriptive of the pump arrangement as amended; Second, it purports to show that this change in the drawing is necessitated merely because through some draftsman's error there was an inadvertence in the showing in the application as filed; and, Third, it represents that the actual machine from which the application was presumably prepared had the pumps connected as the applicant now wants them to be shown. The first point raises a question of interpretation which is not of consequence at this juncture.

The record in this case shows that the drawing for Figure 15 of the patent application was copied faithfully, line for line and without any inadvertence or accident or mistake, from the patentee Svenson's own personal drawing, which is here in evidence as Exhibit A-72 and which had on it exactly the pump connections as shown in the application as filed, and not the pump connections as they were changed later on in the patent application. Care must be exercised in considering Exhibit A-72 because it was changed by the patentee Svenson, as he has testified, at or about the date that he changed the drawing in the application, so that as it now appears it has the pump connections as they were shown in the patent as issued; but in Exhibit A-72, as it was made, and as it was turned over to the attorneys for preparation of the patent application, the pump connections were exactly as shown in the application. Exhibit A-72 as it was made and as it was turned over to the attorneys for preparation of the patent application had the Oilgear QR1x2 system pump connections. All of the facts as to the identity of the draftsman who is alleged to have made the mistake and the facts as to the change in Exhibit A-72 and the change in the patent application are admitted of record. Furthermore, the plaintiffs have not produced any document or any drawing whatever ante-dating the filing of the application which shows the pump connections in the form to which the patentee Svenson later changed them.

The affidavit of the patentee Svenson infers that he had actually constructed his system prior to the filing of the application in the way he desired to show by the amendment, and that some draftsman had inadvertently shown a couple of pipe connections wrongly, so that he should be permitted to change the application by amendment. The record in the case at bar shows, by the patentee Svenson's testimony, that the changes in the pipe connections were not made in the machine until after the

filing date of the patent or, as Svenson expressed it, until "later on, at the end of the year."

Two of the reasons urged upon the Patent Office for allowing the amendment were false and were by the patentee Svenson known to be false.

The only penalty the defendants ask for the use by the patentee of a false affidavit is that it be adjudged that the presumption of validity normally attaching to a patent be held to be destroyed. That can not be said to be demanding a pound of flesh, but the defendants do not cite any authority for the court's assessing a penalty. The plaintiffs do not discuss the question of the truth or falsity of the affidavit but content themselves with a general denial of fraud or fraudulent intent and refrain from a discussion of an appropriate penalty. The plaintiffs do rely upon the affidavit as compelling a construction of claims 23 and 25 which differentiates them from the QR1x2 system. Since the court has not had the benefit of a full discussion of the question of an appropriate penalty, none will be assessed.

The defendants' second and third contentions, that the entire patent is invalid for failure to disclaim claim 23, which defines the very valve, and claim 25, which defines the very apparatus, that Svenson bought from Oilgear in starting his work, have been considered above.

██ Of defendants' fourth contention, that all the claims of Svenson 1,924,422 in issue are invalid under U.S.C.A. Title 35, Section 33, because of their functionality: The court does not believe that this defense should be sustained as to the claims of this patent in suit.

██ Of defendants' fifth contention that claims 5, 10, 11, 33, 34, 35, 36, 37, 38, 39, 40 and 41 are invalid under U.S.C.A. Title 35, Section 33, for failure to find support in the disclosures of the patent: This defense raises the question as to just what Svenson 1,924,422 does disclose. We have found that the patentee Svenson purchased an Oilgear QR1x2 system and made two, and only two, changes in it *in metal*. He desired to use the system to operate a lathe requiring three actuators, so he put in three unrestricted and three restricted orifices, and he provided a different fluid actuating arrangement for operating the plunger of the main valve. However, the controversy which has raged for years between the parties and for weeks before this court has had to do *not* with three actuators, three unrestricted orifices and three restricted orifices, but has had to do with one actuator, one unrestricted orifice and one restricted orifice. The question is, Does the patent disclose the use of one restricted orifice to control one actuator?

One should be able to answer this question by reading the specifications of the patent. The trier of the issue has read the specifications several times, and has just completed a reading of them with a view to setting down in this memorandum those parts of the specifications which refer to three restricted orifices to control the relative movements of three actuators. It develops, however, that to set down here those parts of the specifications which refer to three restricted orifices to control the relative movements of three actuators would require the repeating of approximately one-half of the parts of the specifications already quoted. Accordingly, the court refrains from quoting further other than from the statements of the objects of the invention, where it is stated:

"More specifically, it is an object of my present invention to provide a unique valve arrangement for accurately and positively controlling the distribution of high and low pressure fluids to a plurality of fluid operated actuating mechanisms as for example those mechanisms used for effecting the actuation of machine elements.

\* \* \* \* \*

"Still another object of the present invention is to provide a self-contained valve mechanism which may be effectively employed for distributing fluid to a plurality of fluid actuated mechanisms and to this end I propose to provide a plurality of adjustable and non-adjustable orifices which are directly associated with the valve unit, said orifices serving to direct fluid to said actuating mechanisms."

Reference is made, however, to the six pages of specifications, a considerable portion of which is quoted above and where reference after reference is made to a plurality of restricted orifices to control the relative displacement of fluid to a plurality of actuators or mechanisms. Not once in the entire six pages of specifications is reference made to *one* restricted orifice to control *one* actuator or mechanism.

The court is of the opinion that a reading of the specifications compels the conclusion that the patentee contemplated

varying the displacement of fluid going to the three actuators in the aggregate by (1) shifting the control valve and thereby combining or separating the low and high pressure fluids and sending both or only one of them to the actuators, and (2) adjusting the variable displacement pump, and that he contemplated using the restricted orifices only for the purpose of controlling the proportions of the fluid dispatched to the respective orifices and thereby the relative movements of the three actuators. But since the matter has been the subject of such long continued controversy perhaps it deserves the further consideration which will be given it.

During the course of the trial the controversy as to whether the claims referred to find support in the disclosures of the patent has been referred to as a controversy as to whether the specifications disclose a volumetric system or a constant pressure system. It will be remembered that a volumetric system is one in which all the fluid that is pumped by a pump goes to the actuator or actuators and in such a system the speed of the actuator may be controlled by means of a variable delivery pump. A constant pressure system is one in which a certain maximum pressure is not permitted to be exceeded. This result is accomplished by placing in the system, between the pump and the actuator, a working pressure relief valve set to let liquid pass out of the system at the predetermined maximum pressure. In such a system the speed of the actuator may be controlled by means of a restricted orifice and the working pressure relief valve. The claims now under discussion cover a single actuator system containing a restricted orifice, for the purpose of regulating the displacement of fluid to the single actuator. A restricted orifice cannot be used for regulating the displacement of fluid in a single actuator volumetric system, the reason being that since by definition all of the fluid that is pumped is going to the actuator it makes no difference whether there is a restricted orifice in the line or not. Restricted orifices may be used in a multiple actuator volumetric system for the purpose of proportioning the fluid among the actuators. The court understands that there is no controversy concerning the facts and conclusions set forth in this paragraph.

Figures 6, 8 and 9 illustrate the facts and conclusions set forth in the preceding paragraph.

51 F.Supp.—18½

RESTRICTED ORIFICE IN ACTUATOR INLET

FIGURE 8

RESTRICTED ORIFICE IN ACTUATOR DISCHARGE

FIGURE 9

The plaintiffs contend that the specifications of Svenson 1,924,422 disclose a constant pressure system. A restricted orifice may be one of the two elements used to regulate displacement of fluid in a single actuator constant pressure system. The second element which may be used to regulate displacement of fluid in a single actuator constant pressure system is a so-called "working pressure relief valve"—a valve which, when the restricted orifice tends to retard the flow of liquid, permits the liquid to pass out of the system and back to the sump at the predetermined "working pressure." The defendants contend that the specifications of Svenson 1,-924,422 disclose a volumetric system.

In six pages of specifications the plaintiffs find three statements which they say indicate that ' the system described is a constant pressure system. They are the following:

"The reason for employing these adjustable restricted orifices will be apparent when it is understood that a variable amount of fluid must be displaced to give the desired speed to the parts which are propelled by the fluid actuated mechanisms. That is, the speed of these parts or members is controlled by means of these adjustable orifices."

"The high pressure fluid, however, is directed through the return pipe lines and fluid is forced in a reverse direction through the adjustable orifices 88a, 90a and 92a. Passing the fluid through these adjustable orifices causes a decrease in displacement and thereby enables the pistons of the actuating mechanisms to be moved in a reverse direction at a feeding speed."

"It is also to be noted that I employ the restricted or adjustable orifices for effecting the delivery of fluid at a feeding rate in both forward and reverse directions."

These quotations must be considered with the context. It must be borne in mind, as heretofore pointed out, that the patentee contemplated varying the displacement of fluid going to the three actuators in the aggregate by (1) shifting the control valve and thereby combining or separating the low and high pressure fluids and sending both or only one of them to the actuators, and (2) adjusting the variable displacement pump and that he contemplated using the restricted orifice only for the purpose of controlling the relative movements of the three actuators. In considering the three quotations referred to by the plaintiffs it must be remembered that the patentee cuts in the three restricted orifices when he has so shifted his valve that only the output from the low volume high pressure pump may go through them. The restricted orifices do then carry a decreased displacement of liquid but not because they are restricted orifices but because the control valve has cut out the delivery of the output of the large volume low pressure pump.

The principal reasons why the court believes and holds that the specifications of Svenson 1,924,422 disclose a volumetric system are: (1) The specifications refer repeatedly to a plurality of mechanisms or actuators; (2) the specifications do not at any place refer to a single mechanism or actuator; (3) the specifications do not describe the elements of a constant pressure system (The patentee at least should have said: "For the purpose of providing an hydraulic system that may be operated to decrease or increase the displacement of liquid passing to the actuator by cutting a restricted orifice into or out of the system, I provided a sump, a pump, a control valve, an actuator, a restricted orifice that may be cut into or out of the system, a working pressure relief valve to pass liquid out of the system when the restricted orifice is cut into the system, and the piping to connect the foregoing."); (4) the only mention of valves in the specifications is of safety valves in the following words at page 6, lines 79 to 84: "As shown in the diagrammatic representation of Figure 15, I employ suitable relief valves in association with the fluid circuit so as to positively preclude the building up of pressures to an extent which would tend to cause damage to any of the operating parts."; (5) the patentee does not bother to give either of these valves a number in his drawing; (6) the patentee admits that one of these valves is a safety valve but he contends that the other is a working pressure relief valve; (7) the patentee does not differentiate between the two in the specifications; (8) the patentee purchased a relatively expensive Oilgear QR1x2 volumetric system with its relatively high priced variable displacement pump, while if he had intended to construct a constant pressure system he could have purchased a satisfactory pump at one-quarter the price; (9) the following language from the specifica-

tions, page 4, lines 31 to 41: "It is to be noted that the fluid supplying mechanism or pump shown in the drawings is of the type which may be varied to increase or decrease the displacement of fluid. Thus, by the restricted adjustable orifices 88a, 90a and 92a, I am able to adjust these orifices in accordance with the speed at which fluid is displaced by the rotary plunger pump. In this manner I am able to positively control the speed of travel of the fluid actuated mechanism to which each of said adjustable orifices is connected.", should alone settle the controversy; (10) if the system were a constant pressure system there would be no occasion for adjusting the orifices—if you increased the displacement of the pump all you would do would be to spill more fluid through the relief valve; (11) the hydraulic system disclosed by the patentee's co-pending application Serial No. 391,130 filed September 9, 1929, which is like unto that disclosed by Svenson 1,924,422, has been held by the Examiner of Interferences and the Board of Appeals of the Patent Office to be a volumetric and not a constant pressure system; (12) the testimony of the experts which to the court seems more worthy of credence is to the effect that the specifications disclose a volumetric and not a constant pressure system; and (13) two pieces of documentary evidence are persuasive—they are Defendants' Exhibit D-61, which is a copy of the Oilgear Company drawing of the QR1x2 system that the patentee bought, and Defendants' Exhibit D-72 entitled "Diagram showing oil circuit and valve, QR pump" (this last mentioned drawing was changed three years after the patent application was filed)—these two drawings show identical relief valves, a 1000 pound relief valve, a 300 pound relief valve, and a 50 pound relief valve—Exhibit D-61 shows a volumetric system with three safety valves—Exhibit D-72 shows exactly the same valves.

It results from the foregoing that the Court is of the opinion that the defendants' fifth contention, that claims 5, 10, 11, 33, 34, 35, 36, 37, 38, 39, 40 and 41 are invalid under U.S.C.A. Title 35, Section 33, for failure to find support in the disclosures of the patent, should be sustained.

▇▇▇ The defendants' sixth defense is that claims 34, 35, 36, 37, 39 and 41 (the so-called two pump claims) are invalid on the ground of aggregation. The defendants say that the use of two pumps, as compared to one, does not bring about any new co-operation or result,—that the claims do not attempt to define any. The outputs of the two pumps are used together for rapid traverse and the output of one alone for feed. While, as we shall see, this idea was old, yet the court cannot say that the claims are invalid because they claim aggregation.

▇▇▇ The defendants' seventh contention in respect of Svenson 1,924,422 is that each and every of the claims in issue is invalid on the prior art.

As a background for the study of the prior art on the questions of anticipation and as to whether or not Svenson 1,924,422 discloses invention, the defendants cite and it will be well to consider: Krug 342,463, a German patent of 1920, which has a working pressure relief valve and a control orifice in the supply line, and therefore, a plurality of speeds and a reversing valve for dispatching the liquid to one end or the other of the actuator; Heald 1,582,468 (1923), which has a working pressure relief valve and a restricted orifice and an unrestricted orifice in the supply line, a selector valve for selecting one or the other of said orifices, and, consequently, a plurality of speeds, and which also has a reversing valve for dispatching the liquid to one end or the other of the actuator; Greensmith 1,718,554 (1920), which has a working pressure relief valve and a control orifice in the discharge line, and, consequently, a plurality of speeds, and which also has a reversing valve for dispatching fluid to one end or the other of the actuator; and Ernst 1,969,063 (1928), which has a working pressure relief valve and a restricted orifice in the discharge line and an unrestricted orifice in said line, and a selector valve for selecting one or the other of said orifices, and, consequently, a plurality of speeds, and which also has a reversing valve for dispatching liquid to one end or the other of the actuator.

The defendants contend that the claims in suit are anticipated by or that they disclose no invention over the patents and machines next hereinafter mentioned:

Claim 5: Galloway 1,787,781; Galloway 1,731,718; Bishop 1,905,132; Ernst 1,969,063; Curtis 2,118,020; 1st Excello Diamond Boring Machine.

Claims 10 and 11: Bishop 1,905,132; Ernst 1,969,063; Curtis 2,118,020.

Claim 25: Oilgear QR1x2.

Claims 33, 38 and 40: Bishop 1,905,132; Ernst 1,969,063; Curtis 2,118,020; 1st Excello Diamond Boring Machine.

Claims 34, 35, 36, 37, 39 and 41: Curtis 2,118,020; Oilgear QR1x2 structure with orifice added as taught by Bishop & Ernst Prior Art Patents.

Claims 8 and 9: Ferris 1,843,082; Boyden Valve of Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136; Willey 1,100,642; Miller 1,130,920.

Claim 23: Briegleib Hansen & Co., German patent 220,611 of 1909; Oilgear QR1x2 Valve.

Concerning Ernst 1,969,063, as an alleged prior invention, the plaintiffs make a number of points. The first is, that Ernst does not use a restricted orifice to control the feed rate. In the court's opinion, Ernst does use a restricted orifice to control the feed rate. The plaintiffs' second point is that Ernst discloses a grinding machine which differs from other machine tools and from a machine tool of the type shown in Svenson. The court understands that the plaintiffs contend that Ernst 1,969,063 disclosing, as it does, the use of a restricted orifice in a hydraulic system in a grinding machine, is non-analogous art. The court cannot agree with this contention. The United States Circuit Court of Appeals for the Seventh Circuit has spoken concerning the rule for determining what is and what is not analogous art in the case of Automatic Arc Welding Co. v. A. O. Smith Corp., 60 F.2d 740, at page 742:

"The determination of what is analogous art involves somewhat the same tests as are applied to ascertain patentable novelty. Numerous standards have been laid down, but no rule of thumb is satisfactory. This court attempted to define a test in A. J. Deer Co. v. United States Slicing Machine Co. [7 Cir.], 21 F.2d 812, 813, which is probably as satisfactory as may be found.

" 'If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then we are of opinion that such arts must be said to be analogous, and, if the converse is true, they are nonanalogous arts.'

"The over-elasticity of this test and the necessity for fact support make its universal application impossible. It is surely, not capable of mathematical demonstration. When may the court say that a person possessing mechanical skill and knowledge of the art will be subject to 'an appeal' from another art? Perhaps greater definiteness would be attained if we said an inventor is *chargeable* with the knowledge and doings of men working in the same field."

It seems to the court that when the patentee Svenson labored in respect of the disclosures of Svenson 1,924,422, which disclosures relate to "fluid control mechanisms and more particularly to valves for automatically controlling the distribution of fluid which is used as a propelling medium" he, as a mechanical engineer, was chargeable with knowledge that Ernst had prior thereto used a restricted orifice to control the feed rate in a grinding machine. The plaintiffs' third point in respect of Ernst 1,969,063, is that there is no back pressure valve in the return line, so that the restricted orifice is not always flooded. If the failure to have a back pressure valve has any effect its only effect is to delay the operation of the restricted orifice. Its absence does not destroy the effectiveness of the restricted orifice. The plaintiffs' fourth point in respect of Ernst 1,969,063 is that the restricted orifice there shown is not in the valve but, on the contrary, is out some little distance in the piping. The court holds that there was no invention in placing the orifice in the valve.

The plaintiffs make the same points in respect of Bishop 1,905,132 as they make in respect of Ernst 1,969,063 and the additional point that Bishop does not show a pump. The court's views in respect of Ernst are applicable to Bishop. The court is further of the opinion that in 1929 a mechanical engineer skilled in the designing of hydraulic systems to drive machine tools would know that a pump or a like contrivance was required to dispatch the fluid in a hydraulic system.

The plaintiffs' point in respect of Galloway 1,787,781 is that that patent discloses two valves. However, there is evidence to the effect that one valve may be cut out and that the other will then operate as does Svenson 1,924,422.

There has been considerable evidence and argument concerning Curtis 2,118,020. The plaintiffs say of it that it does not disclose passages and restricted orifices in the valve housing. The court does not believe that

it involved invention in 1929 to place passages and restricted orifices in the valve housing. Concerning Figure 50 of Curtis 2,118,020, the plaintiffs say that it does not disclose an operable device, particularly that the valves 241 and 242 cannot be so manufactured as to be capable of permitting the passage of sufficient low pressure liquid for rapid traverse and as to be capable of being adjusted to permit the passage of a small quantity of high pressure liquid for feed. The court is of the opinion that the valves disclosed can be made to work if one wants them to work.

There is the question as to the equivalency of the Curtis orifice, which is opened wide for rapid traverse and cut down for feed, to the alternate orifices of Svenson 1,924,422. The court holds they are equivalent.

The plaintiffs say that the Oilgear QR-1x2 system which is cited against claims 23 and 25 of Svenson 1,924,422, is distinguished by the Svenson affidavit to which reference has been made. The amendment to the application which was brought about by the affidavit does show a change in pump connections, but the court cannot find that inventive genius was involved in that change, and the evidence discloses that any long continued experimentation which took place leading to the change took place after the application was filed. Furthermore, the evidence discloses that the pump relationship disclosed by the amendment filed in 1932 was old in the Oilgear QC and QH systems which were produced and marketed before the QR1x2 system which Mr. Svenson purchased.

The Briegleib Hansen & Co. German patent 220,611 of 1909, which is a patent on a hydraulic turbine control, is cited against claim 23, which is a hydraulic valve claim. The plaintiffs say "that so far as the elements of the claim are concerned, with a strict literal reading, you will find it in this structure or at least most of it. But our point is, it is not analogous art." The court believes that this German patent is analogous art. By its terms it relates to a "hydraulic * * * control" and it appears that the hydraulic control is a valve. The claim in suit covers a hydraulic valve.

Of Ferris 1,843,082, cited against claims 8 and 9 of Svenson 1,924,422, the plaintiffs say that while it discloses a hydraulic shifting of the valve plunger, yet because (1) the connections of the chambers at the ends of the valve plunger are not within the valve housing and (2) the pilot valve which determines the position of the valve plunger is not within the valve housing but is in a separate structure the patent (Ferris) does not meet claims 8 and 9. The court does not believe there is any patentable difference between the disclosure of Svenson 1,924,422 and that of Ferris 1,843,082.

Of Willey 1,100,642, Miller 1,130,920 and the Boyden valve shown in Westinghouse v. Boyden, Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136, also cited against claims 8 and 9 of Svenson 1,924,-422, the plaintiffs say they are not analogous art—that they are all pneumatic devices. The answer to this is that air is a fluid and that the claims in suit cover fluid control valves.

The defendants cite the first Ex-Cell-O Diamond Boring Machine against claims 5, 33, 38 and 40. The first Ex-Cell-O Diamond Boring Machine was developed, built and operated in the year 1928 and delivered to Ex-Cell-O Corporation by the maker, Buell Die Machine Company on November 6, 1928. This machine embodied two features of construction and operation which are still prominent in the accused machines. These are the selective orifice control of the exhaust fluid discharging from the actuator for controlling the program of movements of the actuator and controlled diversion from the pressure line of the system of that amount of fluid which is not needed during feed. The actual structure of this machine—the hydraulic circuit construction—as it existed in November, 1928, and the date of completion of the machine in its original form and the date of delivery are not in dispute. They have been stipulated. There are, however, two issues relating to this machine. The first is whether or not the claims in suit find response in the hydraulic circuit of the machine, and the second issue is whether or not the machine was a structure which was operative to perform its intended function or purpose, so that it can be considered a successful reduction to practice. The first Ex-Cell-O Diamond Boring Machine comprises a cylinder and piston actuator for the carriage, a gear pump, a tank, a main valve structure, a spool type reversing valve in the main valve structure for determining the direction of movement of the carriage, a restricted orifice, an unrestricted orifice, a selector valve

for determining which of those orifices shall be effective in controlling the rate of movement, and a diverting valve for diverting excess fluid not required in feed when the restricted orifice is made functionally operable. On the question as to whether claim 5 finds response in the machine, the plaintiffs say the restricted orifice is always open and only the unrestricted orifice is opened and closed. The court holds that there is no patentable difference between (1) first opening a restricted orifice and closing an unrestricted orifice, and then closing a restricted orifice and opening an unrestricted orifice, and (2) leaving a restricted orifice open all the time and alternately opening and closing an unrestricted orifice. The reason for this is that when the restricted orifice and the unrestricted orifice are both open they nevertheless operate as an unrestricted orifice. On the question as to whether claims 33, 38 and 40 find response in the machine, the plaintiffs say that the machine does not have a "unitary fluid control means." The patent does not contain a definition of the phrase "unitary fluid control means." The machine does have a "fluid control means." The plaintiffs say that this "fluid control means" is not "unitary" because the restricted orifice is not in the valve housing but on the contrary is located some distance therefrom. Claims 33, 38 and 40 do not require the restricted orifice to be in the valve housing unless the word "unitary" imposes that limitation. The court does not believe that it does. Claims 10 and 11 do require the orifices to be within the valve housing. Claim 10 does so by means of the words "said orifices being included within said housing" and claim 11 does so by means of the words "said orifices being provided within said housing." There is testimony in the record that the restricted orifice in the machine is located as close to the housing as it can be put and still permit a wrench to be applied to the pipes. "Unitary" cannot mean that the valve comprises only one piece of metal because the valve disclosed in the specifications and drawings of the patent is made up of many pieces of metal. Furthermore, a restricted orifice will operate as a restricted orifice whether it be placed in the valve housing, a few inches removed therefrom, or many feet removed therefrom. So there is no patentable difference, so far as the location of the restricted orifice is concerned, between the first Ex-Cell-O Diamond Boring Machine and claims 33, 38 and 40. Accordingly, the court holds that the claims in suit find response in the hydraulic circuit of the first Ex-Cell-O Diamond Boring Machine.

Was the first Ex-Cell-O Diamond Boring Machine operative to perform its intended function or purpose? A great deal of evidence has been introduced on this issue. The court is of the opinion that there had been a satisfactory reduction to practice when in November, 1928, Ex-Cell-O Corporation accepted the machine from the manufacturer, Buell Die Machine Company, for shipment to the Ex-Cell-O Corporation's plant after the latter corporation had supervised tests of the machine. There is evidence in the record that after the delivery of the machine to Ex-Cell-O Corporation and long before any date to which the Barnes lathe is entitled, 200 automobile pistons were machined for the Ford Motor Company on the first Ex-Cell-O Diamond Boring Machine. The evidence further discloses that the machine was not intended to be sold to the trade. Ex-Cell-O Corporation desired to develop a machine of a standard type for sale on the market. Accordingly, particularly during the first six months of 1929 Ex-Cell-O Corporation tried many different things on this machine and added improvements, and its officers and employees criticized the machine and one of their criticisms in writing which has come into the possession of the plaintiffs is mainly relied upon by them to show that the machine was not operable. The court holds that this writing does not show that. It merely shows what the court has heretofore stated. Ex-Cell-O Corporation desired to develop a machine of a standard type for sale to the market and it desired to develop the best possible machine for that purpose, so its officers and employees criticized with a view to improvement. The first Ex-Cell-O Diamond Boring Machine is entitled to a date of November 6, 1928. We have seen that the Barnes lathe, which exemplifies the disclosure of Svenson 1,924,422, is not entitled to an earlier date than October 28, 1929.

The only part of the disclosure of Svenson 1,924,422 that the plaintiffs have used in their systems is the unbalancing arrangement for operating the valve plunger. Only one machine was manufactured embodying the complete system of Svenson

1,924,422. That was the machine completed in October, 1929. It was operated for a few weeks or months and then lay in the museum of the Barnes Company until the summer of 1942, when a new pump and a new relief valve were put on it and it has since been in operation.

The court is of the opinion that the claims in suit of Svenson 1,924,422 are anticipated by or disclose no invention over the patents and machines heretofore mentioned.

The defendants' eighth defense is that claims 23, 25, 34, 35, 36, 37, 39 and 41 are not infringed by the accused Oldsmobile boring machine with its Vickers pump. A Vickers pump has two parts. During rapid traverse the whole output of the pump is used, that is, the output from both parts of the pump is used. During feed a part of the output of the pump is used, that is, the output from one part of the pump is used; the output from the other part is automatically by-passed to the pump. There is one conduit or pipe leading from the pump to the valve. In Svenson 1,924,422, there are two separate pumps and a line leading from each pump to the valve. If the outputs of the two pumps are to be sent to the actuator they are joined in the valve and not before. If the output of but one pump is to be sent to the actuator the output of both go to the valve and the valve sends the output of one to the actuator and the output of the other to the sump. In the court's opinion, because of the state of the art, no one of the claims of the patent is entitled to a broad construction. The valve in defendants' Oldsmobile boring machine does not receive and discharge fluid from a plurality of sources as does the Svenson valve; on the contrary, the valve in defendants' Oldsmobile boring machine receives fluid through a single pipe from a single Vickers pump under all conditions. Accordingly, claim 23 is not infringed.

The defendants' Oldsmobile boring machine does not have a plurality of fluid supplying devices. On the contrary, it has a single fluid supplying device, the Vickers pump unit, which supplies fluid to the valve through a single conduit. It has no valve which in one position effects delivery of fluid from one source of supply and when in another position effects delivery of combined fluids from two sources. On the contrary, the valve in the Olds-

mobile boring machine receives fluid from a single pump through a single pipe under all conditions. Accordingly, claim 25 is not infringed.

Of claims 34, 35, 36, 37, 39 and 41, claim 34 is typical, at least so far as the two elements about to be discussed are concerned. They are: (1) "A relatively low pressure pump for delivering fluid at a relatively rapid rate to said actuator"; and (2) "a relatively high pressure pump for delivering fluid at a slower feeding rate to said actuator." Defendants' Oldsmobile boring machine does not have a response to these two elements. It does not have separate low pressure rapid traverse and high pressure feed pumps. It uses a single source of fluid supply, a Vickers pump unit, which supplies fluid through a single pipe under high pressure or low pressure, depending upon whether a restricted orifice is cut into the circuit for feed or cut out for rapid traverse. The whole output of the pump is used during rapid traverse and part of it is by-passed to the sump during feed. Except for efficiency, this Vickers pump unit functions the same as other single pump units with conventional by-pass valves and is interchangeable therewith. The court holds that defendants' Oldsmobile boring machine does not infringe these claims.

The court has considered the questions of infringement without regard to the matter of estoppel, which has heretofore been discussed. There is really no dispute in respect of the facts. The claims are clear. There is no question concerning the construction and operation of the defendants' Oldsmobile boring machine. The questions are as to the conclusions to be drawn from the undisputed facts. And those questions are questions of, shall we say, mechanics, hydraulics or physics. To the court this seems to be a proper place for the application of what appears to the court to be an exception to the rule of this Circuit in respect of estoppel to deny infringement. See L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., supra.

The defendants' ninth defense is that, although the elements of the remaining claims are found in the accused machine, those claims are not "infringed" for the reason that the claims find more complete response in the prior art patents and machine: Bishop 1,905,132; Galloway 1,787,-781; Curtis 2,118,020, Figures 50 and 19;

Ernst 1,969,063; and first Ex-Cell-O diamond boring machine. The court is of the opinion that this defense is well founded, but, since it is so closely related to the defendants' seventh defense of invalidity, it is unnecessary to pursue the matter further.

2. *Svenson 1,986,862 for a "Fluid Controlling Means," Issued January 8, 1935, on an Application Filed November 16, 1929, and Containing 29 Claims, of Which 22 Are in Suit.*

In Svenson 1,986,862, which is said to be a patent on a "Fluid Controlling Means," the patentee says:

"My present invention relates generally to hydraulic feeding means and more particularly to means for controlling the dispatchment of a fluid medium to fluid operated mechanisms such as mechanisms for actuating machine tools and the like.

"Pumps of the multi-plunger type have heretofore been employed for displacing fluid medium to various types of actuating mechanisms such as fluid actuated devices for moving machine tools. One of the problems incident to the operation of such rotary plunger pumps is that of overcoming pulsative effects which result when said pumps are functioning to cause relatively slow feeding movement of a hydraulic actuator. Thus for example, when it is desired to move a tool across the surface of the work at a slow speed in order to make a heavy cut, the rate of displacement of fluid within the hydraulic actuator is obviously less as compared with the displacement within said actuator which takes place when said tool is being moved rapidly across the work. These deleterious, pulsative effects take place during the slow movement of the tool and in many instances seriously impair the cutting action of the tool.

"It is one of the primary objects of my present invention to provide improved and effectively operable means of very simple and inexpensive construction for overcoming the above mentioned and other unsatisfactory results which have heretofore been experienced, and to this end I propose to provide improved means whereby a portion of the displaced fluid may be diverted so as to eliminate pulsative effects.

"More specifically, my invention contemplates the provision of a bleed passage which will serve to divert a predetermined volume of fluid displaced by a rotary plunger pump in such a manner as to maintain uniform, non-pulsative flow of the fluid into the actuator.

"Another object of my present invention is to provide means, as above set forth, for diverting displaced fluid, which is entirely automatic and adapted to be used in a fluid system without the necessity of employing independent means for positively controlling the actuation of the fluid diverting means.

"Still another object of my invention is to provide a fluid feeding device having a discharge orifice which may be adjustably controlled in size so as to effect the diversion of a desired volume of displaced fluid in accordance with the operating characteristics of the mechanism or machine with which the fluid feeding means is to be associated.

"Still another object of my invention is to provide a fluid feeding means of simple, yet sturdy construction which may be employed independently of any actuating mechanism for diverting a predetermined volume of displaced fluid and which may also be rendered inoperative by simply shifting a valve, which shifting may be accomplished manually or automatically as the occasion may demand.

"Still another object is to provide in combination with a fluid system in which fluid is displaced by a multi-plunger pump or the like, a fluid diverting device which includes a restricted orifice or bleed passage and a valve which is operative in response to the movement of a machine element to control the functioning of said bleed passage.

\*　\*　\*　\*　\*　\*

"The invention about to be described includes control mechanism for automatically controlling the distribution of fluid and this mechanism includes the device designated generally by the numeral 10. In order to clearly illustrate the practical application of the invention I have shown this control or compensating mechanism 10 in operative association with a fluid displacement system which includes a high pressure displacement rotary pump 12, a low pressure gear pump 14, a main control valve 16 and a tool actuating mechanism 18.

\*　\*　\*　\*　\*

"The control mechanism 10 includes a suitable housing 38 which housing is provided with a passage 40 disposed at substantially right angles with respect to a

passage 42. Communication between the passage 40 and the passage 42 is established by means of a restricted orifice or bleed passage 44 and the size of this orifice is controlled by means of a suitable needle valve 46. The passage 40 is connected by means of a pipe line 48 to the pipe line 24 as clearly shown in Figure 1 and the passage 42 is connected by means of a pipe line 50 to a pipe line 52. This pipe line 52 is connected to the low pressure side of the fluid circuit and a back pressure valve 54 is interposed between the pipe line 52 and a pipe line 56 which communicates with a reservoir 58.

\* \* \* \* \*

"For the purpose of understanding the practical application of this control mechanism 10, assume that fluid is being displaced from the high pressure pump 12 at a substantially constant rate and that the main valve 22 is so positioned as to cause said fluid to be delivered to the actuating mechanism 18. Assume further that during the initial stroke of the tool carriage 34, the tool 60 carried thereby during its initial movement, removes practically no metal from the work piece and that as the tool advances, the cutting action of the tool is increased. That is to say, more metal is removed as the tool advances. It will be seen that as a heavier cut is made by the tool, or in other words, as said tool is subjected to greater resistance, there will be a tendency to set up increased pressure in the cylinder 32 of the actuating mechanism. This also tends to increase the velocity of the fluid which is by-passed through the pipe line 48 and hence through the bleeding or restricted orifice 44. By diverting a portion of the displaced fluid in this manner it will be apparent that less fluid per unit of time is dispatched to the cylinder, thereby decreasing the speed of travel of the piston 30 and consequently the tool 60. Thus, by means of the control mechanism 10, a predetermined portion of the volume of fluid displaced by the plunger pump is diverted through the bleed passage and thence through the pipe line 50.

\* \* \* \* \*

"As set forth above, my improved control mechanism 10 may be placed within any fluid system and will automatically function to divert a predetermined portion of displaced fluid without employing auxiliary operating devices. However, in some in-

stances it may be desirable to temporarily render the control mechanism functionally inoperative during the actuation of a machine tool. In such instances I employ a valve 62 which is reciprocably mounted within the housing 38. This valve 62 is formed with an annular passage 64 which permits fluid introduced from the pipe line 48 to be delivered to the bleed passage 44 when said valve occupies the position shown in Figure 1. The upper portion of the valve 62 is formed with a shank 66 and slidable along the upper extremity of this shank is a cam bar 68 in the particular disclosure which is carried by the tool carriage 34. Fluid introduced within the passage 40 is by-passed through a restricted passage 70 which communicates at its lower extremity with a chamber 72 at the lower end of the valve 62. The pressure of the fluid within the chamber 72 is sufficient to constantly urge said valve upwardly into engagement with the surface of the cam bar 68 as shown in Figure 1. As the cam bar moves to the left in response to the movement of the carriage mechanism 34, a depressed portion 74 of the cam permits the valve 62 to be urged upwardly a sufficient distance so as to prevent the diversion of fluid through the restricted or bleed passage 44. The arrangement of the valve and cam mechanism just described is applicable in instances where it is desirable to reduce the speed of travel of the tool for a certain portion of its stroke and then to increase the speed of travel thereof.

\* \* \* \* \*

"From the foregoing description it will be apparent that my invention contemplates a hydraulic system of control wherein the pressure of the propelling fluid in the actuator, namely, the fluid within the cylinder 32 which propels the piston 30, is maintained. In other words, even though the actuator be subjected to variations in load, the propelling effectiveness of the fluid in the actuator is not impaired. This system of control should be clearly distinguished from systems commonly referred to as 'bypass' systems, wherein a restricted orifice interposed between the source of supply or pump and the actuator is brought into play for the purpose of decreasing the rate at which the fluid is delivered to the actuator. The excess fluid under such circumstances is returned through resilient valve means at a pressure which is greater than the pressure of the propelling fluid in the actuator. In such

290

systems of control, the effective propelling pressure of the propelling fluid in the actuator is decreased when the restricted orifice is rendered functionally operative."

The diagram shown in Figure 10 will aid in an understanding of the patentee's statements in his patent. The diagram il-

FIGURE 10

lustrates the principle of fluid control by diversion for regulating the speed of an actuator during feed in a volumetric hydraulic system as disclosed in Svenson 1,986,862. Of the parts referred to in the foregoing extracts from the patent, three are not specifically shown in the diagram in Figure 10. They are the main valve 22 which is contained in 16 and the tool carriage 34 and the tool 60. The tool carriage is moved by the actuator piston 30 and the tool is carried by the tool carriage.

The claims in suit are the following:

"1. In combination with a fluid transmission system including pumping means for displacing fluid, a propelling mechanism and a main fluid control valve operatively connected therewith for controlling the starting and reversing of said propelling mechanism, control mechanism operable independently of said main valve and having an orifice for diverting a pre-

determined portion of the displaced fluid in response to an increase in resistance experienced by the propelling mechanism during at least the forward movement thereof without impairing the propelling power of said propelling mechanism.

"2. In combination with a fluid transmission system including pumping means for displacing fluid, a propelling mechanism and a main fluid control valve operatively connected therewith for controlling the starting and reversing of said propelling mechanism, control mechanism operable independently of said main valve for diverting a portion of the displaced fluid when the load varies during at least the forward movement of said propelling mechanism without reducing the pressure of the propelling fluid in the propelling mechanism.

"3. In combination with a fluid transmission system including pumping means for displacing fluid, a propelling mechanism and a main fluid control valve operatively connected therewith for controlling the starting and reversing of said propelling mechanism, control mechanism operable independently of said main valve and having a bleed passage for automatically controlling the diversion of displaced fluid in accordance with the resistance experienced by the propelling mechanism without decreasing the pressure of the propelling fluid in said propelling mechanism.

"4. In combination with a fluid transmission system including pumping means for displacing fluid, a propelling mechanism and a main fluid control valve operatively connected therewith for controlling the starting and reversing of said propelling mechanism, control mechanism operable independently of said main valve and having a bleed passage for automatically controlling the diversion of displaced fluid in accordance with the resistance experienced by the propelling mechanism without decreasing the pressure of the propelling fluid in said propelling mechanism, and means for controlling the amount of fluid diverted through said bleed passage.

"5. In combination with a fluid transmission system including pumping means for displacing fluid, a propelling mechanism and a main fluid control valve operatively connected therewith for controlling the starting and reversing of said propelling mechanism, control mechanism for diverting a portion of the displaced fluid when

the load varies without reducing the pressure of the propelling fluid in said propelling mechanism, and means operable independently of said main valve for rendering the control mechanism functionally inoperative.

"6. In combination with a fluid transmission system including pumping means for displacing fluid, a propelling mechanism and a main fluid control valve operatively connected therewith for controlling the delivery of said fluid to said propelling mechanism, control mechanism for diverting a portion of the displaced fluid during at least the forward movement of said propelling mechanism without reducing the pressure of the propelling fluid in said propelling mechanism, and a valve means for controlling the passage of fluid through said control mechanism.

. * * * * *

"9. In combination with a fluid transmission system including pumping means for displacing fluid, a main reversing valve operatively connected therewith and a fluid actuated mechanism operatively connected with said valve, fluid control mechanism including means for diverting a portion of the fluid displaced by said pumping means at a pressure experienced in said fluid actuated mechanism, and means operable in response to the actuation of said fluid actuated mechanism during at least the forward movement thereof for controlling the passage of fluid through said diverting means.

"10. In combination with a fluid transmission system including pumping means for displacing fluid, a main reversing valve mechanism operatively connected with said pumping means and a fluid actuated mechanism operatively connected with said valve, fluid control mechanism for diverting a portion of the fluid displaced by said pumping means without reducing the propelling effectiveness of the propelling fluid upon said fluid actuated mechanism, and valve mechanism operable in response to the actuation of said fluid actuated means during at least the forward movement thereof for controlling the passage of fluid through said fluid control device.

"11. In combination with a fluid transmission system including pumping means for displacing fluid, a main reversing valve mechanism operatively connected therewith and a fluid actuated mechanism operatively connected with said valve, a control device having a restricted orifice through which a portion of the fluid displaced by said pumping means may be diverted at a pressure experienced in said fluid actuated mechanism, and a valve mechanism operable in response to the actuation of said fluid actuated mechanism during at least the forward movement thereof for controlling the operative functioning of said restricted orifice.

"12. In combination with a fluid transmission system including pumping means for displacing fluid, a main fluid dispatching valve, a passageway connecting said fluid dispatching valve and said pumping means, a fluid actuated mechanism operatively connected with said valve, said mechanism including a piston within a cylinder, and fluid control mechanism including a device for diverting a portion of the fluid displaced by said pumping means during at least the forward movement of said fluid actuated mechanism without reducing the propelling power of fluid in said fluid actuated mechanism, said device being connected at a point intermediate the pumping means and the valve, said valve being shiftable for starting and reversing said fluid actuated mechanism.

"13. In combination with fluid actuated mechanisms for propelling machine elements and the like and means for supplying fluid to said mechanisms, a bleed valve mechanism for diverting a predetermined portion of the fluid directed to the fluid actuated mechanisms in response to an increase in resistance experienced by the elements propelled by said mechanism, and valve means operable in timed relation with the travel of said fluid actuated mechanisms for controlling the starting, stopping, and direction of movement thereof.

* * * * *

"15. In combination with a fluid circuit having a high pressure pump, means for controlling the fluid displaced by said pump, said means including a restricted orifice through which a governed amount of fluid may be diverted from the portion of the fluid circuit connected with the discharge side of said high pressure pump without decreasing the pressure of the propelling fluid discharged by said pump, a hydraulic actuator including a piston within a cylinder, and valve mechanism for controlling the starting and reversal of said actuator, said fluid diverting means being adapted to function during the for-

ward movement of said actuator at a pressure experienced in said hydraulic actuator.

"16. In combination with a fluid circuit having a high pressure pump, means for controlling the fluid displaced by said pump, said means including an orifice through which a governed amount of fluid may be diverted from the portion of the fluid circuit connected with the discharge side of said pump without decreasing pressure of the propelling fluid displaced by said pump, means for controlling the functioning of said fluid diverting means, a hydraulic actuator, and a valve operable independently of said controlling means for governing the starting and reversal of said actuator, said fluid diverting means being adapted to function during the forward movement of said actuator at the propelling pressure experienced in said hydraulic actuator.

\* \* \* \* \*

"19. In a hydraulic actuator system, a shiftable supporting machine element, a hydraulic actuator movable in forward and reverse directions for propelling said element including a piston within a cylinder, pumping means, fluid conducting means connecting said pumping means with said actuator, fluid diverting means associated with said conducting means for diverting fluid therefrom at the propelling pressure experienced in said actuator when the machine element is subjected to increase in load during its movement in a forward direction, and means for controlling the functioning of said fluid diverting means in timed relation with respect to the forward shifting of said element.

"20. In a hydraulic actuator system, a shiftable supporting machine element, a hydraulic actuator movable in forward and reverse directions for propelling said element including a piston within a cylinder, fluid conducting means connected with said actuator, fluid diverting means associated with said conducting means for diverting fluid therefrom at the propelling pressure experienced in said actuator when the machine element is subjected to increase in load during the forward movement of said actuator, pumping means for supplying fluid, means for controlling the functioning of said fluid diverting means in timed relation with respect to the shifting of said machine element, and a control valve mechanism capable of being shifted to at least three positions, namely, forward, re-

verse, and neutral, for controlling said hydraulic actuator.

"21. In a hydraulic actuator system, a shiftable machine element, a hydraulic actuator movable in forward and reverse directions for propelling said element including a piston within a cylinder, fluid conducting means connected with said actuator, fluid diverting means associated with said conducting means for diverting fluid therefrom when the machine element is subjected to increase in load during the forward movement of said actuator, pumping means for supplying fluid, means for controlling the functioning of said fluid diverting means in timed relation with respect to the shifting of said machine element, and a control valve mechanism capable of being shifted to at least three positions, namely, forward, reverse, and neutral, for controlling said hydraulic actuator, said control valve mechanism in its neutral position being adapted to circulate fluid in the system and thereby render the pump functionally inoperative for propelling purposes.

"22. In a hydraulic actuator system, a shiftable machine element, a hydraulic actuator movable in forward and reverse directions for propelling said element including a piston within a cylinder, fluid conducting means connected with said actuator, fluid diverting means associated with said conducting means for diverting fluid therefrom at the propelling pressure experienced in said actuator when the machine element is subjected to increase in load during the forward movement of said actuator without impairing the propelling effectiveness of the propelling fluid in said actuator, pumping means for supplying fluid, means adapted to be automatically engaged by the structure of said shiftable machine element for controlling the operative functioning of said fluid diverting means and valve means for controlling the direction of movement of said hydraulic actuator.

"23. In a hydraulic actuator system, a shiftable machine element, a hydraulic actuator for propelling said element including a piston within a cylinder, fluid conducting means connected with said actuator, fluid diverting means associated with said conducting means for diverting fluid therefrom when the machine element is subjected to increase in load, pumping means for supplying fluid, valve means for

controlling the direction of movement of said shiftable machine element, and hydraulically shiftable means for controlling the functioning of said fluid diverting means in timed relation with respect to the shifting of said machine element.

"24. In combination with a fluid transmission system including pumping means for displacing fluid, a fluid dispatching valve operatively connected therewith and a fluid actuated mechanism operatively connected with said valve, a fluid control device for diverting a portion of the fluid displaced by said pumping means, means operable in response to the actuation of said fluid actuated mechanism for controlling the passage of fluid through said fluid control device, and a second pumping mechanism for delivering fluid to said actuator, said valve being constructed and arranged whereby fluid from only one of the pumps is employed for propelling purposes when said control mechanism is functionally operable.

\* \* \* \* \*

"26. In a hydraulic actuator system, a shiftable machine element, a hydraulic actuator movable in forward and reverse directions for propelling said element and including a piston within a cylinder, fluid conducting means connected with said actuator, fluid diverting means associated with said conducting means for diverting fluid therefrom at the propelling pressure of the propelling fluid in said actuator when the machine element is subjected to increase in load during the forward movement of said actuator, pumping means for supplying fluid, means for controlling the functioning of said fluid diverting means in timed relation with respect to the shifting of said machine element, and a control valve mechanism capable of being shifted to at least three positions, namely, forward, reverse, and neutral, for controlling said hydraulic actuator.

"27. In a hydraulic actuator system, a plurality of shiftable supporting machine elements, a hydraulic actuator coupled with each element for moving said element in forward and reverse directions, each of said actuators including a piston within a cylinder, fluid conducting means connected with said actuators, fluid diverting means associated with said fluid conducting means for diverting fluid therefrom at the propelling pressure experienced in said actuators when the machine elements are sub-jected to increase in load during the forward movement thereof without impairing the propelling effectiveness of the propelling fluid in said actuators, pumping means for supplying fluid means adapted to be automatically engaged by the structure of at least one of said shiftable machine elements for controlling the operative functioning of said fluid diverting means, and valve means for controlling the direction and movement of said actuators.

"28. In a hydraulic actuator system, a plurality of shiftable supporting machine elements, a hydraulic actuator connected with each of said elements, each of said actuators including a cylinder and piston construction, fluid conducting means connected with said actuators, fluid diverting means associated with said fluid conducting means for diverting fluid therefrom when the machine elements are subjected to increase in load, pumping means for supplying fluid, valve means for controlling the direction of movement of said actuators, and hydraulically shiftable means for controlling the functioning of said fluid diverting means in timed relation with respect to the shifting of at least one of said machine elements."

The plaintiffs contend that the claims in suit are valid and that they are infringed by the machines next enumerated. Defendants' First Senior Hydraulic System is said to infringe Claims 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 15, 16, 19, 20, 22, 23 and 26. Defendants' Second Senior Hydraulic System is said to infringe Claims 6, 9, 10, 11, 12, 15, 19, 20, 22, 23 and 26. Defendants' Junior Hydraulic System is said to infringe Claims 6, 9, 10, 11, 19, 22 and 23. Defendants' Oldsmobile Boring Machine is said to infringe Claims 6, 9, 10, 11, 12, 15, 19, 20, 21, 22, 24 and 26. Defendants' 2-Way 8-Station Hand Index Machine is said to infringe Claims 6, 9, 10, 11, 12, 15, 19, 20, 21, 22 and 26. Defendants' Frankford Arsenal Machine is said to infringe Claims 6, 9, 10, 11, 12, 13, 15, 19, 20, 22, 23, 26, 27 and 28. Defendants' Large Size Self-Contained Hydraulic Unit Types 23 and 25 is said to infringe Claims 6, 9, 10, 11, 12, 15, 19, 20, 22, 23 and 26.

The defendants summarize their defenses as follows: (1) The entire patent is invalid under Section 33, Title 35 U.S.C.A., because, by their deceptive and misleading language, as well as by their needless multiplication, the claims (and the accompany-

ing specification) attempt to obscure the fact that they define nothing but the simplest and best known inherent characteristics of any diversion type of control system; (2) all of the claims in issue are invalid under Section 33, Title 35 U.S.C.A., particularly in the light of General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, because of their functionality; (3) the entire patent is invalid because of the restricted orifices at "A," either on the ground that plaintiffs have failed seasonably to apply for reissue to correct this long-known defect in the disclosure, or alternatively, that the claims fail to read on the disclosure as it now stands and are therefore invalid under Section 33, Title 35 U.S.C.A.; (4) each and every one of the claims in issue are invalid on the prior art; (5) Claims 13, 27 and 28, which call for plural actuators, and claim 24, which calls for two pumps, are invalid on the ground of aggregation; (6) none of the machines accused, employing working pressure relief valves as they do rather than a diversion orifice of constant area, constitutes an infringement; and (7) in the event that the claims are construed, as plaintiffs would have them construed here in order to cover a working pressure relief valve, then they are additionally and squarely anticipated by the Greensmith and Ernst patents.

▆▆▆ The defendants' first and second contentions are that Svenson 1,986,862 is invalid because of its failure to comply with Section 33, Title 35 U.S.C.A., which reads as follows: "Before any inventor or discoverer shall receive a patent for his invention or discovery he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; and in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; and he shall particularly point out and distinctly claim the part, improvement, or combination which

he claims as his invention or discovery. The specification and claim shall be signed by the inventor."

The defendants say that although the system of Svenson 1,986,862 consists essentially of simply a controlled leak in the pressure line, that simplicity has been obscured by a tangled mass of claim verbiage, and that the patent is invalid under the statute quoted because of vague, ambiguous and nebulous claims. They cite: Standard Oil Co. v. Globe Oil & Refining Co., 7 Cir., 82 F.2d 488, 496; Knight Soda Fountain Co. v. Walrus Mfg. Co., 7 Cir., 258 F. 929; and United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. ——. The defendants also say that the patent is invalid under the statute quoted because of an inordinate multiplication and duplication of claims which obscure rather than point out that which is claimed as the invention, and they cite: Carlton v. Bokee, 84 U.S. 463, 472, 17 Wall. 463, 472, 21 L.Ed. 517; Walker on Patents, Deller's Ed., 1937, Vol. 2, p. 1978; and In re Buttolph, 75 F.2d 629, 632, 22 C.C.P.A., Patents, 973. And, finally, in this connection the defendants say that all of the claims in issue are invalid under the statute quoted because of their failure to define a structure as distinguished from a mere result and they cite: General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, and Otis Elevator Co. v. Pacific Finance Corp., 9 Cir., 68 F.2d 664.

The defendants like to refer to this patent as a patent on a hole, and their statement that the patent is one on a hole comes so near to telling the whole truth that it seems ridiculous that the patentee should require so many words to describe and claim his invention.

It is true that, while the patentee's idea is simple, he has clothed and perhaps concealed it in many words; that he has multiplied claims unnecessarily (for instance, there is very little difference between claims 1, 2, 3, 4 and 12, between claims 5, 6, 9, 10 and 11, between claims 15 and 16, between claims 19, 20, 21, 22, 23 and 26, and between claims 27, 28 and 13); and that in the case of some elements in some of the claims in issue the patentee has defined a function rather than a structure, but nevertheless the court believes that justice will be best served if the court re-

frains from striking down the patent for these reasons.

■ The defendants' third contention is that the entire patent is invalid because the main valve shown in Figure 1 of the patent drawings includes a restricted orifice and that plaintiffs have failed seasonably to apply for reissue to correct this long-known defect in the disclosure, or, alternatively, that the claims fail to read on the disclosure as it now stands and are therefore invalid under Sec. 33, Title 35 U.S.C.A., above quoted. The plaintiffs' answer is that the restricted orifice was shown in the main valve by inadvertence and mistake; that it is not mentioned in the specifications; and that it may be disregarded. The court is of the opinion that this answer is sufficient and that the restricted orifice shown in the main valve may be disregarded.

■ The defendants' fourth defense against Svenson 1,986,862 is that each and every one of the claims in issue is invalid on the prior art.

The hydraulic system incorporated in Svenson 1,986,862 is simple. Basically, it is the ordinary volumetric system. The one added item of claimed novelty is the provision in the volumetric system of a diverter or bleeder for by-passing a portion of the fluid from the pressure delivery line of the pump back to the intake side of the system, where it may be re-pumped, instead of letting it go to the actuator. This by-passing of a portion of the fluid diminishes the volume left for delivery to the actuator, and thereby correspondingly diminishes the actuator speed. The diverter or bleeder is an orifice. This orifice is controlled by a cam actuated cut-off valve.

The claims may be divided into four groups as follows:

Group I: Claims 1, 2, 3, 4, 12 and 15, reciting a diverter or bleeder operable independently of the main or starting-and-reversing valve (shown as main valve 16).

Group II: Claims 5, 6, 9, 10, 11, 16, 19, 20, 21, 22, 23 and 26, reciting means for rendering the diverter operative or inoperative (Svenson's cut-off valve 62).

Group III: Claim 24, reciting a two-pump type of fluid supply mechanism.

Group IV: Claims 13, 27 and 28, reciting plural actuators.

Against each of the claims in suit the defendants cite the following patents: Bates 704,430 issued July 8, 1902, on an application filed January 19, 1901; Huxford 1,866,212 issued July 5, 1932, on an application filed March 16, 1927; Snarry, 1,753,096 issued April 1, 1930, on an application filed October 5, 1926; and Kempton 1,731,719 issued October 15, 1929, on an application filed February 4, 1925.

Bates 704,430 was a file wrapper reference. There has been considerable evidence and argument concerning it. All of the claims of Group I above are anticipated by Bates. The claims of Group II above are attempted to be distinguished from Bates by reason of the fact that Bates shows a manually operated diverting valve rather than one arranged to be automatically operated by dogs, a cam, or the like. Automatic actuating arrangements for valves in hydraulic systems were old on November 16, 1929, Svenson's filing date. There was no invention in adding to Bates a cam or dog for his diverting valve. Claim 24 (Group III) is attempted to be distinguished from Bates by reason of its provision for a two-pump source of fluid. Two pump systems were old prior to Svenson. It has been observed that Svenson purchased a two-pump Oilgear System before he began his experimentation. There ·was no invention in providing for two pumps rather than the one of Bates. The claims of Group IV are attempted to be distinguished from Bates because they call for a plurality of actuators. There was no invention in providing for a plurality of actuators at Svenson's filing date. See Curtis 2,118,020.

Kempton 1,731,719, Snarry 1,753,096, and Huxford 1,866,212 were not cited by the Examiner. Each of them discloses the fundamental ideas of Svenson 1,986,862 and are earlier than Svenson.

The court is of the opinion that the claims in suit of Svenson 1,986,862 are anticipated by or disclose no invention over the patents heretofore mentioned.

The plaintiffs have never marketed any machines containing the disclosures of Svenson 1,986,862. It is a mere so-called "paper patent."

■ The defendants' fifth defense is that claims 13, 27 and 28, which call for plural actuators, and claim 24, which calls

for two pumps, are invalid on the ground of aggregation.

In respect of plural actuators, the defendants say that they simply interfere with each other, rather than co-act or co-operate in any way; that the only manner in which they can be reconciled in the circuit at all is for their bleeders to be timed for simultaneous operation, in which case the provision of an extra bleeder is simply surplusage; and that the provision of plural actuators in the circuit is thus clearly shown to be aggregative. Even if it can not be said that plural actuators interfere with each other, the court is satisfied that they do not co-act or co-operate in any way and that the provision of plural actuators in the circuit is therefore aggregative.

■ The court feels otherwise in respect of claim 24, the two pump claim. If there were no prior art other than a one pump volumetric hydraulic system including a bleeder the court feels that there might be invention in devising a two pump volumetric hydraulic system including a bleeder. The court, accordingly, does not feel justified in striking down claim 24 as aggregative.

The defendants' sixth defense is that none of the machines accused, employing working pressure relief valves, as they do, rather than diversion orifices of constant area, constitutes an infringement.

None of the machines accused as an infringement under Svenson 1,986,862 has a diversion or bleeder orifice comparable either in structure or function to that of the patent. What plaintiffs point to in the accused machines as the device in question is the working pressure relief valve. There are a number of differences between the Svenson bleeder and the Ex-Cell-O working pressure relief valve. Some of them will be referred to. Svenson has a separate auxiliary control valve for opening and closing the diverting orifice. Ex-Cell-O has no auxiliary control valve and no equivalent thereof. The Svenson auxiliary control valve is opened mechanically. The Ex-Cell-O working pressure relief valve is automatically opened by pressure. The primary function of the Svenson diverting orifice is to divert an increased amount of liquid under increased pressure due to increased tool resistance. The primary function of the Ex-Cell-O working pressure relief valve is to maintain a constant pressure under varying conditions of tool resistance. The Svenson diverting orifice diverts liquid continuously during its operative period as determined by the cam and shut-off valve. The Ex-Cell-O working pressure relief valve passes liquid only at working pressure as produced by orifice restriction or tool resistance or both. In a system controlled by the Ex-Cell-O working pressure relief valve the pressure is constant, regardless of resistance encountered by the tool. The size of the Svenson diverting orifice remains constant regardless of tool resistance and variations in pressure. The size of the opening in an Ex-Cell-O working pressure relief valve varies with tool resistance to maintain constant pressure. In a system controlled by a Svenson diverting orifice the actuator propelling force varies, increasing when tool resistance increases and decreasing when tool resistance decreases. In a system controlled by an Ex-Cell-O working pressure relief valve the actuator propelling force is constant because of the constant pressure maintained by the valve. In a system controlled by a Svenson diverting orifice the pump reaction varies due to pressure variation. In a system controlled by an Ex-Cell-O working pressure relief valve the pump reaction is constant because of maintenance of constant pressure. In a system controlled by a Svenson diverting orifice a large pressure increase produces only a relatively small increase in diversion since by the orifice flow formula ($V = A \times \sqrt{\text{pressure drop}}$) the pressure head must be four times as great to produce double the diversion through the orifice. In a system controlled by an Ex-Cell-O working pressure relief valve there are no pressure changes since the valve opens whenever the pressure reaches the desired working pressure. In a system controlled by a Svenson diverting orifice a back pressure valve is desirable (perhaps necessary) for cooperation with the diverting orifice and its control valve. In a system controlled by an Ex-Cell-O working pressure relief valve a back pressure valve is not used or suitable for use. In the Svenson auxiliary control valve the needle operates to regulate the amount of liquid diverted under varying conditions of pressure. In Ex-Cell-O the pressure regulating adjustment operates to establish the constant working pressure desired in the system. The diversion or bleeder ori-

fice which Svenson claims derives from a class of prior art which includes: Bates 704,430 filed in 1901; Huxford 1,866,212 filed 1927; Snarry 1,753,096 filed 1926; and Kempton 1,731,719 filed 1925. The working pressure relief valve derives from a different class of prior art, which includes: Greensmith 1,718,554 filed 1920; Ernst 1,-969,063 filed 1928; and the first Ex-Cell-O Diamond Boring Machine (1929).

None of the accused systems embodies any means comparable to Svenson's cam operated control valve for cutting the working pressure relief valve into or out of service. In the accused systems the working pressure relief valve is always in operation continuously throughout the feeding or working period. The working pressure relief valve is opened solely in response to pressure in the system and, in particular, in response to the increase in pressure caused either by increase in resistance of the work against the tool or by the cutting of the restricted control orifice into the actuator line. This is in contrast with Svenson's arrangement in which the diversion or bleeder device is rendered operative or inoperative at arbitrarily chosen points determined by the contour of the control cam irrespective of pressures which may prevail in the circuit.

The only machine charged to infringe claim 24, the only two pump claim, is the Oldsmobile boring machine. That machine, with its Vickers pump, has been considered at length in connection with its alleged infringement of Svenson 1,924,422. Claim 24 is not infringed. The Oldsmobile boring machine has no diversion or bleeder orifice (it has a working pressure relief valve). It has no separate auxiliary control valve for opening and closing the diverting orifice. It has but one pump.

The only machine charged to infringe claims 13, 27 and 28, the plural actuators claims, is the so-called Frankford Arsenal Machine. These claims are not infringed. The Frankford Arsenal machine has no diversion or bleeder orifice (it has a working pressure relief valve). It has no separate auxiliary control valve for opening and closing the diverting orifice. Furthermore, the plural actuators of the Frankford Arsenal machine are mechanically interconnected by a rack and pinion arrangement. This mechanical interconnection of the actuators excludes any necessity for timing them by hydraulic means.

The court has again considered the questions of infringement without regard to the matter of estoppel. What the court said in respect of estoppel as it related to the defendants' right to deny infringement of Svenson 1,924,422 is pertinent here and will not be repeated.

The defendants' seventh and final defense against Svenson 1,986,862 is that in the event the claims are construed, as the plaintiff would have them construed in order to cover a working pressure relief valve, then they are additionally and squarely anticipated by Greensmith 1,718,-554 and Ernst 1,969,063. In the court's opinion this point is well taken.

Before concluding the consideration of Svenson 1,986,862, the court should perhaps express its conclusions concerning some matters which were considered at length on the trial but which now seem of minor importance because of the views which the court has expressed. These conclusions follow:

(1) Svenson is not shown by satisfactory evidence to be the inventor of anything embodied in the Sundstrand-Harvester lathe. He is not corroborated by any other witness. He did not claim in the Patent Office to be the inventor of anything embodied in the Sundstrand-Harvester lathe except as an afterthought after his opponents' proofs were in.

(2) The Sundstrand-Harvester lathe of 1927 did not embody a hydraulic control mechanism responding to any of the claims of Svenson 1,986,862 in issue. Any fluid spilling through the relief valve on the Sundstrand-Harvester lathe did not effect control or regulation of speed. The feed rate in that lathe was determined by mechanical means—by the worm and worm wheel drive, and when they were engaged the hydraulic pressure was tolerated merely. It was certainly not regulating speed.

(3) The hydraulic circuit of the so-called Timken machine was not modified to include diversion until June 19, 1929. Svenson is not shown by satisfactory evidence to be the source of the ideas which brought about that modification.

(4) The Barnes lathe which, as has been stated, is not entitled to an earlier date than October 28, 1929, is not claimed to support Svenson 1,986,862.

(5) Svenson 1,986,862 is not entitled to a date earlier than its filing date November 16, 1929.

(6) The governor valve of the first Ex-Cell-O diamond boring machine, which operated on pressure in the system between the actuator and the orifice, had as one of its functions that of diverting liquid from the system. Accordingly, it was the equivalent of the working pressure relief valve, which operates on pressure in the system between the pump and the actuator and has as its function that of diverting liquid from the system.

(7) The first Ex-Cell-O diamond boring machine with its governor valve, which, as has been stated, is entitled to the date of November 16, 1928, does not anticipate Svenson 1,986,862. The idea embodied in the machine and that disclosed in the patent are entirely different.

(8) The first Ex-Cell-O diamond boring machine was equipped, prior to May 15, 1929, with a working pressure relief valve but even as so equipped it did not anticipate Svenson 1,986,862. The idea embodied in the machine and that disclosed in the patent are entirely different.

(9) The first Ex-Cell-O diamond boring machine, equipped with a working pressure relief valve and entitled to a date at least as early as May 15, 1929, was a reduction to practice of a hydraulic circuit exactly matching that of the machines accused as infringements of Svenson 1,986,862.

3. *Svenson 2,036,162 for a "Machine Tool Unit," issued March 31, 1936, on an application filed September 13, 1930, and containing 28 claims, of which 11 are in suit.*

In Svenson 2,036,162 which is said to be a patent on a "Machine Tool Unit," the patentee says:

"My invention relates generally to a machine tool unit, and more particularly to a self-contained actuator unit wherein all of the essential elements are mounted upon a unitary head frame.

&ast; &ast; &ast; &ast; &ast;

"I propose to provide a self-contained actuator unit wherein a frame or head frame structure provides a support for all of the tool and pump driving mechanisms. . "More specifically, it is an object of my invention to provide a self-contained actuator unit, as above set forth, wherein driving spindles are driven from a prime mover, which also serves to propel a pumping mechanism, which pumping mechanism delivers fluid to a hydraulic actuator serving to effect relative movement between at least one of said spindles and the base upon which the frame may be mounted.

"A further object of my invention is to provide an actuator unit, as set forth above, which may be standardized for application to various mountings, and which may be shifted from place to place without the necessity of tearing down or dismantling the machine tool structures, and it is a further object to so arrange the unit that it will function with equal effectiveness in a horizontal, vertical, or inclined plane, and that it may be attachable or detachable with a minimum amount of skill and effort.

&ast; &ast; &ast; &ast; &ast;

"I provide a spindle support and a hydraulic actuator arranged in parallelism therewith, said parts, together with the prime mover for the spindle and the pump mechanism also driven thereby, being mounted upon a unitary head frame.

"In addition to the above mentioned advantageous characteristics, my invention contemplates the provision of an actuator unit, in which a prime mover, a plurality of fluid pumping mechanisms, a fluid actuator, a tool holding mechanism, and a control mechanism therefor are all supported upon a unitary frame structure so as to present a self-contained actuator unit.

"Still another object of my invention is to provide a self-contained actuator unit, as set forth above, wherein the constituent parts are so organized as to enable them to be combined into a relatively small compact unit, with the entire 'power house' or driving mechanism mounted upon a unitary frame structure.

&ast; &ast; &ast; &ast; &ast;

"&ast; &ast; &ast; I have disclosed said invention in connection with a drilling unit. This drilling unit includes a main head frame 20 which is adapted to be mounted in any suitable manner upon any suitable base, such as the base or main machine frame 22, Figures 1 and 3. The head frame 20 is secured to the base by means of bolts 24, and secured to the underside of the frame 20 by means of bolts 26 is a prime mover or electric motor 28. One end of the frame 20 provides a support for driving and pumping mechanism, later to be described, while the portion of the frame immediately above the motor 28 supports a frame or housing designated generally by the numeral 30.

"The upper portion of this frame or housing 30 provides a cylinder section 32, while the lower portion of the housing is designed to receive a multi-sided or square spindle supporting member or quill 34.

\* \* \* \* \*

"The shaft 78 of this motor terminates within a lubricant retaining chamber 80, and fluid within this chamber is secured against leakage along the shaft 78 by means of a suitable packing box 82.

\* \* \* \* \*

"By having the chamber 80 completely sealed against leakage, the entire unit may be positioned at any angle, or, in other words may be shifted between vertical and horizontal positions without disturbing the operative effectiveness thereof.

"A low pressure large displacement pumping mechanism 94 is mounted upon the main frame 20 by means of bolts 96. \* \* \* Fluid supplied to this gear pump is retained within a reservoir 108, which is enclosed within the main frame 20, Figure 1. \* \* \* Fluid at low pressure supplied by the pump 94 is employed to effect rapid traverse of the actuator piston 74, while fluid from a high pressure variable displacement pump 116 is employed to effect feeding movement of the piston 74.

\* \* \* \* \*

"From the foregoing description it will be clear that the arrangement of the conduits connecting the actuator cylinder 32 with the pumps 94 and 116 and also with the reservoir 108 is such as to particularly adapt said parts to be mounted on a unitary frame to present the self-contained actuator unit which forms the basis of this invention.

\* \* \* \* \*

"Attention is again directed to the fact that my invention enables the provision of a self-contained complete metal removing apparatus, such as a drill or boring unit, which may be positioned in any plane .or may be shifted from place to place with the utmost ease. Heretofore metal removing devices have in many instances been employed which comprise a plurality of devices, such as drill mechanism distributed along a bed, but these devices do not compromise individual self-contained complete operating units of the type set forth above and shown in the. drawings. \* \* \* This unit may be shifted ، from place to place, positioned at any angle and employed in the same sense as a portable hand drill.

\* \* \* \* \*

"It will also be apparent that my invention broadly relates to self-contained actuator units wherein the tool is adapted to be longitudinally shifted with respect to a supporting base. While in the present instance I have disclosed the head frame mounted upon the supporting guide surface of a main frame or bed 22 in such a manner that the head frame may be secured in a fixed position with respect to said surface, the invention is by no means limited to such a construction, but contemplates self-contained actuator units of modified form which function to cause relative movement between a tool holder and the supporting surface of a main frame, and eliminate the difficulties experienced heretofore in the use of conventional machines. It will also be apparent that the self-contained feature of my unit is such as to preclude the necessity of connections other than electrical, and in this manner I eliminate the unsightly appearance of external conduits or pipes, and also reduce to a minimum the possibility of fluid leakage.

\* \* \* \* \*

"The terms 'self-contained actuator unit', 'unitary head frame', etc., referred to in the specification and claims, have been used advisedly with a view of clearly distinguishing applicant's invention from conventional machine tools of the type in which,. contrary to applicant's, the tool spindles, feed transmission, rapid traverse transmission, prime mover, and control arrangement are not segregated into a detachable, coherent, unitary organization. In other words; these terms refer to a portion or part of a machine which .is in a sense separable or detachable from the main frame structure and from the structure which supports the work piece. The self-contained actuator unit or head frame ،contains the rotating and propelling mechanisms, namely, those actuating parts of the machine which are grouped together in a coherent, compact manner and are adapted to be supported by a main frame structure. Conventional machines incorporate a frame structure which· supports the actuating parts · and work support in such a manner as to preclude the shifting or detachment of said actuating parts as a unit."

Figure 11, hereinafter set forth,. is a vertical sectional view of a drilling machine

300

which is representative of one embodiment of the invention disclosed in Svenson 2,-036,162:

movement between a supported tool and said main supporting frame structure, adjustable feeding transmission on said head

**FIGURE 11**

The claims in suit are the following:

"4. A self-contained actuator unit comprising a hydraulic actuator member, a rotatable tool supporting spindle connected with said actuator member and longitudinally translatable in response to the shifting of said actuator member, a pumping mechanism for supplying fluid under pressure to said hydraulic actuator member, said pumping mechanism including a housing, a plurality of shiftable pistons in said housing, valve means for said pistons, adjustable driving means for imparting movement to said pistons, a rotary member for imparting rotation to said adjustable driving means, means directly engaging said rotary member and driven from said tool supporting spindle, whereby rotation is imparted directly from said spindle to said rotary member, a prime mover, and a head frame for supporting all of said parts as a self-contained unit.

\* \* \* \* \*

"7. In a machine tool, the combination of a main supporting frame structure, a self-contained machine head frame on said main frame structure, a tool driving and supporting structure on said head frame, rotary tool driving transmission on said head frame, actuator means for effecting relative

frame for said actuator means, said feeding transmission including feed rate adjustment means, an electric motor carried by said head frame structure for driving both transmissions, and power operated rapid traverse transmission carried by said head frame for causing said actuator means to move said supported tool to a feeding position and for causing the reversal of said actuator means.

\* \* \* \* \*

"9. A self-contained actuator unit including a unitary head frame structure adapted to be mounted upon a supporting surface of a machine frame, a spindle rotably mounted on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with the supporting surface of the machine structure to which the head frame is applied, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an eleric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, and valve means adapted to control the rate and direction of flow of fluid from said pumping means into said

cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit.

"10. A machine tool including a self-contained actuator unit having a unitary head frame structure adapted to be mounted upon a supporting surface of a machine frame, a spindle rotatable on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with the supporting surface of the machine to which the head frame is applied, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, valve means adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit, and means for actuating said valve means in timed relation with the translation of said spindle.

\* \* \* \* \*

"13. A self-contained actuator unit including a unitary head frame structure adapted to be mounted upon a supporting surface of a machine frame, a spindle rotatable on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with the supporting surface of the machine to which said frame is applied, said hydraulically responsive means including a fluid receiving cylinder, a prime mover on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, valve means adapted to control the rate and direction of fluid flow from said pumping means to said cylinder, and a fluid reservoir presented by a portion of said head frame structure, said unitary head frame structure supporting the aforementioned elements so as to present a self-contained actuator unit.

"14. A self-contained actuator unit including a unitary head frame structure adapted to be mounted upon a supporting surface of a machine frame, a spindle rotatable on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with the supporting surface of the machine to which said frame is applied, said hydraulically responsive means including a fluid receiving cylinder, a prime mover on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, valve means adapted to control the rate and direction of fluid flow from said pumping means, and a fluid reservoir presented by a portion of said head frame structure, said reservoir being so positioned as to insure gravity feed of fluid to the pumping means when said head frame is mounted in an inclined position, said unitary head frame structure supporting the aforementioned elements so as to present a self-contained actuator unit.

\* \* \* \* \*

"16. A self-contained actuator unit including a unitary head frame structure adapted to be mounted upon a supporting surface, of a machine frame, a spindle rotatable on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with the supporting surface of the machine to which the head frame is applied, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, and valve means positioned externally of said fluid receiving cylinder for controlling the rate and direction of flow of fluid from said pumping means to said hydraulically responsive means in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit.

"17. A self-contained actuator unit including a unitary head frame structure adapted to be mounted upon a supporting surface of a machine frame, a spindle rotatable on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with the supporting surface of the machine to which the head frame is applied, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on

said head frame driven from said prime mover for delivering fluid to said cylinder, the axes of the electric motor, pump, and cylinder being parallel to the line of reciprocation of said spindle, and valve means adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit.

\* \* \* \* \*

"20. A self-contained actuator unit including a unitary head frame structure adapted to be mounted upon a supporting surface of a machine frame, a spindle rotatably mounted on said head frame, the axis thereof being parallel with the supporting surface of the machine frame to which the head frame is applied, a shiftable translating element carried by said head frame, mechanism carried by the head frame for moving said translating element at a feeding rate including means whereby the feeding rate of said translating element may be adjusted, a prime mover mounted on said head frame for imparting rotation to said spindle and operatively coupled for driving purposes with said feeding mechanism, power driven mechanism carried by the head frame for moving said translating element at a faster rate, and control means on said head frame adapted to selectively control the operative effectiveness of said mechanisms upon said translating element, said head frame and elements supported thereby presenting a self-contained actuator unit.

\* \* \* \* \* \*

"23. In a machine tool, the combination of a main supporting frame structure, a self-contained machine head frame on said main frame structure, a tool driving and supporting structure on said head frame, rotary tool driving transmission on said head frame, actuator means for effecting relative movement between a supported tool and said main supporting frame structure, feeding transmission on said head frame for translating said actuator means, an electric motor carried by said head frame structure for driving both transmissions, rapid traverse transmission carried by said head frame and driven from said electric motor for translating said actuator means to move said supported tool to a feeding position and for causing the reversal of said actuator means, means for varying the rate of movement imparted by one of said translating transmissions independently of the other, and control means carried by the head frame and adapted for automatic actuation to selectively govern the operative effectiveness of said feeding and rapid traverse transmissions.

"24. In a machine tool, the combination of a main supporting frame structure, a self-contained machine head frame on said main frame structure, a tool driving and supporting structure on said head frame, rotary tool driving transmission on said head frame, actuator means for effecting relative movement between a supported tool and said main supporting frame structure, hydraulic feeding transmission on said head frame for translating said actuator means, an electric motor carried by said head frame structure for driving both transmissions, power operated rapid traverse transmission carried by said head frame for translating said actuator means to move said supported tool to a feeding position and for causing the reversal of said actuator means, means for varying the rate of movement imparted by one of said translating transmissions independently of the other, and control means carried by the head frame and adapted for automatic actuation to selectively govern the operative effectiveness of said feeding and rapid traverse transmissions."

The plaintiffs contend that the claims in suit are valid and that they are infringed by the machines next mentioned. The Ex-Cell-O self-contained hydraulic actuator unit No. 21 (small) is said to infringe claims 4, 9, 10, 13, 14, 16 and 17. The Ex-Cell-O self-contained hydraulic actuator unit No. 23 and No. 25 (large) is said to infringe claims 7, 9, 10, 13, 14, 16, 17, 20, 23 and 24.

The defendants' defenses may be summarized as follows: (1) The patent is invalid as a whole for failure to comply with Section 33, Title 35, U.S.C.A., because of unreasonable multiplicity of claims predicated on one simple and old concept; (2) the claims in issue and particularly claims 4, 7, 20, 23 and 24 are invalid because of aggregation in that they attempt to predicate novelty in a unit as such on the use of a particular form of pump and a particular two-pump type of hydraulic system; (3) all of the claims in issue are invalid for lack of invention over or are anticipated by the prior art; and (4) none of the claims in issue is infringed by either of the units accused under them.

Referring to the defendants' first defense, it is true that counsel for the plaintiffs well describes the "heart of this patent" in approximately ten lines and that the patentee requires four pages of specifications and 28 claims, covering more than four pages, to describe and claim the same thing. Nevertheless, the court does not feel justified in holding the patent invalid because of an unreasonable multiplicity of claims.

Referring to the defendants' second defense, that the claims in issue, and particularly claims 4, 7, 20, 23 and 24 are invalid because of aggregation, the court is of opinion that no good purpose will be served in considering this issue separate and apart from the issue as to whether or not the patent discloses invention over the prior art.

We come to the defendants' third defense, which is that all of the claims in issue are invalid for lack of invention over or are anticipated by the prior art.

The plaintiffs describe the "heart of this patent" as follows: "The invention is of a hydraulic unit that comprises a frame structure that furnishes a support for and is combined with all of the tool operating and controlling mechanisms in a compact operative relationship, and that by reason of this frame structure with its characteristics and functions, a new entity is provided which is fully self-contained as an operative unit, and that may be moved from place to place as desired and attached to the main frame structure of the machine tool." And the plaintiffs say that the specifications fully describe that structure and that the claims amply cover it.

It is not conceded by the defendants that the patent in suit is a patent on a hydraulic unit head. Defendants say that that idea was old, that the Patent Office refused to grant the patentee such a patent, and that what the Patent Office in fact granted the patentee was a patent on certain specifically defined elements. The defendants say: "This is not a patent on a self-contained hydraulic unit, as such. That was old years before Mr. Svenson. What it is, is a very puny improvement patent where no inventive improvement and, in fact, no novelty existed, on a specific form of unit with a specific type of two-pump transmission and even that we find in the prior art."

Taking the plaintiffs at their word, that the invention is of a hydraulic unit, we first direct our attention to a number of mechanical units which exemplify the so-called self-contained unit principle. Kingsbury 1,780,083 applied for in 1927 and granted in 1930, is one of the patents referred to. The machine there described was shown in the "American Machinist" of August 19, 1926, and it was there said of the machine: "The Number 18 drilling head is in itself a complete unit consisting of a driving motor, an automatic variable feed and a clamping attachment to hold the work." In Potter 1,673,088, applied for in 1923 and issued in 1928, the patentee says: "A fundamental principle or idea of my invention is the construction of units, each comprising a spindle and properly supported tools and a motor which by suitable gearing revolves the spindle and feeds the tools so that any number thereof within reason may be assembled so as to constitute a multi-spindle machine, any one of which not including its motor, preferably, may be removed from the assembly without in any degree or fashion impairing the usefulness of those that remain." Milholland 1,841,546 was applied for in 1927 and issued in 1932, and Milholland 1,849,683 was applied for in 1930 and issued in 1932. The Milholland special automatic drilling machine is illustrated in the "American Machinist" of August 30, 1928, where will be found the following statement: "The automatic drill head units are entirely independent of each other and have separate drilling motors. The feed of the cutting tools is accomplished by a plate cam, designed to feed the drills 0.015 in. and spot-face at 0.005 in. per rev." Other patents disclosing the mechanical so-called self-contained unit principle are: Watson 1,850,099, applied for in 1928 and issued in 1932; Poole 2,006,746, applied for in 1929 and issued in 1935; and Yeomans, applied for in 1918 and issued in 1919. Another early mechanical self-contained unit is Foote-Burt mechanical unit of 1923. The complete story of unit heads, mechanical and hydraulic, was told as early as December 15, 1927, in an issue of "Machinery" published on that date at page 329 as follows: "Another interesting matter that stands out prominently is the drill-head principle, firms, supplying small heads as independent units, to be built into any type of multiple machine for drilling, reaming, counterboring, tapping, spot-facing, and hollow-milling. Each head has its own drive and feed details, and thus may be placed anyhow, in horizontal, vertical, or angular dispositions, and at any locations,

closely set, or widely separated, according to the needs of the work. The machine resulting from this make-up is practically built around the work-jig, consequently often consisting merely of a flat plate on a suitable stand, and drilled to secure the jig and heads. The latter may, in some instances, have a range of adjustment for different-sized batches of similar pieces. The usual construction embodies motor drive and a cam feed, but hydraulic feed also occurs, with single-valve control, so that the operator makes the start, and all the units go through their cycle automatically, comprising rapid forward motion, then the feed rate, quick return, and stop. When a class of manufacture is discontinued or changed, the units can be stripped from the machine, and rearranged on it or another framework. Highly-specialized types are thus built up in the shop at a less cost than purchasing a machine out, which would, however, have little or no capacity for subsequent modification." The statements above quoted from the "American Machinist" and from "Machinery" and from the Potter patent, as well as the other patents and prior art structures referred to, demonstrate that the idea of a mechanical so-called self-contained unit was not new when the patentee Svenson began his work, and one of the questions presented to the court is whether or not the patentee Svenson, by substituting a hydraulic transmission for one of the two mechanical transmissions in a unit head, entitled himself to a patent on a so-called hydraulic unit head. The court does not believe that he did. See Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, at page 549, 58 S.Ct. 662, at page 664, 82 L.Ed. 1008, where Mr. Justice Roberts, speaking for the Court, said: "The patent is therefore void as claiming more than the applicant invented. The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention. And the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination." If the hydraulic transmission idea was new and novel and involved invention he may have been entitled to a patent on that but not on the unit head. This for the reason that it does not appear that the hydraulic transmission operates in any unusual, unexpected or unobvious way in a unit head or any differently than it operates in any machine tool, and neither does it appear that the other elements in the unit head function any differently than they were wont to function.

Amongst the prior art machines, patents and publications, being or disclosing hydraulic self-contained units, are: the Ingersoll self-contained drill unit of 1925; Morgan 2,030,888, issued February 18, 1936, on an application filed December 2, 1927; Oberhoffken 1,944,362, issued January 23, 1934, on an application filed March 11, 1929; "Machinery" magazine of November 21, 1929, at page 244; Roberts 1,757,685, issued in 1930 on an application filed in 1928; Galloway 1,764,098 issued in 1930 on an application filed in 1927; a publication known as "Symposium on Hydraulic Feeds for Machine Tools," being a part of a report of the transactions of the American Society of Mechanical Engineers for the year 1927; and a Babcock Foote-Burt self-contained drill unit sold in 1929. The Ingersoll Company's self-contained drill unit and Morgan 2,030,888 are cited against all of the claims in suit. Oberhoffken 1,-944,362 is cited against claims 9, 10, 13, 14, 16 and 17. The Babcock Foote-Burt self-contained drill unit, sold in 1929, is cited against these last-mentioned claims and, additionally, claim 4. The plaintiffs contend that the Ingersoll unit sold in 1925, is not a self-contained drill unit. The court holds that it is. The shape of the frame and the arrangement of the elements on the frame were different from those of Svenson. Furthermore, Ingersoll did not refer to its machine as a self-contained unit but all the elements of a self-contained unit were there and they were on a frame. A hydraulic self-contained unit by any other name is a hydraulic self-contained unit. The plaintiffs also contend that the Morgan patent 2,030,888 does not disclose a self-contained unit. They say that the specifications were amended after the plaintiffs had placed their self-contained unit on the market. It is true that the specifications in the application were amended but Figure 1 in the application and in the patent, which plainly shows a self-contained unit, was not amended after its filing in 1927. Neither was the description of the parts in the application amended after the original filing date. Of Oberhoffken 1,944,362, the plaintiffs say that it does not disclose a tank or sump. It is true that, while it

discloses pipes marked "to tank" and "from tank," it does not disclose a tank. The defendants say that, since the .patentee describes a "machine tool unit," one skilled in the art would know that the tank should be placed within the unit. What the court decides is that, with the disclosures of Oberhoffken before him, Svenson did not exercise inventive genius in placing his tank within the unit. Exactly the same statement may be made with reference to Galloway 1,764,098.

The plaintiffs admit that the Babcock Foote-Burt self-contained drill unit is in fact a self-contained unit but they insist that Svenson ante-dates it. Svenson's filing date is September 13, 1930. It is stipulated that the Babcock unit was completed and sold in August, 1930. Svenson's three earliest drawings are: (1) A drawing of a fragment of a quill; (2) a drawing dated September 13, 1929, and entitled "Automatic Drilling Machine"; and (3) a drawing dated September 18, 1929, entitled "Automatic Drill." These are all of· the dated documents that Svenson has ahead of Babcock's first sketch, which is dated October 17, 1929. The sufficiency of this sketch to show conception has been questioned. The court holds it to be sufficient. It shows clearly that Babcock had the idea of a unit head which Svenson claims. The first Svenson drawings of a unit that are dated and which clearly show a unit, and which embody all the elements that the plaintiffs say a unit must have are dated in March, 1930. In the meantime, Babcock had sent his conception drawing from Detroit to the home office of his company and had shown it to people in that office. There is correspondence in the record about the sketch. In February and March of 1930 in Cleveland, at the office of the Foote-Burt Company, further drawings were made and signed and dated by another engineer, who testified as a witness. A Babcock Foote-Burt machine was sold in April, 1930, for delivery in August, 1930. The working drawings for the Svenson unit were made and dated in March, 1930, and they began ordering parts at or about that time, or certainly in the following month. There is a lack of documentary evidence of the completion and testing of the Svenson machine. There is oral testimony as to its completion and testing for a period of eleven weeks that ended in August, 1930. The first Svenson unit was sold and shipped on February 26, 1931.

The court is of the opinion that Babcock has established the earlier conception date and diligence in adapting and perfecting his invention down to the date of his completion and shipping of his machine. Svenson has failed to show reduction to practice prior to the stipulated date for Babcock.

The court is of the opinion that all of the claims in issue are invalid for lack of invention over or are anticipated by the prior art cited.

Coming to the question of infringement, it will be observed that if the claims are considered separate and apart from the specifications, the words of a number of them will find response in defendants' machines, while if the claims are interpreted in the light of the disclosures of the specifications, as they must be, it will be found that they call for entirely different machines.

Defendants' large-sized self-contained hydraulic unit (Types 23 and 25) is said to infringe claims 7, 20, 23 and 24. Of these claims, claim 7 may be said to be typical, particularly so far as concerns the two elements about to be discussed. The following two elements of claim 7, "adjustable feeding transmission on said head frame for said actuator means" and "power operated rapid traverse transmission carried by said head frame for causing said actuator means to move said supported tool to a feeding position and for causing the reversal of said actuator means" must be particularly considered. The specifications of Svenson 2,036,162 disclose two pumps, two sets of pipes to the actuator, and two transmissions, and the court is of the opinion that the claims, interpreted in the light of the disclosures in the specifications, require two pumps, two sets of pipes to the actuator, and two transmissions. The defendants' large-size self-contained hydraulic unit (Types 23 and 25) does not have two separate transmissions for imparting feed and rapid traverse movements to the actuators, independently of each other. On the contrary, the defendants use substantially the same transmission mechanism for feed and rapid traverse (including pump, intake conduits, control valves, and discharge conduits) simply adding restricting orifices to the circuit used for rapid traverse to reduce the volume of fluid and also using both cylinders of the actuator, instead of only one, to further reduce the speed during

feed. The defendants' machine is an entirely different machine from that disclosed in Svenson 2,036,162, and the claims referred to are not infringed.

The defendants' large-sized self-contained hydraulic unit (Types 23 and 25) and the small-sized self-contained hydraulic unit (Type 21) are both charged to infringe claims 9, 10, 13, 14, 16, and 17, of which claim 17 is typical. Of that claim and the claims of which it is typical, there are two elements which are not found in the defendants' machines. They are "pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder," and "valve means adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle." When the specifications of Svenson 2,036,162 are examined and these two elements are examined in the light of the specifications, then it is found that in that patent "pumping means" comprises two pumps, a large capacity low pressure constant volume gear pump for use in rapid traverse and a small capacity high pressure variable displacement piston type pump for use during feed. It will also be found that "valve means" functions to cut into the circuit the large volume gear pump to provide fast speed for rapid traverse and to cut out the gear pump, leaving in the small volume high pressure pump to provide slow speed for feed. Control of the feed speed is effected by manual adjustment of the output of the high pressure feed pump. Two entirely different pumps and a special type of co-operating valve are necessary for operation of the Svenson circuit. Neither pump could be used alone without completely redesigning the valve and the circuit. The defendants' machines do not have such two-pump pumping means, no such co-operating valve, and no such mode of operation in effecting rapid traverse and feed. Defendants' large-size self-contained hydraulic unit (Types 23 and 25) uses a single constant volume pump, two actuators, one small and one large, yoked together and moving in unison, and a special combination of pilot and control valves whereby fluid from the single pump is directed to the small actuator alone to produce fast speed for rapid traverse and to both actuators to effect slow speed for feed. Control of the feed speed is automatically effected by the use of restricted orifices, cut into the actuator discharge line. Defendants' small-size self-contained hydraulic unit (Type 21) uses a single variable displacement swashplate type of piston pump with a single actuator, providing fast speed for rapid traverse and slow speed for feed by varying the output of the pump. Control of the pump output, and therefore of the feed speed is automatically effected by the use of a restricted orifice in the actuator discharge line. Svenson 2,036,162 and defendants' machines both produce rapid traverse and feed movements of their actuators, but their structural combinations and their modes of operation are entirely different and the claims referred to are not infringed.

The court is inclined to the view and holds that claim 4 of Svenson 2,036,162 is infringed by the Defendants' small-sized self-contained hydraulic unit (Type 21), though there may be some doubt whether the "driving means for imparting movement to said pistons" in the machine is "adjustable" as required by element 7 of the claim.

4. *Svenson 2,178,364 for a "Material Working Apparatus," Issued October 31, 1939, on an Application Filed September 13, 1930, and Containing 15 Claims, of Which 3 Are in Suit.*

At the beginning of the argument, the plaintiffs said of this patent and that of which the discussion has just been concluded: "The drawings of Svenson 2,036,162 and those of Svenson 2,178,364 are one and the same. One is a division of the other. Both have to do with self-contained hydraulic actuator units. Svenson 2,036,162 is the broader because it includes both the sliding head type of unit and the quill type of unit, while Svenson 2,178,364 is the narrower patent since it includes only the quill type." The defendants refused to acquiesce in plaintiffs' estimate of Svenson 2,178,364 and said of it: "This is not a second unit patent. It is simply a patent on a subcombination of a quill and an actuator and in claims 13 and 14 a basic form of spindle drive aggregated with that." However, at page 14823 of the record, the plaintiffs acquiesce in defendants' contention that the invention of Svenson 2,178,364 is limited to the quill arrangement.

In Svenson 2,178,364 the patentee says: "It is one of the primary objects of my present invention to provide a hydraulically controlled unit of compact and durable construction. which is readily adaptable for use in many types of machines, * * * * * * * *

"A further object of my invention is to provide a hydraulic actuator unit for shifting machine elements as above set forth, which is not only of compact and durable construction, but is of very simple construction, thereby enabling the same to be economically manufactured as compared with relatively expensive actuator devices of the mechanical type which have been employed in practice heretofore.

"Another object of my invention is to provide a hydraulic actuator unit as above set forth for reciprocating a machine element, such as a drilling or boring tool, which unit will function with equal effectiveness in a horizontal, vertical, or inclined plane, and which is attachable or detachable with a minimum amount of skill and effort.

"Still another object of my invention is to provide a hydraulically operated actuator unit as above set forth which is extremely accurate in effecting the performance of cutting operations, and to this end I propose to provide an improved spindle support and a hydraulic actuator arranged in parallelism therewith.

"More specifically, my invention contemplates the provision of a multi-sided spindle support which is adapted to be conveniently secured in a fixed position or to reciprocate within a suitable frame to thereby maintain absolute alinement of the spindle which is rotatable within said multi-sided support.

"Still more specifically, my invention contemplates the provision, in combination with the multi-sided support as above set forth, of a hydraulic actuator which is arranged in substantial parallelism with said support, and which is adapted to reciprocably actuate the same, said support and actuator being conveniently housed within a unitary frame structure.

"In addition to the above mentioned advantageous characteristics, my invention contemplates the provision of an actuator unit, in which a prime mover, a plurality of fluid pumping mechanisms, a fluid actuator, and a tool holding mechanism are all supported upon a unitary frame structure which is readily detachable with respect to a suitable support or base.

"My invention also contemplates the provision of an improved hydraulic closed circuit arrangement, which includes a variable displacement, high pressure pump, said pump being continuously driven from a suitable prime mover."

The claims in suit are the following:

"12. A metal working machine comprising a housing, quill supporting means associated with said housing, a quill coaxial with said supporting means and slidably mounted therein, a spindle journaled in said quill and coaxial therewith, a hydraulic actuator coupled with said quill and extending in the general direction thereof, fluid pressure generating means adapted to hydraulically reciprocate said actuator for imparting reciprocation to said quill, and means for rotating said spindle.

"13. In material working apparatus, a reciprocable spindle supporting sleeve, a rotatable spindle within said sleeve, rotary spindle driving means comprising a shaft extending within said sleeve and rotatably and slidably connected with said spindle, hydraulic feed mechanism for said supporting sleeve driven in synchronism with said shaft, a housing for said supporting sleeve having means therein cooperatively arranged to prevent angular shifting of the sleeve during reciprocation thereof, said sleeve being adapted for reciprocation within said housing to effect the translation of said spindle and serving as the sole lateral support for the spindle whereby to present a self-contained spindle supporting unit.

"14. In material working apparatus, a reciprocable spindle supporting sleeve, a rotatable spindle within said sleeve, rotary spindle driving means comprising a shaft extending within said sleeve and rotatably and slidably connected with said spindle for driving purposes, hydraulic feed and rapid traverse mechanism for said supporting sleeve driven in synchronism with said shaft, a housing for said supporting sleeve having means therein cooperatively arranged to prevent angular shifting of the sleeve during the reciprocation thereof, said sleeve being adapted for reciprocation within said housing to effect the translation of said spindle and serving as the sole lateral support for the spindle whereby to present a self-contained spindle supporting unit."

The plaintiffs contend that the patent is valid, that claims 12, 13 and 14 are infringed by the Ex-Cell-O self-contained hydraulic actuator unit (Types 23 and 25 large) and that claims 13 and 14 are infringed by the Ex-Cell-O self-contained hydraulic actuator unit (Type 21 small).

The defendants' defenses are: (1) That the nine-year history of the application for the patent shows such laxity on the part of the Patent Office as to vitiate the normal

presumption of validity; (2) that, as a result of the hiatus which occurred in the prosecution of the application for the patent, it is invalid on either or both of the grounds that (a) there was an abandonment under Section 37, Title 35 U.S.C.A., or (b) even if the date of resumption of prosecution in the Patent Office be treated as equivalent to a new application as of that date, the plaintiffs' own sale of units at a date more than two years earlier constitutes a public use bar; (3) that each of the three claims in issue is invalid on the ground of aggregation; (4) that each of the claims in issue is invalid on the prior art; and (5) that claims 13 and 14 are not infringed by defendants' machines.

The defendants' first contention, that the nine-year history of the application for the patent shows such laxity on the part of the Patent Office as to vitiate the normal presumption of validity, cannot, in the court's opinion, be sustained. The patentee sought certain claims in the Patent Office, which claims were disallowed. He filed one, or perhaps two, section 4915, 35 U.S.C.A. § 63, proceedings to compel the allowance of the claims in question. After a time, he dismissed the Section 4915 proceedings, filed other claims in the Patent Office, and continued the prosecution of the patent, and claims were finally allowed which are identical with or greatly resemble claims which in the first place had been disallowed by the Patent Office. The court does not think that this indicates anything other than that the officials of the Patent Office changed their minds.

The conclusion which the court has reached in respect of the defendants' first defense indicates that there should be a like decision in respect of the defendants' second defense. The second defense is that the patent is invalid on either or both of the grounds: (1) That there was an abandonment under Section 37, Title 35 U.S.C.A., or (2) even if the date of resumption of prosecution in the Patent Office be treated as a new application of that date, the plaintiffs' own sale of units at a date more than two years earlier constitutes a public use bar. The court is of the opinion that there was no abandonment and that there was no proceeding equivalent to the filing of a new application, and that, accordingly, the second defense cannot be sustained.

The defendants' third defense, that each of the three claims in issue is invalid on the grounds of aggregation, appears to be no more or less than a contention that each of the three claims fails to show invention over the prior art. Accordingly, nothing further will be said of the third defense, except incidentally in connection with the fourth defense.

The defendants' fourth defense is that each of the claims in issue is invalid on the prior art. Plaintiffs say that in some cases and under some circumstances the quill type of actuator unit has an advantage over the sliding head type because of the fact that the quill moves the tool forward from the body of the unit and thus allows more tools to work about a given workpiece. This contention is not apparently disputed and it appears to be well founded. The defendants do say that the quill idea is old and they cite, generally, against all the claims in suit: Rogers 411,616 issued in 1889; Lassiter 1,046,311, issued in 1912; Debie French patent 561,265, issued in 1923; and Roberts 1,757,685, issued in 1930 on application filed in 1928. Rogers 411,616, issued 41 years before Svenson filed his application, discloses everything of consequence concerning a "quill." In that patent, at lines 37 to 58 of page 1 thereof will be found the following language: "G, the drill-spindle; * * * M, the taper drill-socket in the lower end of the drill-spindle, which drill-spindle has a central bore to receive its vertical driving shaft; N, the vertical driving-shaft fitting the central bore of the drill-spindle and splined therein, and serving as the means by which motion is imparted to the drill-spindle, while at the same time the drill-spindle is capable of vertical motion in its bearing as the feeding progresses;". In the specifications of the Debie French patent 561,265, issued in 1923, will be found the following reference to a "quill:" "In order to reduce in height the bulkiness of the apparatus, the pieces C and a are: the first the male of the second and the second the female of the first." The defendants cite Roberts 1,757,-685, Johnson 1,783,019, Poole 2,074,426 and Lassiter 1,046,311 particularly against claim 12. The court is of the opinion that each of them is a full anticipation of the disclosures of claim 12. The defendants cite, particularly, against claims 13 and 14 Roberts 1,757,685, Johnson 1,783,019 and Lassiter 1,046,311. The court is of the opinion that neither claim 13 nor claim 14 discloses invention over these prior art patents. It follows from the foregoing that the court is of the opinion that each of the three claims in suit is invalid.

It is not denied by the defendants that claim 12, if valid, is infringed not only by defendants' large-sized self-contained hydraulic unit Types 23 and 25, but also by defendants' small-sized self-contained hydraulic unit Type 21, but the defendants say that these two machines more nearly resemble the disclosures of the prior art patents, Poole, Johnson, Lassiter and Roberts than they do Svenson 2,178,364, and the court is of the opinion that they are right in this contention.

Plaintiffs contend that defendants' large-sized self-contained hydraulic unit Types 23 and 25 and defendants' small-sized self-contained hydraulic unit Type 21 each infringe both claims 13 and 14. The defendants contend that defendants' self-contained large-sized hydraulic unit Types 23 and 25 do not infringe either claims 13 or 14 for the reason that defendants' unit has no feed mechanism driven in synchronism with its spindle driving shaft. The court is of the opinion that this contention is well taken. Defendants' machine contains feed rate control means whereby the longitudinal feed is maintained constant regardless of variations in speed of the spindle and its driving means.

Defendants contend that the defendants' small-sized self-contained hydraulic unit Type 21 does not infringe either claim 13 or 14 for each of three several reasons. They say, first, that the defendants' device has no feed mechanism driven in synchronism with its spindle driving shaft. In the court's opinion this contention is well taken. The defendants' machine contains special pump control means whereby the longitudinal feed is maintained constant regardless of variations in speed of the spindle and its driving means. Defendants' second contention is that the housing for defendants' quill does not have means therein for preventing the angular shifting of the sleeve, as in Svenson. The defendants' quill is prevented from angular shifting by an external pin. It is true that this is a small difference. It is likewise true that the matter claimed is a small matter. Defendants' third contention is that defendants' quill does not serve as the sole lateral support for its spindle. This contention is well taken. The rear end of defendants' spindle is supported in and by a spindle drive sleeve.

The conclusion is that claim 12, if valid, is infringed, and that claims 13 and 14 are not infringed.

5. *Svenson 2,174,850 for a "Hydraulic Control and Actuator Mechanism," Issued October 3, 1939, on an Application Filed December 21, 1931, and Containing 37 Claims, of Which Two Are in Suit.*

The plaintiffs say that this patent discloses and that the claims in suit refer to a machine containing a reservoir formed by the wall portions of the frame of the machine and adapted to carry fluid so positioned with respect to the spindle as to absorb heat generated by the high speed rotating spindle.

In Svenson 2,174,850 the patentee says:

"It is also an object of the present invention to provide for use in a hydraulic actuator system a unitary frame supporting structure for supporting as a unit, a rotary supporting member or spindle, fluid pressure generating means or pump, and a fluid reservoir whereby fluid may be maintained in association with said rotary supporting member for dissipating heat generated by the rotation of said supporting member or spindle."

\* \* \* \* \*

"Extending upwardly and formed integral with the base or bed 42 at one end thereof is a head stock section designated generally by the numeral 48. This section 48 is cast in one piece with the bed and provides a support for a rotary supporting member or spindle 50.

"Particular attention is directed to the fact that this unitary head stock section or frame 48 is not only designed to support or carry the spindle 50, but is also designed to serve as a fluid reservoir designated generally by the numeral 52, see particularly Figure 2.

\* \* \* \* \*

"The headstock structure actually provides the wall structure for the reservoir and also serves to support the spindle, pumps, driving means, etc., as a complete unit. The spindle is not only supported by the unitary frame structure of the head stock but is so positioned with respect to the fluid contained within the frame, such as the fluid within the reservoir, that heat developed from the rotation of the spindle within its bearings is appreciably dissipated through the contained fluid."

The claims in suit are the following:

"26. A hydraulic unit structure including a unitary frame structure, a rotary supporting member carried by said unitary

frame, a fluid pump associated with said frame, driving means for said pump carried by the frame, and a fluid reservoir within said frame, portions of said frame providing wall portions of said reservoir, the fluid within said frame being so positioned with respect to said rotary supporting member as to facilitate in dissipating heat resulting from rotation of said supporting member within said frame."

"28. A hydraulic unit structure including a unitary frame structure, a bearing within said frame, a rotary supporting spindle carried by said bearing in said unitary frame, a fluid pump associated with said frame, driving means for said pump carried by the frame, driving means for said spindle carried by said frame, and a fluid reservoir within said frame, portions of said frame providing wall portions of said reservoir, the fluid within said frame being so positioned with respect to said rotary supporting member as to facilitate in dissipating heat resulting from rotation of said supporting member within said frame."

The plaintiffs contend that the patent is valid and that claims 26 and 28 are infringed by both the Ex-Cell-O self-contained hydraulic actuator unit (Type 21, small-size) and the Ex-Cell-O self-contained hydraulic actuator unit (Types 23 and 25 large size).

The defendants' defenses are: (1) That the patent is invalid under Section 33, Title 35 U.S.C.A., for failure to disclose a structure for carrying out the alleged invention; (2) that the patent is invalid under Section 31, Title 35 U.S.C.A. for lack of utility; (3) that the two claims in issue are invalid on the ground of aggregation; (4) that the two claims in issue are invalid on the prior art; and (5) that the defendants followed the prior art.

The patent makes a sufficient disclosure of a structure for carrying out the alleged invention. The court cannot say that the alleged invention completely lacks utility. Here, the defense of invalidity because of aggregation does not differ materially from the defense of invalidity for lack of invention. And so we come to the fourth defense of invalidity on the prior art. The defendants cite the Babcock Foote-Burt self-contained drill unit of 1929; Sears 1,-422,140, issued in 1922 on an application filed in 1920; Anderson 1,069,995, issued in 1913 on an application field in 1912; and Curtis 2,118,021, issued in 1938 on an application filed in 1927.

The Babcock unit of 1929 has everything claimed in claims 26 and 28. The plaintiffs contend that Svenson 2,174,850 is older than Babcock because, they say, Svenson carried his date of invention back at least to May, 1930, and prior to the dates of Babcock. The court considered the Babcock unit during an examination of Svenson 2,036,162, above, and came to the conclusion that Babcock is entitled to the date of October 17, 1929, which is earlier than any date claimed for the patent now under consideration. In Sears 1,422,140, there are shown "a fluid reservor within said frame" "portions of said frame providing wall portions of said reservior," and "the fluid within said frame being so positioned with respect to said rotary supporting member as to facilitate in dissipating heat resulting from rotation of said supporting member within said frame." The motor, however, is not mounted on the frame and the pump and driving means therefor, which supplies air pressure, is not shown. In Anderson 1,069,995, the fluid pump and driving means therefor for furnishing compressed air to the actuator is now shown. And in Curtis 2,118,021 the fluid reservoir is not within the frame and the portions of the frame do not provide wall portions for the reservoir. The court is of the opinion, however, that the Babcock Foote-Burt self-contained drill unit anticipates Svenson 2,174,850, and particularly claims 26 and 28 thereof, and that Svenson 2,174,850 does not disclose invention over Sears 1,422,140, Anderson 1,069,995 and Curtis 2,118,021.

The defendants say their accused machines follow the prior art as taught by Anderson 1,069,995, Sears 1,422,140 and the Babcock Foote-Burt self-contained drill unit of 1929. The court believes that this contention is well taken, and that, while claims 26 and 28 read on the accused machines, the claims are not in fact infringed for the reasons that the claims are invalid and that the defendants' machines follow the prior art.

Before leaving Svenson 2,174,850, it may be well to refer to some additional prior art to which the defendants have called attention, and which prior art shows oil reservoirs formed in the frame of the machine. This prior art is: "Machinery"

magazine (British) of November 21, 1929, page 244; Flygare 1,893,076 (1929-1933); Greensmith 1,718,554 (1920-1929); Hoelscher 2,012,084 (1930-1935); Lassiter 1,-046,311 (1912); Galloway 1,731,718 (1927-1929). In "Machinery" magazine (British) of November 21, 1929, at page 244, is found the following language:

"The body of the head forms an oil reservoir, from which the oil is drawn by a special type of pump, indicated at A, in Fig. 2.

\* \* \* \* \*

"The hydraulic mechanism of the head and automatic indexing table is completely enclosed; there are no stuffing glands; any small leakages past the piston or valves automatically returning to the sump in the body of the head."

While in the drawings of the Galloway patent a sump is not shown, yet the termini of pipes leading to and from the sump are shown and these indicate that the sump is in the frame.

6. *Barnes, Guirl and Johnson 2,098,220 for a "Material Working Apparatus," Issued November 9, 1937, on an Application Filed August 12, 1932, and Containing 48 Claims, of Which 7 Are in Suit.*

■ The structure disclosed in Barnes, Guirl and Johnson 2,098,220 is a double-end machine, in which two self-contained hydraulic units are mounted on a main base to slide toward and away from a central work fixture. This work fixture is mounted to rotate on a horizontal axis extending lengthwise of the bed, and the work fixture turns step by step, always in the same direction, to carry each workpiece loaded thereon progressively from a loading sta-

tion into and through five work stations, at each of which stations each work piece has a machining operation performed thereon. Each complete cycle of operation on the work comprises clamping a pair of workpieces in one of the six work clamps of the work fixture, this being done at the loading station. After this is done, the machine is started in operation, in the first stage of which the workpieces are moved into the first machining station. Then, the work fixture is locked against movement and the two heads or units move toward each other, in rapid traverse and feed to machine the workpieces, after which the heads retreat to their remote positions. The workfixture is then automatically indexed to position the pair of workpieces at the second, third, fourth and fifth stations progressively, at each of which the workfixture is locked in place and the heads automatically approach, machine the work, and again retreat. At the next indexing movement of the workfixture the pair of finished workpieces are brought to the loading station, where they are unclamped and removed by the operator. In this complete cycle, pertaining to any given pair of workpieces, the operation of the machine is completely automatic, both as to the approach and retreat of the heads or units and as to the step-by-step indexing rotation of the work fixture. No manual intervention is required of the operator, his only duty being to load and unload the workpieces at the initial loading station. Figure 12, hereinafter set forth, is a front elevational view of a machine embodying the features of Barnes, Guirl & Johnson, 2,098,220 and Figure 13, hereinafter set forth, is a transverse sectional view of the machine, which view gives an idea of the work fixture with its six work clamps.

**FIGURE 12**

312

**FIGURE 13**

In Barnes, Guirl and Johnson 2,098,220, the patentee says:

"A further important object of the present invention is to provide an improved practical machine, whereby a plurality of parts may be simultaneously operated upon from opposite sides thereof, and whereby parts may be effectively indexed to a plurality of positions until the machining thereof has been completed.

"More specifically, the invention contemplates the provision of metal working apparatus, in which a work holder positioned intermediate a pair of oppositely disposed reciprocable heads is adapted to be indexed through a plurality of positions in timed relation with the movements of the cutting tools carried by said heads, whereby machining operations may be successively performed on opposite sides of the work.

\* \* \* \* \* \*

"A further object of the invention is to provide in combination with a machine of the aforementioned type safety devices which are adapted to prevent the functioning of the index mechanism out of timed relation with the functioning of the tool carrying heads.

"The present invention further contemplates a novel arrangement of self-contained actuator units or drill units in combination with a shiftable work holder or work supporting unit whereby production of work is greatly expedited."

The claims in suit are the following:

"37. In a machine tool, the combination of a main frame structure having a supporting surface, a self-contained actuator unit mounted on said supporting surface including a unitary head frame structure, a spindle rotatably mounted on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with said supporting surface, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, valve means on said head frame adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit, a shiftable work holder cooperatively positioned with respect to the spindle carried by said head frame, and means for effecting the shifting of said work holder in timed relation with the translation of said spindle whereby to enable work pieces carried by said work holder to be successively machined.

"38. In a machine tool, the combination of a main frame structure having a supporting surface, a self-contained actuator unit mounted on said supporting surface including a unitary head frame structure, a spindle rotatably mounted on said head frame, a shiftable translating element carried by said head frame, mechanism carried by the head frame for moving said translating element at a feeding rate, a prime mover mounted on said head frame for imparting rotation to said spindle and operatively coupled for driving purposes with said mechanism, power driven mechanism carried by the head frame for moving said translating element at a faster rate, control means on the head frame adapted to selectively govern the operative effectiveness of said mechanisms upon said translating element, said head frame and element supported thereby presenting a self-contained actuator unit, a shiftable work holder cooperatively positioned with respect to the spindle carried by said head frame, and means for effecting the shifting of the work holder in timed relation with the transla-

tion of said spindle whereby to enable work pieces carried by said work holder to be successively machined.

"39. In a machine tool, the combination of a main frame structure having a supporting surface, a self-contained actuator unit mounted on said supporting surface including a unitary head frame structure, a spindle rotatably mounted on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with said supporting surface, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, valve means on said head frame adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit, a self-contained supporting frame including shiftable work supporting structure cooperatively positioned with respect to the spindle carried by said head frame, and means for effecting the shifting of said work supporting structure in timed relation with the translation of said spindle whereby to enable work pieces carried by said work supporting structure to be successively machined.

"40. In a machine tool, the combination of a main frame structure having a supporting surface, a self-contained actuator unit mounted on said supporting surface including a unitary head frame structure, a spindle rotatably mounted on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with said supporting surface, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, valve means on said head frame adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit, a

shiftable work holder cooperatively positioned with respect to the spindle carried by said head frame, means for effecting the shifting of said work holder in timed relation with the translation of said spindle whereby to enable work pieces carried by said work holder to be successively machined, and shiftable means for positively insuring a preselected alinement between said spindle and the work piece carried by the work holder.

"41. In a machine tool, the combination of a main frame structure having a supporting surface, a self-contained actuator unit mounted on said supporting surface including a unitary head frame structure, a spindle rotatably mounted on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with said supporting surface, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, valve means on said head frame adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit, a shiftable work holder cooperatively positioned with respect to the spindle carried by said head frame, and hydraulic actuator means for effecting the shifting of said work holder in timed relation with the translation of said spindle whereby to enable work pieces carried by said work holder to be successively machined.

\* \* \* \* \* \*

"43. In a machine tool, the combination of a main frame structure having a supporting surface, a self-contained actuator unit mounted on said supporting surface including a unitary head frame structure, a spindle rotatably mounted on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with said supporting surface, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder,

valve means on said head frame adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit, a second self-contained actuator unit similar to the first mentioned actuator unit and similarly mounted on said supporting surface, a shiftable work holder cooperatively positioned with respect to the spindle carried by said actuator units whereby to enable the machining of a work piece from opposite sides thereof, and means for effecting the shifting of said work holder in timed relation with the translation of said actuator units whereby to enable work pieces carried by said work holder to be successively machined.

\* \* \* \* \* \*

"48. In a machine tool, the combination of a main frame structure having a supporting surface, a self-contained actuator unit mounted on said supporting surface including a unitary head frame structure, a spindle rotatably mounted on said head frame, hydraulically responsive means connected with said head frame for imparting translation to said spindle in a direction parallel with said supporting surface, said hydraulically responsive means including a fluid receiving cylinder, a prime mover such as an electric motor on said head frame for rotating said spindle, pumping means on said head frame driven from said prime mover for delivering fluid to said cylinder, valve means on said head frame adapted to control the rate and direction of flow of fluid from said pumping means into said cylinder in timed relation with the translation of said spindle, said head frame supporting the aforementioned elements so as to present a self-contained actuator unit, said hydraulic arrangement being such as to enable the translation of said spindle at a plurality of feeding rates, a shiftable work holder cooperatively positioned with respect to the spindle carried by said head frame, and means for effecting the shifting of said work holder in timed relation with the translation of said spindle whereby to enable work pieces carried by said work holder to be successively machined."

The plaintiffs contend that the patent is valid and that the claims in suit are infringed by the defendants' Ford crank shaft centering machine.

The defendants' defenses are: (1) That the patent is invalid in its entirety for failure to disclaim claims 1, 2, 3, 4, 7, 11 and 12, which read squarely on a Universal Products machine, completed at a date early enough to be a full statutory bar, and of which plaintiffs had full knowledge, having manufactured a portion of that machine, and one of the patentees having personally inspected it after installation; (2) that the claims in issue are invalid on the ground that they define simply an old and exhausted combination, substituting a unit for an ordinary sliding head in a machine with an automatic work holder, or, to approach the same facts in another way, the details of the unit, as such, are simply aggregated with an automatic work holder and with which they co-act in no new way and achieve no new result; (3) that the claims in issue are invalid for lack of invention over Svenson 2,036,162 (herein suit) adding, as they do, simply an automatic work holder, that is, a work holder shifted in timed relation to the unit of the Svenson patent; (4) that the claims in issue are invalid on the prior art; and (5) that there is no infringement of any of the claims in issue.

The court has indicated above that the defendants' first defense cannot be sustained. Coming to a consideration of defendants' second and third defenses, the court is of the opinion that the patentees could not lawfully claim one unit head or two unit heads in combination with an automatic work holder. The unit head was at least as old as the application for Svenson 2,036,162. The unit head or heads did not operate in an unexpected or unobvious way with the automatic work holder or in any other way than they always had operated. If the automatic work holder was new the patentees might lawfully have a patent on it alone but not upon it and the old unit or units. Rogers v. Alemite, 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251; Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008.

The defendants cite against all of the claims in suit: Svenson 2,036,162, issued in 1936 on an application filed in 1930 (the unit head patent, above considered); Morgan 2,030,888, issued in 1936 on an application filed in 1927; the Haeger Machine of May, 1929; Haeger 1,861,055, issued in 1932 on an application filed in 1930.

The eight elements of claim 9 of Svenson 2,036,162 are copied almost word for word in claims 37, 39, 40, 41, 43 and 48 of Barnes, Guirl & Johnson 2,098,220 and they are copied substantially in claim 38 of

the last mentioned patent. The court is of the opinion, as above stated, that no one of these claims can be valid because it is an attempt to get another and later patent on the Svenson unit head.

Morgan 2,030,888 shows a unit head and a shiftable work holder. Neither the Haeger Machine nor Haeger 1,861,055 can be said to disclose unit heads but they do disclose all the elements which could be assembled into unit heads, and the court holds that in 1932 it was obvious to one skilled in the art to do this. Both the Haeger Machine and the Haeger patent disclose adjustable work holders. The court is of the opinion that the claims in suit do not disclose invention over Morgan 2,030,888, the Haeger Machine of May, 1929, or Haeger 1,861,055, and that they are, accordingly, invalid.

The following element of claims 37, 38, 39, 40, 41, 43, and 48 "means for effecting the shifting of said work holder in timed relation with the translation of said spindle whereby to enable work pieces carried by said work holder to be successively machined" is not found in defendants' Ford crank shaft centering machines. The defendants' hydraulically operated work holder is not shifted in timed relation with the translation of the spindle. In defendants' machine, the operator effects the shifting of its work holder by manual operation of an indexing lever. The following elements of claim 38 "mechanism carried by the head frame for moving said translating element at a feeding rate" and "power driven mechanism carried by the head frame for moving said translating element at a faster rate" are not found in defendants' machine. The defendants do not have separate feed and rapid traverse mechanisms (pumps), as does the patent in suit. The defendants' machine does not have the following element of claim 40 "shiftable means for positively insuring a preselected alignment between said spindle and the work piece carried by the work holder." The defendants have no means which insures alignment between its spindle and the work piece which is equivalent to the positively aligning bushings and locating bars of the patent in suit. The defendants' machine does not have the following element of claim 48 "said hydraulic arrangement being such as to enable the translation of said spindle at a plurality of feeding rates." The defendants' hydraulic arrangement is such as to enable translation at only one feeding rate.

The court is of the opinion that no one of the claims in suit is infringed.

7. *Svenson 2,078,695 for an "Automatic Lathe and Fluid Circuit," Issued April 27, 1937, on an Application Filed March 27, 1930, and Containing 219 Claims, of Which 18 Are in Suit.*

The plaintiffs say: "This Svenson patent 2,078,695 discloses and claims functionally independent hydraulic rapid traverse and feed circuits operably effective independently of each other to shift the elements of a machine tool in rapid traverse and in uniform feed."

The diagram shown in Figure 14 is a reproduction of that portion of Figure 23 of the patent drawings which is necessary to an understanding of the patent.

**FIGURE 14**

The defendants say comparison of Svenson 2,078,695 with Svenson 1,924,422 (also in suit) "reveals that they both disclose substantially the same form of manufacturing type lathe and differ simply in the detail of the hydraulic circuit provided. In each instance, there are three main actuators for operating the front and rear tool slides. In the case of Svenson 2,078,695, the patentee has abandoned the idea of supplying all three of these actuators by a suitable distribution arrangement from a single pair of pumps. Instead, the problem of distributing pressure fluid to a plurality of actuators, which characterized Svenson 1,924,422 has been obviated by providing separate feed 172 and 172a for the respective actuators." The defendants further say that Svenson 2,078,695 discloses neither a "valveless" feed circuit nor "independent circuits."

In Svenson 2,078,695, the patentee says:

"One of the important objects of my present invention is to provide, in combination with movable machine elements, such as tool carriages and the like, a system of fluid control which is not only exceedingly simple in arrangement and economical to manufacture, but which is also exceedingly efficient and positive in controlling the movement of these machine elements. To this end I propose to provide what I shall hereinafter refer to as a closed, valveless, fluid circuit, in combination with the machine elements, such as tool carriages and the like, which are to be shifted. This novel and practical valveless fluid circuit is not only adapted for use in connection with the control of machine tools, but has a very broad application in various fields wherein it is desirable to hydraulically effect the shifting of parts.

"Another object of my invention is to provide hydraulic means, in combination with a machine spindle, whereby a governed amount of movement of tool carriages and the like may be obtained per revolution of said spindle. In other words, I propose to correlate the movement of the spindle with the movement of the tool carriages, and in order to present a practical, workable arrangement, I contemplate directly coupling with the spindle a plunger pump of a new and practical design which is free from fluid leakage or slippage.

"Still another object of my present invention is to provide, in combination with elements to be moved, such as machine tool carriages and the like, a fluid system of control having a closed high pressure circuit and an associated low pressure circuit, said high pressure circuit being employed for feeding purposes, and the low pressure circuit for rapid traverse movements.

"More specifically, my invention contemplates the provision of the above mentioned associated high and low pressure fluid circuits which are so arranged that each of said circuits is operable independently of the other.

"A further object is to eliminate the necessity of employing complicated fluid control valves and the like which have not only been very expensive, but which have also had a decided tendency by reason of fluid leakage, etc., to materially reduce the propelling effectiveness of the fluid pumping mechanism forming a part of the circuit which normally includes such control valves. To remedy this condition I propose to provide a new and improved single control for governing the movement of a plurality of machine tool carriages and the like, which may be conveniently manipulated without disturbing or affecting in any way the propelling effectiveness of the pump included within the feeding circuit.

"A still further object of my invention is to provide, in combination with machines as above set forth, a continuously operable low pressure fluid propelling mechanism, such as a gear pump, and a high pressure fluid propelling mechanism, such as a plunger pump, which is directly coupled with the machine spindle, the propelling effectiveness of one of said pumps being totally independent of the propelling effectiveness of the other.

"Another object is to overcome the disadvantages and difficulties resulting from the use of clutch and other transmission arrangements which have been employed in connection with machine tools and the like.

\* \* \* \* \*

"From the foregoing it will be understood that my invention contemplates the provision of an inexpensive, simple, and durably constructed material working apparatus and a hydraulic or fluid system of control which is not only extremely simple in arrangement, but which is of a very practical design. By employing this system of fluid control, I am able to eliminate the necessity of using the usual complicated and expensive control valves. These conventional control valves are normally connected to both low and high pressure cir-

cuits, and hence their structural arrangement is quite complicated. My improved system of control enables the use of a single, simple, three-position valve which is connected only to a low pressure circuit. In other words, leakage or fluid slippage which has been experienced heretofore in using conventional control valves in high pressure fluid circuits, is completely obviated by my improved arrangement. In my device, the high pressure circuit is operable independently of the low pressure circuit, and no valves of any kind are required in said high pressure circuit. Through the agency of this closed valveless circuit combined with my improved variable displacement plunger pump directly driven from the work supporting spindle, I able to obtain a predetermined feeding movement of an actuator piston per revolution of the work supporting spindle. The tapered valve arrangement combined with the stationary block for supporting the radial pistons, presents a pumping structure which is particularly adaptable for use in closed circuits. This results from the fact that the tapered valve positively prevents leakage toward its smaller end, and any slow leakage of fluid at its larger end is redirected to the intake side of the pump. This is to be distinguished clearly from pumping devices which have been employed heretofore, wherein a high degree of fluid slippage has been experienced along the surfaces of the rotary valves, thereby causing the overheating of the fluid and a material decrease in the propelling efficiency of the pump. In other words, my invention provides, in combination with an actuator piston, a pumping mechanism having valveless ducts extending between said pump and the actuator piston, and the fluid medium confined within said parts being substantially non-compressible, imparts a positive and constant propelling force against the actuator piston. Thus, the high pressure circuit may be termed a primary circuit, and the low pressure circuit may be termed a secondary circuit, said primary circuit being used for feeding purposes, and the secondary circuit for the purpose of rapid traverse.

\* \* \* \* \*

"In the present invention the plunger pump is connected to the opposite sides of the actuator cylinder in such a manner that a uniform movement of the tool or carriage propelled by the actuator piston is positively effected in direct accordance with the volumetric displacement of fluid to the intake portion of the cylinder irrespective of the resistance encountered by the tool or carriage in its travel. That is to say, even though a milling machine carriage or lathe tool meets with varying degrees of resistance during its travel (resulting from soft spots in the metal, or non-circular form of the part to be turned in the lathe), the volumetric displacement to the intake side of the cylinder continues at a uniform rate, and therefore the piston must likewise travel uniformly in accordance with such displacement.

"The plunger pump is connected with the advancing side of the piston in such a manner that fluid confined in front of the advancing side of the piston must be returned at the same rate as the fluid displaced to the intake side of the actuator piston by the plunger pump. By this arrangement the fluid bodies controlled by the action of the plunger pump operate similarly to a lead screw in a lathe wherein no slippage takes place.

\* \* \* \* \*

"From the foregoing it will be apparent that I provide two independent circuits, namely, a high pressure circuit which is connected to the plunger pump, and a low pressure circuit which is connected to the gear pump. The low pressure circuit is initially placed in operative position by shifting the main valve, and at this interval the high pressure circuit is in an inoperative state. The actuation of the low pressure circuit causes the high pressure circuit to be rendered functionally operative, and the low pressure circuit is then rendered functionally inoperative, thereby allowing the high pressure circuit to impart feeding movement to a tool carriage independently of any other circuit. At a predetermined interval, and in response to the movement of said tool carriage, the low pressure circuit is again rendered functionally operative, and then said low pressure circuit causes the high pressure circuit to be rendered functionally inoperative, whereby said low pressure circuit operates independently of the high pressure circuit to impart a rapid reverse movement to the tool carriage.

"Attention is directed to the fact that by employing my improved hydraulic actuator system, I am able to impart a speed to an actuator piston which is constantly proportional to the speed of movement of the prime mover. In other words, if in the present instance the work supporting

spindle is considered as a prime mover with respect to the plunger pumps, it will be clear that said plunger pumps will impart a speed to the actuator piston connected therewith which is constantly proportional to the rotative speed of the prime mover or spindle. Fluid from the plunger pumps is dispatched at a uniform rate and there is no slippage of the fluid, hence there is a direct and constant proportion between the linear travel of the actuator piston and the angular or rotary displacement of the driving spindle.

\* \* \* \* \*

"With regard to the arrangement of the pistons 137 and 154 shown in Figure 23, it will be apparent that, due to the presence of the piston rods, in each instance there will be a slightly less volume of fluid introduced on the piston rod side of the cylinder chamber than is discharged from the other side during each movement of said piston. Hence, as the pistons move forwardly and their respective piston rods enter the cylinder chamber, a greater volume of fluid will be displaced on the advancing side of the piston than is taken in on the opposite side of said piston during a given movement of said pistons. The bleed passages or restricted orifices 380 and 382 of the valve 260, Figure 18, provide means for allowing this excess fluid on the advancing side of the pistons to escape. However, my invention also contemplates the provision of piston constructions, in which the volume of fluid taken in on the piston rod side of the pistons during a given movement thereof will equal the volume displaced from the opposite side thereof. In such instances there is no necessity of providing the bleed passages."

The claims in suit are the following:
"13. In a hydraulic actuator system for moving machine parts and the like, a fluid operated actuator, a circuit including fluid propelling means for imparting rapid traverse to said actuator, a second circuit including a second fluid propelling means for imparting uniform feeding speed to said actuator, said first circuit serving to condition said second circuit for propelling purposes with respect to said actuator, and means for rendering said first mentioned circuit functionally inoperative during the functioning of said second circuit, whereby the fluid in said second circuit will impart feeding movement to the actuator independently of said first mentioned circuit.

\* \* \* \* \*

"62. In a hydraulic actuator system for moving machine parts and the like, a hydraulic actuator including a piston within a cylinder, fluid propelling means for imparting uniform feeding speed to said actuator, a second fluid propelling means for imparting rapid traverse to said actuator, and hydraulically actuated valve means for rendering the second mentioned propelling means functionally inoperative for propelling purposes with respect to the actuator piston during the operative functioning of the other propelling means.

\* \* \* \* \*

"69. In a hydraulic actuator system for controlling the movement of and for actuating machine parts and the like, a hydraulic actuator including a piston within a cylinder, fluid propelling mechanism for delivering fluid under relatively high pressure into the actuator at a uniform feeding rate to propel the actuator at a feeding rate, a second relatively low pressure fluid propelling mechanism for propelling said actuator at a rapid rate, and shiftable valve means for selectively controlling the delivery of fluid from the low pressure means to the actuator, said valve means serving in one shifted position to render the low pressure propelling mechanism functionally operative for propelling purposes with respect to the actuator and in another shifted position to render said low pressure propelling mechanism functionally inoperative for propelling purposes with respect to said hydraulic actuator, whereby to cause said high pressure propelling mechanism to propel said actuator.

\* \* \* \* \*

"95. In a hydraulic actuator system for controlling the movements of and for actuating machine parts and the like, a hydraulic actuator including a piston and cyclinder relatively movable with respect to each other, a hydraulic feeding circuit, a hydraulic rapid traverse circuit, a constantly driven rapid traverse pump within said latter circuit, a feed pump within said feeding circuit, means for driving said feed pump, and shiftable means operable in accordance with the direction of fluid flow in the rapid traverse circuit for controlling the operative functioning of said feed pump.

\* \* \* \* \*

"121. A system of hydraulic control and actuation including a hydraulic actuator, a relatively high pressure pumping mechanism for imparting uniform feeding move-

ment to said actuator, a second pumping mechanism for imparting rapid traverse to said actuator, and a shiftable control mechanism for said pumping mechanisms comprising a member shiftable within a casing adapted in one shifted position to direct fluid from the first mentioned pump for feeding purposes to said actuator independently of said second mentioned pumping mechanism.

\* \* \* \* \*

"132. In a hydraulic actuator system for moving machine parts and the like, a fluid operated actuator, a fluid circuit for effecting rapid traverse of said actuator, said circuit including ducts connected with opposite sides of the actuator and fluid propelling means connectable with said ducts, valve means adapted to control the starting and direction of flow of fluid within said ducts, and a second fluid circuit for imparting feeding movement to said actuator, said second circuit including a fluid propelling mechanism connectable with said actuator for delivering fluid under relatively high pressure into said actuator at a uniform feeding rate, the functioning of said second circuit being independent of the functioning of the first circuit.

\* \* \* \* \*

"136. In a hydraulic actuator system for moving machine parts and the like, a fluid operated actuator, a low pressure fluid circuit connectable with said actuator for imparting rapid traverse thereto, a high pressure fluid circuit connected with said actuator for imparting a slower feeding movement thereto, each of said circuits being adapted to function independently of the other, means within said high pressure fluid circuit for varying the amount of fluid flow to said actuator to thereby control the speed of said actuator, and means for selectively controlling the functioning of said circuits.

"137. In a hydraulic actuator system for moving machine parts and the like, a fluid reservoir, a fluid operated actuator, a circuit including fluid propelling means for imparting rapid traverse to said actuator, a second circuit including a fluid propelling means for imparting feeding movement to said actuator, and means for rendering said second circuit functionally operable in response to the fluid flow in the first mentioned circuit, whereby to enable the circulation of fluid in the first circuit into said reservoir.

\* \* \* \* \*

"163. In a hydraulic actuator system for controlling the movements of machine parts, a hydraulic actuator including a piston and cylinder relatively movable with respect to each other, fluid propelling means for delivering fluid at a relatively rapid rate to said cylinder, fluid propelling means for delivering fluid at a slower rate to said cylinder, and automatically shiftable valve mechanism for controlling the timed functioning of the actuator, said valve mechanism being constructed and arranged so that in one position it serves to prevent direct communication between said first mentioned fluid propelling means and said actuator and to simultaneously condition the second mentioned fluid propelling means operable to propel said actuator.

"164. In a hydraulic actuator system for controlling the movements of and for actuating machine parts and the like, a hydraulic actuator including a piston and cylinder relatively movable with respect to each other, a hydraulic feeding circuit, a hydraulic rapid traverse circuit, a constantly driven rapid traverse pump within said latter circuit, a feed pump within said feeding circuit, means for driving said feed pump, and shiftable means cooperative with the fluid flow in the rapid traverse circuit for controlling the operative functioning of at least one of said pumps.

\* \* \* \* \*

"166. In a machine tool, a frame structure, a supporting spindle rotatably mounted therein, rotary spindle driving transmission, supporting means, actuator means for effecting relative movement between said supporting spindle and said supporting means, feeding transmission for said actuator means, a prime mover for driving both transmissions, power operated rapid traverse transmission for causing said actuator means to effect relative movement between said spindle and supporting means to a feeding position and for causing reversal of said actuator means, said feeding transmission and rotary tool driving transmission being driven in synchronism from said prime mover, and means for rendering said rapid traverse transmission functionally ineffective to thereby condition the feeding transmission for operatively propelling said actuator means.

\* \* \* \* \*

"181. In a machine tool structure, a rotary supporting spindle, driving means therefor, a reciprocable supporting mem-

326

ber, a rapid traverse transmission for said supporting member, a slower feed transmission for propelling said supporting member independently of said rapid traverse transmission, power means for actuating said spindle driving means and said transmissions, shiftable control elements for selectively causing the reciprocable member to be driven by either of said transmissions, one of said control elements being shiftable as an incident to the shifting of another of said control elements, and an initiating member adapted when shifted to a given position to cause one of said control elements to shift in a preselected direction whereby to initiate actuation of another of said control elements.

"182. In a machine tool structure, a rotary supporting spindle, driving means therefor, a supporting member movable in forward and reverse directions, a rapid traverse transmission for said supporting member, a slower feed transmission for propelling said supporting member independently of said rapid traverse transmission, power means for actuating said spindle driving means and said transmissions, shiftable control elements for selectively causing the reciprocable member to be driven by either of said transmissions and in either forward or reverse direction, one of said control elements being shiftable as an incident to the shifting of another of said control elements, an initiating member adapted when shifted in a given direction to cause one of said control elements to shift in a predetermined direction whereby to initiate actuation of another of said control elements, and means for shifting said first mentioned control element so as to cause said supporting member to be moved in a reverse direction.

\* \* \* \* \*

"186. A fluid transmission system for machine tools and the like, a hydraulic actuator member, two sources of fluid supply, means for conducting fluid from said sources to said actuator for propelling purposes, and control means operable for enabling the fluid from both of said sources to simultaneously act upon said actuator member during a predetermined movement of said actuator member and including means operable in response to the shifting of said actuator member by the action of fluid from both of said sources to enable the positive continued movement of said actuator member under the in-fluence of fluid from only one of said sources.

\* \* \* \* \*

"209. In a hydraulic actuator system, a hydraulic actuator including a piston and cylinder construction, fluid propelling means for delivering fluid at a rapid rate to said cylinder, fluid propelling means for delivering fluid at a slower, uniform feeding rate to said cylinder, and shiftable valve means adapted in one position to allow the by-passing of fluid from the first mentioned propelling means, whereby to render the second fluid propelling means functionally operable for propelling said actuator.

"210. In a hydraulic actuator system for controlling the movements of and for actuating machine parts and the like, a hydraulic actuator including a piston and cylinder relatively movable with respect to each other, a relatively small delivery pump adapted to deliver fluid at a uniform feeding rate for imparting feeding movement to said actuator, a relatively large delivery pump for imparting rapid movement to said actuator, a source of fluid supply, and shiftable valve means adapted in one position to effect the by-passing of fluid from said large delivery pump to said source of supply under relatively low pressure during the operative functioning of the small delivery pump, and in another shifted position to direct fluid from said large delivery pump for propelling said actuator at a rapid rate, and fluid control means operated by fluid from one of said pumps for controlling the operative effectiveness of the small delivery pump.

\* \* \* \* \*

"215. A system of hydraulic control, including a hydraulic actuator, high pressure pump mechanism for imparting feeding movement to said actuator, means for maintaining the fluid at the discharge side of said actuator under pressure, a second pumping mechanism for imparting rapid traverse to said actuator, shiftable control mechanism adapted in one shifted position to direct fluid from the first mentioned pump for feeding purposes to said actuator, and fluid responsive means for automatically controlling the operative effectiveness of said high pressure pumping mechanism with respect to said actuator.

\* \* \* \* \*

"219. In a hydraulic actuator system for shifting machine parts and the like, a fluid operated actuator, a source of fluid supply,

a circuit including a fluid propelling means for imparting rapid traverse to said actuator, a second circuit including a second fluid propelling means for imparting feeding speed to said actuator, said first circuit serving to condition said second circuit for propelling purposes with respect to said actuator, and means for by-passing said first fluid propelling means under a relatively low control pressure to said source of supply during the functioning of said second circuit, whereby the fluid in said second circuit will impart feeding movement to the actuator independently of said first circuit."

The plaintiffs contend that the patent is valid and that each of the claims in suit, except claim 166, is infringed by defendants' Oldsmobile boring machine, and that claim 166 is infringed by defendants' large-size self-contained hydraulic unit Types 23 and 25.

The defendants' defenses are: (1) That the presumption of validity normally attaching to a patent has been destroyed by reason of Svenson's false representations to the Patent Office in connection with the application for this patent; (2) that upon the patentee's admission, the quality of "independence" of the circuits, upon which novelty is predicated, is not susceptible of test nor definition, wherefore the patent is void under Section 33, Title 35 U.S.C.A.; (3) that in so far as the claims attempt to predicate novelty upon the use of a leakless feed pump, they are invalid because (a) such a pump has been shown not to exist in fact, and (b) in any event the substitution of one pump for another in an old circuit would, in so far as the circuit is concerned, result simply in an old and exhausted combination (Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008); (4) that upon the patentee's interpretation of "independent" and "functionally inoperative" rapid traverse circuit in this suit, all of the claims in issue are invalid on the Oilgear QH system (Ferris 1,854,127 and Morgan 2,030,888); (5) that however strictly they may be construed, claims 62, 69, 95, 137, 163, 164, 186, 209, 210, 215 are anticipated by any one of Morgan 2,030,888, Ferris 1,854,127 or British patent of Natco 270,715, and, of these, claim 186 is also met by the Oilgear QR1x2 system and claims 69, 163, 209, 210 and 215 are also met by German patent 220,611; while claim 166 is anticipated by either said Morgan or

Natco patents as well as by Walker 1,493,301 (in suit), and claim 121 is met by any one of Ernst 1,835,977, German 220,611, and the Oilgear QR1x2 system, while the remaining claims in suit (13, 132, 136, 181, 182 and 219) are met by any one of Morgan 2,030,888, British 270,715, Ferris 1,854,127 or Ernst 1,835,977 if misconstrued to read on the accused system; (6) that Curtis 2,118,020 alone, also precludes a finding of infringement of any valid claim for it squarely anticipates claims 62, 69, 121, 163, 186, 209, 210 and 215 and, as to the remaining claims (13, 95, 132, 136, 137, 164, 166, 181, 182, and 219), this Curtis patent also squarely anticipates them, if they be misconstrued to read on the accused system; and (7) that there is no infringement of any claim in issue.

■ Under their first defense, the defendants point out: (a) That the patentee continuously represented to the Patent Office that he had invented a slipless (leakless) pump and had included it in the hydraulic system on which he was seeking a patent, and that because he had a slipless pump he had "independent" circuits and absolute "synchronism" between the carriage and the spindle, and that, because no one before him had a slipless pump, there were no anticipations, and (b) that the patentee and his assignees, the plaintiffs, did not have, never have had, and do not now have a slipless pump. These contentions of the defendants are well founded, but, nevertheless, the court does not believe the representations were fraudulently made, they were the result of the excessive enthusiasm of the patentee.

Under their first defense, the defendants also point out that the patentee, in attempting to distinguish his system from that disclosed in the British patent corresponding to Curtis 2,118,021, filed in the Patent Office two marked copies of drawings from the Curtis patent, in one of which he drew arrows indicating direction of flow opposite to that of the original ones appearing in the Curtis patent. This has been admitted by the plaintiffs to be a mistake, and the court thinks it was nothing more than a mistake.

The defendants' first defense has not been sustained.

■ Referring to Figure 14, the so-called "closed, valveless, fluid circuit" of Svenson 2,078,695 is made up of the pipe 164, the plunger pump 172, the pipe

322

166, and the cylinder 156. The patentee has provided in the valve casing 260 two bleed passages 380 and 382 (which are not shown in Figure 14, but are shown in Figure 18 of the patent drawings). The patentee says he employs these bleed passages as a precaution against leakage in the cylinder and to care for the excess fluid on one side of the piston head due to the fact that there is a piston rod on only one side of the piston head. He also says that his invention contemplates (but he does not illustrate) piston constructions where the volume of fluid taken in on the piston rod side of the piston during a given movement thereof will equal the volume displaced from the opposite side thereof. To the extent that it is necessary to introduce fluid into or to discharge fluid from this high pressure circuit, it is neither "closed" nor "independent." Fluid introduced into and that discharged from the high pressure circuit must come from or go to (as the case may be) the low pressure circuit which includes the pipes 168 and 170 and the valve 138, as well as the cylinder 156. In the course of the cross-examination of the patentee Svenson, he defined the word "independent," used in the patent, to include reference to devices in which pistons like that shown in Figure 14 are used with the piston rod either entering or leaving the cylinder during feed, and thus require that fluid be either added to or expelled from the circuit. He said, in substance, that something more than 10% of the fluid but not as much as 50% thereof could be either added to or expelled from the feed circuit and yet maintain the so-called "independence" of the circuits, that he, personally, did not know of any test for determining whether the feed and rapid traverse circuits are independent, that he never tried to make such a test, and that the patent itself did not tell how to make such a test. The word "independence" having been thus defined, the defendants insist that the claims which include the element of "independence" are void under Section 33, Title 35 U.S.C.A. These claims are 13, 132, 136, 181, 182 and 219. The court is of the opinion that the alleged invention is sufficiently described, and that these claims are not void under the section of the statute referred to. It seems to the court that a more serious question arises in respect of these claims under Section 31, Title 35 U.S.C.A. It is doubtful whether the patentee has disclosed an operable "independent" feed circuit, and, therefore, it is doubtful whether the claims cover devices having utility, as required by Section 31. The Patent Office allowed the claims and therefore held that they claim devices having utility. The court accordingly resolves the doubts which it has in favor of the claims.

The court is of the opinion that the defendants' third defense must be sustained. The evidence discloses that there is no such thing as a slipless (leakless) pump. Even if the patentee had invented a slipless pump and included it in his hydraulic system, on which he sought and procured a patent, it would not have operated therein in an unexpected or unobvious way, and the old elements of the claimed combination would not have performed or produced a new or different function or operation than that theretofore performed or produced by them, and therefore he would not have been entitled to a patent on a combination. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008.

The patentee says that he provides "hydraulic means, in combination with a machine spindle, whereby a governed amount of movement of tool carriages * * * may be obtained per revolution of the spindle." He says that he does this by "directly coupling with the spindle a plunger pump * * * which is free from fluid leakage or slippage." He says further: "The plunger pump is connected with the advancing side of the piston in such a manner that fluid confined in front of the advancing side of the piston must be returned at the same rate as the fluid displaced to the intake side of the actuator piston by the plunger pump. By this arrangement the fluid bodies controlled by the action of the plunger pump operate similarly to a lead screw in a lathe wherein no slippage takes place." The "plunger pump" which the patentee is referring to is 172 in Figure 14. This plunger pump is driven by a chain (only a portion of which is shown) which in turn is driven by a sprocket mounted on the spindle (neither the sprocket nor the spindle is shown). The supposed advantage to which the patentee refers is claimed in an element of claim 166, worded as follows: "said feeding transmission and rotary tool driving transmission being driven in synchronism from said prime mover." This element could only be satisfied by a slipless

pump delivering a non-compressible liquid into a truly "closed" circuit. Claim 166 calls for a device which is not operable and is therefore void.

The defendants' fourth, fifth and sixth defenses will now be considered. The defendants say that while Svenson 1,924,422 (above considered) was, as has heretofore been shown, the result of an attempt by Svenson to patent many of the features of the Oilgear QR1x2 system, Svenson 2,078,-695 is the result of his attempt to patent the older Oilgear QH system. The defendants say that the Oilgear QH system, which is an exemplification of the disclosures of Morgan 2,030,888 and Ferris 1,854,127, has (a) two pumps of the same form and related in exactly the same manner as in the Svenson circuit and cycle, (b) the feed pump with its inlet and outlet connected directly to the two ends of the actuator by uninterrupted or "valveless" pipes and related to the rapid traverse circuit just as in Svenson to accomplish the same degree of independence or dependence of the feed and rapid traverse circuits as in Svenson, and (c) a spindle and feed pump driven by a common motor to give just as much "synchronization" as Svenson obtains.

The defendants cite Morgan 2,030,888, issued February 18, 1936, on an application filed December 2, 1927, against each of the following claims: 62, 69, 95, 137, 163, 164, 166, 186, 209, 210 and 215. They cite Natco 270, 715 (Br.) 1928 against the same claims, and Ferris 1,854,127, issued April 12, 1932, on an application filed February 12, 1926, against each of said claims, other than 166.

The plaintiffs say that they consider Morgan, Natco, Ferris and the Oilgear QH system as one structure. And as the court understands their arguments, they point out two alleged differences between Svenson 2,078,695 and the Oilgear QH system. First, the gear pump in the Oilgear QH system is used to maintain the plunger pump flooded with fluid so that it may operate and this prevents there being "independent" circuits. Second, in the Oilgear QH system a pilot valve controls a rotary valve so that the amount of delivery of fluid from the high pressure pump is controlled by the pilot valve and the pilot valve is not within the circuit containing the actuators. In the court's opinion, these distinctions are not differences. Though in the Oilgear QH system the gear pump does charge the plunger pump, this merely means that some of the

fluid from the so-called low pressure circuit is introduced into the so-called high-pressure circuit, and if one looks at Figure 14 one observes that all the fluid that ever enters the high pressure circuit in Svenson 2,078,695 comes from the low pressure circuit,—it cannot come from any other place. In the Oilgear QH system, a pilot valve and a rotary valve perform the same functions of the valve 138 in Svenson and accordingly the plaintiffs say the pilot valve is not in the actuator circuit and that this is a difference which makes Svenson patentable. The court cannot agree.

When one lays the "plumbing" of the Oilgear QH system out beside the "plumbing" of Svenson 2,078,695, one sees a remarkable resemblance. The principal differences are that in the Oilgear QH system the piston rod enters the other end of the actuator cylinder from that which it enters in Svenson, and the pipes from the high pressure pump do not directly enter the actuator cylinder but, on the contrary, join the pipes from the low pressure pump just before they enter the actuator cylinder. In other words, in the Oilgear QH system there are a few inches of piping common to the two circuits. The court does not believe that these are patentable differences. Morgan 2,030,888, Natco 270,715 (Br.) 1928 and Ferris 1,854,127 either anticipate the claims against which they are cited or those claims disclose no invention over the citations. There has been some controversy concerning Natco 270,715 (Br.) 1928. Its drawings show the high pressure pump taking liquid directly from the sump, so that the high pressure and low pressure circuits are "indpendent." The plaintiffs contend that this is a draftsman's error, that the high pressure pump shown therein is an Oilgear pump and that it cannot take liquid directly from the sump. On the other hand, the defendants say that the patent must stand on its own feet, that the pump shown in the patent is not necessarily an Oilgear pump, that there were other pumps that could have been used and which would take liquid directly from the sump. The court is of the opinion that, on the record as it is, the patent must be taken at its face value.

The defendants cite Curtis 2,118,021, issued May 17, 1938, on an application filed November 30, 1927, and Brieglieb, Hanson & Co. 220,611 (Ger.) 1909 against claims 62, 69, 121, 163, 209, 210 and 215. They also cite Ernst 1,835,977, issued

324

December 8, 1931, on an application filed May 11, 1929, and the Oilgear QR1x2 system against claim 121. They cite Curtis 2,118,021 and the Oilgear QR1x2 system against claim 186. Walker 1,493,301 (in suit) is cited against claim 166. The court is of the opinion that all of these patents and structures, other than Walker, either anticipate the claims against which they are cited or the claims disclose no invention over the citations. Walker discloses mechanical transmissions, and, while claim 166 is in terms broad enough to include mechanical transmissions, it is, in the court's opinion, limited to hydraulic transmissions by the specifications of the patent and, therefore, Walker does not invalidate.

The defendants' Oldsmobile boring machine, which is charged to infringe all of the claims in suit, other than claim 166, has a Vickers combination pump unit, which supplies fluid through a single pipe to a control valve by which it is dispatched through a single pipe to the actuator. From the actuator, the flow returns to the control valve through a single pipe, and thence passes to the sump through a single pipe either directly or by way of a restricted orifice, depending upon whether the main control valve is in rapid traverse or feed condition. The piping is identical during both rapid traverse and feed, except for a passage about three inches in length through which the oil is additionally passed during feed in order to compel it to go through the restricted feed orifice. There is only one circuit in this machine. That single circuit cannot be said to be "valveless." There is only one pump in defendants' machine. It is true that this pump embodies two impellers, the output of one of which can be by-passed through an unloader valve upon a predetermined increase in the pressure of the output. The accused pump can be interchanged in the Oldsmobile circuit for any other single pump with a working pressure relief valve on it. It cannot, however, be interchanged with the Svenson two pumps in the circuit of the Svenson patent, nor can Svenson's two pumps be substituted for the single Vickers pump in the accused Oldsmobile circuit.

The defendants' Oldsmobile machine does not have the two pumping mechanisms and the shiftable control called for by claim 121. It does not have the two sources of fluid supply and the control means called for by claim 186. It does not have the high pressure pump, the low pressure pump, the shiftable control mechanism and the fluid responsive means for automatically controlling the operative effectiveness of said high pressure pumping mechanisms called for by claim 215, which is typical of the group of claims consisting of claims 62, 69, 163, 209, 210 and 215. It does not have the rapid traverse circuit, the second (feeding) circuit, the first circuit which serves to condition the second circuit for propelling purposes, or means for by-passing the first fluid propelling means called for by claim 219, which is typical of the group of claims consisting of claims 132, 13, 136 and 219. It does not have the rapid traverse transmission, the feed transmission, the power means for actuating the spindle driving means and said transmissions or shiftable control elements for selectively causing the reciprocable member to be driven by either of said transmissions called for by claim 182 of the group of claims consisting of claims 181 and 182. It does not have the hydraulic rapid traverse circuit, the hydraulic feeding circuit, or the shiftable means co-operative with the fluid flow in the rapid traverse circuit for controlling the operative functioning of at least one of said pumps called for by claim 164, which is typical of the group of claims consisting of claims 137, 95 and 164.

Defendants' large-sized self-contained hydraulic unit types 23 and 25 does not have two separate transmissions for imparting rapid traverse and feed movements to the actuator. The defendants' unit uses substantially the same transmission for feed and rapid traverse. Furthermore, the accused unit does not drive the rotary tool spindle and feed mechanisms in synchronism. On the contrary, defendents' unit has a governor valve for maintaining a constant feed rate, irrespective of changes in rate of spindle rotation. Accordingly, the defendants' unit does not have the feeding transmission for the actuator means, the power operated rapid traverse transmission, the prime mover for driving both transmissions, the means for driving the feed transmission and rotary tool driving transmission in synchronism or the means for rendering said rapid traverse transmission functionally ineffective, called for by claim 166.

No one of the claims is infringed.

**8.** *Svenson 2,215,257 for a "Material Working Apparatus and Control Therefor," Issued September 17, 1940, on an Application Filed August 11, 1933, and Containing 90 Claims, of Which 13 Are in Suit.*

The disclosure of Svenson 2,215,257 differs from that of Svenson 2,078,695 (above considered) only in that (1) the auxiliary actuator (290, 292 and 294 in Figure 14), which in the earlier patent was used to operate a clutch for starting and stopping the spindle and feed pump, is in Svenson 2,215,257 used to operate a switch for starting and stopping the motor that drives the same spindle and pump and (2) a reversing valve has been added in the feed circuit so that reverse feed is possible.

In Svenson 2,215,257, the patentee says:

"I propose to utilize the electric current for breaking the motor when reversing the main mass of the motor, * * *

\* \* \* \* \*

"my invention contemplates a starting and stopping arrangement, as mentioned above, wherein a prime mover, such as an electric motor, may be effectively employed to drive a tool spindle and a feed pump in combination with control mechanism for automatically and very quickly arresting rotation of the motor at a predetermined interval in the cycle of operation to permit the operative functioning of a rapid traverse mechanism.

"A further object of the invention is to provide in combination with a reversible motor for propelling a machine tool spindle a novel and highly efficient hydraulic system of control therefor.

\* \* \* \* \*

"Another object of my invention is to provide an improved electrical system of control in combination with a reversible motor, which control operates to effect the instantaneous stopping of a motor at a predetermined point of a cycle of operation.

\* \* \* \* \*

"The simple plugging arrangement for the motor and the hydraulic arrangement coupled therewith present a decided advantage both from the standpoint of design and actual use in the field."

The claims in suit are the following:

"1. In material working apparatus, a rotary machine spindle, a support, means including a hydraulic actuator for causing relative translation between the spindle and support, pump mechanism for delivering fluid to said actuator, a prime mover for imparting rotation to said spindle in timed relation with the functioning of said pump mechanism, and power operated control means for effecting the automatic starting and stopping of said prime mover in timed relation with the relative movement between the spindle and support.

"2. In material working apparatus, a rotary machine spindle, a support, means including a hydraulic actuator for causing relative translation between the spindle and support, pump mechanism for delivering fluid to said actuator, an electric motor for imparting rotation to said spindle in timed relation with the functioning of said pump mechanism, and power operated control means for effecting the automatic starting and stopping of said electric motor in timed relation with the relative movement between the spindle and support.

\* \* \* \* \*

"5. In material working apparatus, a rotary machine spindle, a support, means including a hydraulic actuator for causing relative translation between the spindle and support, pump mechanism for delivering fluid to said actuator, a reversible electric motor for imparting rotation to said spindle, and control means for effecting the automatic stopping of said motor by connecting said motor in reverse for a period which is sufficient to arrest forward rotation of the motor.

\* \* \* \* \*

"18. In material working apparatus, a rotary machine spindle, a support, means including a hydraulic actuator for causing relative translation between the spindle and support, pump mechanism for delivering fluid to said actuator, a prime mover for imparting rotation to said spindle, and control means for effecting the automatic starting and stopping of said prime mover in timed relation with the relative translation between the spindle and support, said control means including mechanism for subjecting the prime mover to a reverse torque in effecting the stopping thereof.

"19. In material working apparatus, a rotary machine spindle, a support, means including a hydraulic actuator for causing relative translation between the spindle and support, pump mechanism for delivering fluid to said actuator, an electrical prime mover for imparting rotation to said spindle, and control means including an electrical circuit arrangement for subjecting the prime mover to reverse torque and

thereby effecting the automatic stopping thereof in timed relation with the relative translation between the spindle and support.

"20. In material working apparatus, a rotary machine spindle, a support, means for causing relative translation between the spindle and support, a prime mover for imparting rotation to said spindle, and control means for effecting automatic starting and stopping of said prime mover in timed relation with the relative translation between the spindle and support, said control means including mechanism for subjecting the prime mover to a reverse torque for stopping said prime mover.

"21. In material working apparatus, a rotary machine spindle, a support, means for causing relative translation between the spindle and support, an electrical prime mover for imparting rotation to said spindle, and control means including an electrical circuit arrangement for subjecting the prime mover to reverse torque to thereby effect the automatic stopping thereof in timed relation with the relative translation between the spindle and support.

\* \* \* \* \*

"47. In a control system for governing the duration and directional effect of flow in an electrical circuit which includes a directional motor, a fluid operated actuator, fluid power means for shifting said actuator, a fluid control mechanism for initiating the shifting of said actuator, electrical circuit controlling means connected with said fluid operated actuator, an electromagnetic controller operable as an incident to the functioning of said electrical circuit controlling means for starting said motor and for selecting the direction of motor torque, and another controlling means for causing said electromagnetic controller to arrest the flow of the current in said motor.

"48. In a control system for governing the duration and directional effect of flow in an electrical circuit which includes a reversible motor, a fluid operated actuator, fluid power means for shifting said actuator, a fluid control mechanism for initiating the shifting of said actuator, electrical circuit controlling means connected with said fluid operated actuator, an electromagnetic controller operable as an incident to the functioning of said electrical circuit controlling means for starting said motor and for selecting the direction of motor torque, and another electrical control means driven in response to the actuation of said motor for controlling the duration of current flow when the direction of said motor torque is altered.

\* \* \* \* \*

"54. In a machine tool, a rotary spindle, a rotary electric motor for rotating said spindle, a support, a shiftable hydraulic actuator arranged and constructed to cause relative movement between the spindle and the support, pumping means for propelling said actuator at feeding and rapid traverse rates, shiftable valve means for controlling the movements and speed of travel of the hydraulic actuator, electrical control and circuit means for the motor including means for directing current to the motor to cause rotation thereof in a given direction when the hydraulic actuator is shifted and for causing a breaking action upon the motor when the hydraulic actuator reaches a predetermined position, and a control device operated by the rotation of the motor for controlling the action of said electrical control and circuit means.

"55. In a machine tool, a rotary spindle, a rotary electric motor for rotating said spindle, a support, a shiftable reciprocable hydraulic actuator arranged and constructed to cause relative reciprocable movement between the spindle and the support, pumping means for propelling said actuator at feeding and rapid traverse rates, shiftable valve means for controlling the movements and speed of travel of the hydraulic actuator, electrical control and circuit means for directing current to the motor to cause rotation thereof in a given direction when the hydraulic actuator is shifted and for reversing the current effect upon the motor when the hydraulic actuator reaches a predetermined position, and an electrical contractor operated by the rotation of the motor for terminating the reverse current effect.

"56. In a machine tool, a rotary spindle, a rotary electric motor for rotating said spindle, a support, a shiftable hydraulic actuator arranged and constructed to cause relative movement between the spindle and the support, pumping means for propelling said actuator at feeding and rapid traverse rates, means for automatically stopping the feeding of the actuator if the spindle motor stops, shiftable valve means for controlling the movements and speed of travel of the hydraulic actuator, electrical control and circuit means for directing current to the motor to cause rotation thereof in a given direction when the hydraulic actuator is shifted for feeding and for reversing the

current effect upon the motor when the hydraulic actuator completes its feeding movement, and a control device operated by the rotation of the motor for terminating the reverse current effect.

\* \* \* \* \*

"67. In a fluid transmission system for machine tools and the like a hydraulic actuator member, two sources of fluid supply, means for conducting fluid from said sources to said actuator for propelling purposes, control means operable for enabling the fluid from both of said sources simultaneously to act upon said actuator member during a predetermined movement of said actuator member including means operable in response to the shifting of said actuator member by the action of fluid from both of said sources to permit the positive continued movement of said actuator member under the influence of fluid from only one of said sources, and a unitary control means for reversing the fluid flow from both of said sources of fluid supply."

The plaintiffs contend that the claims in suit are valid; that defendants' first senior hydraulic system, second senior hydraulic system, junior hydraulic system, Ex-Cell-O type 61 heavy duty boring machine, and Oldsmobile boring machine each infringes each of claims 1 and 2; that said Oldsmobile boring machine infringes additionally each of claims 5, 18, 19, 20, 21, 47, 48, 54, 55, 56 and 67; and that defendants' Frankford Arsenal machine infringes each of claims 1, 18, and 20.

The defendants summarize their defenses as follows: (1) The patent is void in its entirety for multiplicity of claims under Section 33, Title 35 U.S.C.A., having, as it does ninety claims on a machine which differs in only two minor structural particulars from the machine shown in Svenson 2,078,695 (in suit); (2) claims 1 and 2 are invalid on Svenson 2,078,695 since they call merely for starting and stopping the motor for the spindle and feed pump, instead of clutching and unclutching the same to accomplish the equivalent result as in Svenson, 2,078,695; (3) claims 5, 18, 19, 20, 21, 54, 55 and 56 (the "plugging" claims) are invalid, covering as they do, at best, merely the use of a conventional plugging control for stopping a spindle drive motor, for lack of invention over Svenson, 2,078,695, and numerous machines in the art having plugging controls for stopping their spindle drive

motors; (4) claims 47 and 48, covering a conventional plugging control circuit, operated by a fluid actuated switch (as distinguished from any other type of actuator for the switch) are invalid over the prior art; (5) claims 5, 18, 19, 20, 21, 47, 48, 54, 55 and 56 are invalid because they call for old and exhausted combinations; (6) claim 67 is invalid on Svenson 2,-078,695 and other prior art cited; (7) the patent is invalid in its entirety for failure to disclaim claim 67, which reads squarely on the Oilgear QR1x2 system that Svenson had purchased years before and of which he had full personal knowledge; (8) the patent is invalid in its entirety for failure to disclaim claim 55 which was obtained by a false affidavit purporting to antedate Barnes & Guirl 2,042,379, and of which Svenson well knew he was not the inventor; and (9) claims 1, 2, 18, 20 and 67 are not infringed as charged; and, although the remaining claims can be applied, in terms, to the accused machine, they apply in the same manner to the prior art and are, therefore, not "infringed."

It is true, as the court believes, that the patentee has unnecessarily multiplied claims on a machine which differs in only two minor structural particulars from the machine shown in Svenson 2,078,695 but in the case of this patent, as in the cases of other patents in suit, the court is of the opinion that the ends of justice will be best served if it refrains from striking down the patent on this ground.

The court is of the opinion that the defendants' second defense must be sustained. Both patents disclose an auxiliary actuator (290, 292 and 294 in Figure 14). In Svenson 2,078,695 this auxiliary actuator is used to operate a clutch for starting and stopping the spindle and feed pump. In the patent now under examination this auxiliary actuator is used to operate a switch for starting and stopping the motor that drives the same spindle and pump. In the court's opinion the two uses were mechanical equivalents, and there was no invention involved in making the change. The defendants say, and the court believes with truth, that it was an obvious mechanical expedient to replace the mechanical clutch for starting and stopping the spindle and feed pump with a plugging control mechanism, including reversing switch, motor and plugging switch as taught by Fiedler 869,356 (1907), DuBois 1,161,932

(1915), Townsend 1,677,008 (1928), and Swett 1,207,660 (1916).

Claims 5, 18, 19, 20, 21, 54, 55 and 56 have been referred to as the "plugging" claims for the reason that they called for the "plugging" of the spindle drive motor. This "plugging" is described in claim 5 as follows: "control means for effecting the automatic stopping of said motor by connecting said motor in reverse for a period which is sufficient to arrest forward rotation of the motor." Claims 54, 55 and 56 also have another element which in claim 56 is phrased as follows: "a control device operated by the rotation of the motor for terminating the reverse current effect." One of the two additions which in Svenson 2,215,257 the patentee added to Svenson 2,078,695 was, as has been stated, an electric switch which, to stop the motor, reversed the electric current, and which cut off the current when sufficient reversed current had been applied to stop the motor. The defendants cite against these claims: Svenson 2,078,695 (1930–1937) or a machine manufactured under the patent which was shipped in February, 1931; Merco Nordstrom duplex boring and tapping machine built by Baker Bros., Inc., shipped July 17, 1930; Oldsmobile two-way tapping machine built by National Automatic Tool Co., shipped January 23, 1929; Nash three-way tapping machine built by Foote-Burt Co., shipped August 20, 1930; Graham-Paige machine for chamfering cylinder bores, June 13, 1929; Carlson 1,890,495 (1930–1932) and Alden 2,000,553 (1932–1935).

Svenson 2,078,695 (in suit) does not have the electric apparatus which reverses the current and, when the power of the forward movement of the motor and the power of the reversed current cancel each other, cuts off the current, but it does have a clutch which accomplishes the same purpose. The Merco Nordstrom duplex boring and tapping machine, the Oldsmobile two-way tapping machine, the Nash three-way tapping machine, and the Graham-Paige machine for chamfering cylinder bores do have electric apparatus which reverses the current, and, when the power of the forward movement of the motor and the power of the reversed current cancel each other, cuts off the current. Carlson, 1,890,495 specifies a magnetic brake and Alden 2,000,553 specifies mechanical braking means, each of which is in the court's opinion the mechanical equivalent of the disclosures of Svenson 2,215,257. The court is of the opinion that claims 5, 18, 19, 20, 21, 54, 55, and 56 are invalid for the reason, as contended by defendants, that they disclose no invention over the patents and machines enumerated other than Alden 2,000,553. A machine equipped in accordance with the disclosures of Svenson 2,215,257 was shipped on August 31, 1931, and the patent is entitled to that date and accordingly antedates Alden 2,000,553, which issued on an application filed March 17, 1932.

The machine known on the record as the Chrysler crank-shaft turning machine built by LeBlond Machine Tool Company and shipped June 15, 1928, anticipates each of the claims 5, 19 and 21.

Against claims 47 and 48 which cover a conventional plugging control circuit, operated by a fluid actuated switch (as distinguished from any other type of actuator for the switch) the defendants cite: the Merco Nordstrom duplex boring and tapping machine; the Oldsmobile two-way tapping machine; and Carlson 1,890,495, all above referred to, together with Smith 1,861,245. The court is of the opinion that the claims disclose no invention over the machines and patents cited.

Referring to claims 5, 18, 19, 20, 21, 47, 48, 54, 55 and 56, the defendants say they are invalid because they call for old and exhausted combinations. Specifically, they say that the use, in a machine tool, of hydraulic actuating mechanism with electric controls for starting and stopping the machine tool spindle was fully disclosed in Carlson 1,890,495, issued December 13, 1932, on an application filed July 31, 1930; that while the electric braking means shown in Carlson is somewhat different from the "plugging" control, Carlson antedated Svenson in the combination of hydraulic power and electric power; that Svenson was not the inventor of the plugging control; and, finally, that there was no invention in substituting "plugging" control for the braking control of Carlson. The court agrees.

Against claim 67 the defendants cite Svenson 2,078,695, Brieglieb, Hansen & Co. 220,611 (Ger.) 1909 and the Oilgear Q.R. 1x2 structure (1929). Claim 67 is substantially the same as claim 186 of Svenson 2,078,695 except that there is added in claim 67 an additional element which is phrased as follows: "a unitary control means for reversing the fluid flow from both of said sources of fluid supply." The defendants

say, with reason, that in 1933 it was an obvious mechanical expedient to adapt control valve 138 (Figure 14) to reverse the fluid flow from both pumps if desired. Brieglieb, Hansen & Co. 220,611 (Ger.) and the Oilgear O.R. 1x2 are, in the court's opinion, full anticipations of claim 67.

The defendants' seventh and eighth defenses have been considered heretofore and the decision has favored the plaintiffs.

Coming to the questions of infringement—six of defendants' machines are charged to infringe Claim 1. The last two elements of the claim which are phrased as follows: "a prime mover for imparting rotation to said spindle in timed relation with the functioning of said pump mechanism, and power operated control means for effecting the automatic starting and stopping of said prime mover in timed relation with the relative movement between the spindle and support," do not find response in any one of said six machines. No one of the six machines has a prime mover which imparts rotation to the spindle in timed relation with the functioning of the pump and no one of the six has control means for starting and stopping such a prime mover. The spindles (spindle) of the defendants' first senior hydraulic system, second senior hydraulic system, 1212, 2112 junior precision boring machine Ex-Cell-O style 1212, heavy duty cylinder boring machine type 61, Oldsmobile boring machine, and Frankford Arsenal Machine are (is) driven by motors (motor) which are (is) started and stopped (and reversed) entirely independently of the continuously rotating actuator pump (pumps).

All of the foregoing machines, except defendants' Frankfort Arsenal machine, are charged to infringe claim 2. The last two elements of claim 2 are the same as the last two elements of claim 1, except that in claim 2 the words "electric motor" are substituted in the place and stead of the words "prime mover" in the last two elements of claim 1. The last two elements of claim 2 do not find response in any one of the five machines which are charged to infringe the claims. No one of the five machines has an electric motor which imparts rotation to the spindle in timed relation with the functioning of the pump, and no one of the five has control means for starting and stopping such an electric motor.

The defendants' Frankford Arsenal machine is charged to infringe claims 18 and 20. The question arises as to whether the element which is phrased as follows and which is found in both claims, "control means for effecting the automatic starting and stopping of said prime mover in timed relation with the relative translation between the spindle and support, said control means including mechanism for subjecting the prime mover to a reverse torque in effecting the stopping thereof," finds response in defendants' Frankford Arsenal machine. If the claims were valid and entitled to a broad construction, it would probably be held that the machine does infringe. The accused machine has a liquid motor with a relief valve, and the plaintiffs contend that the relief valve is a "mechanism for subjecting the prime mover to a reverse torque in effecting the stopping thereof." The relief valve does not apply a reverse torque. It is merely a brake. If the claims were valid and entitled to a broad construction, the brake would probably be held to be the equivalent of a mechanism for applying a reverse torque, but the claims are neither valid nor entitled to a broad construction.

The defendants' Oldsmobile boring machine is charged to infringe claim 67. In the court's opinion, there are five elements of that claim which do not find response in defendants' Oldsmobile boring machine. They are: "two sources of fluid supply, means for conducting fluid from said sources to said actuator for propelling purposes, control means operable for enabling the fluid from both of said sources simultaneously to act upon said actuator member during a predetermined movement of said actuator member including means operable in response to the shifting of said actuator member by the action of fluid from both of said sources to permit the positive continued movement of said actuator member under the influence of fluid from only one of said sources, and a unitary control means for reversing the fluid flow from both of said sources of fluid supply." The defendants' Oldsmobile boring machine does not have two sources of fluid supply, either structurally or functionally. It has a single source of fluid supply, that is to say, a Vickers pump unit. This pump unit supplies fluid through a single pipe under all conditions. The whole output of the pump is used during rapid traverse and a part of it is by-passed to

the sump during feed. Except for efficiency, this Vickers pump unit functions the same as other single pump units with conventional by-pass valves and is interchangeable therewith.

The defendants' Oldsmobile boring machine is also charged to infringe claims 5, 19, 21, 47, 48, 54, 55 and 56. The words of the claims do apply to the machine. But against the charge of infringement the defendants point out that in using in the Oldsmobile boring machine a plugging control mechanism, operated by dogs in timed relation with the movement of the tool slide, and reverse current interrupting means for stopping the spindle motor of a hydraulically operated machine tool, the defendants followed the teaching of the prior art as specifically disclosed in the Merco Nordstrom duplex boring and tapping machine built by Baker Brothers in 1930. All elements and all combinations of elements of claims 5, 18, 19, 20, 21, 47. 48, 54, 55 and 56 which are common to the accused Oldsmobile boring machine and to Svenson 2,215,257 are also found in the Merco Nordstrom duplex boring and tapping machine, referred to.

9. *Barnes & Guirl 2,020,868 for a "Boring Machine and the Like," Issued November 12, 1935, on an Application Filed January 18, 1930, and Containing 35 Claims, of Which 21 Are in Suit.*

■ The defendants briefly and quite accurately describe Barnes & Guirl 2,020,-868 as follows: "This patent discloses what is, in essence, simply an automatic drill press. As usual in such machines, it incorporates a vertical column carrying a tool spindle head. Beneath the depending tool (in this instance, a boring tool) is a transversely movable work carriage that is shiftable step-by-step. Steps of advance of the work are alternated with machining strokes of the tool head. In operation the machine duplicates the familiar motions of an ordinary drill press in which the operator alternately pulls the head down to drill, raises it again to free it of the work, and shoves the work along one step after drilling each hole. It is that cycle which this machine carries out automatically." During the trial and since, the court has pigeonholed the patent as one on a specific form of cam groove in a cam drum. While these few words identify the patent for the writer by reference to a salient characteristic of the disclosure, they do not fairly describe the patent.

In Barnes & Guirl 2,020,868 the patentee says:

"We propose to provide a machine which is automatically operable to perform a series of cutting operations, it being only necessary for a workman to set up the work on the machine and then by a single manipulation of a control handle, initiate the performance of the above mentioned successive cutting operations.

"More specifically, our invention contemplates the provision of a machine in which the work may be set up on a carriage or table which is adapted for intermittent linear movement, a cutting tool being designed to be automatically and successively moved into and out of operative engagement with the supported work, the intermittent shifting of the work on the carriage being controlled in timed relation with respect to the movement of the tool.

"Another object is to provide a machine of improved automatic design in which a series of cutting operations may be performed on the work by a tool which is shiftable toward and away from said work, said operations being performed with absolute accuracy and with a minimum amount of skill and effort on the part of the operator.

"Still another object of our invention is to provide in combination with a movable work support and shiftable tool carriage, an efficiently operable hydraulic control which will serve to automatically govern the intermittent shifting of the work and the movement of the tool toward and away from the work.

"Still more specifically, one of the objects of our invention is to provide an improved cam mechanism for controlling the intermittent movement of the work supporting table in such a manner as to accurately and positively position the work so as to be operatively engaged by a rotary tool which is movable vertically with respect to the table.

"Another object is to provide a machine as above set forth which is adapted to be equipped with a variable displacement fluid pumping mechanism, said machine having means for supporting a rotatable cutting tool which is adapted to be hydraulically reciprocated, and a work supporting table which is adapted to be intermittently and hydraulically moved in a linear direction transversely of the reciprocable tool support."

Figures 15, 16 and 17, hereinafter set forth, are reproductions of certain of the patent drawings. Figure 15 is a front

FIGURE 15

FIGURE 16

FIGURE 17

elevational view of a machine which is representative of one embodiment of the invention. Figure 16 is a fragmentary central vertical sectional view taken longitudinally of the work supporting table, certain of the parts, such as the indexing drum cam, being shown in elevation. Figure 17 is a semi-diagrammatic representation of the oil circuit and the electrical circuits for automatically controlling the operation of the machine.

The claims in suit are the following:

"1. In metal working apparatus of the class described, work supporting means linearly shiftable in opposite directions, tool supporting means shiftable transversely with respect to said work supporting means, a fluid pumping mechanism, a hydraulic transmission operatively connected with said pumping mechanism for effecting movement of the work supporting means, said hydraulic transmission comprising a piston within a cylinder and operatively connected with said work supporting means, mechanism interposed between said hydraulic transmission and said pumping mechanism for effecting the reversal of said hydraulic transmission, means operable in timed relation with respect to the movement of said work supporting means for controlling the actuation of said reversing mechanism, and means for successively interrupting the movement of said work supporting means during the advancement thereof in a given direction and for securing said work support in a predetermined position during each successive dwell thereof in cooperation with said hydraulic transmission acting thereagainst.

"2. In metal working apparatus of the class described, work supporting means linearly shiftable in opposite directions, tool supporting means shiftable transversely with respect to said work supporting means, a fluid pumping mechanism, a hydraulic transmission operatively connected with said pumping mechanism for effecting movement of the work supporting means, said hydraulic transmission comprising a piston within a cylinder and operatively connected with said work supporting means, mechanism interposed between said hydraulic transmission and said pumping mechanism for effecting the reversal of said hydraulic transmission, means operable in timed relation with respect to the movement of said work supporting means for controlling the actuation of said reversing

mechanism, and shiftable abutment means for intermittently interrupting the movement of said work supporting means and for securing said work supporting means in a preselected position during each successive dwell thereof in cooperation with the hydraulic transmission acting thereagainst, said shiftable means being operable in response to the movement of said tool supporting means.

\* \* \* \* \*

"7. In metal working apparatus of the class described, shiftable work supporting means, tool supporting means shiftable transversely with respect to said work supporting means, a hydraulic transmission operatively connected with said work supporting means, a hydraulic transmission operatively connected with said tool supporting means, a fluid pumping mechanism, a main fluid valve for controlling the displacement of fluid to said hydraulic transmissions, and abutment means adapted to be engaged by the structure of the work support for successively interrupting the progressive movement of said work supporting means as said work supporting means moves in a given direction and functioning in timed relation with respect to the movement of said tool supporting means, said hydraulic mechanism being connected with the work supporting means so as to urge said means against the abutment and thereby maintain a predetermined position of a supported work piece during the machining thereof.

"8. In metal working apparatus of the class described, shiftable work supporting means, tool supporting means shiftable transversely with respect to the movement of said work supporting means, a hydraulic transmission operatively connected with the work supporting means, a hydraulic transmission operatively connected with said tool supporting means, a fluid pumping mechanism, a shiftable valve for controlling the displacement of fluid to said hydraulic transmissions, means for successively interrupting the movement of the work supporting means as said work supporting means is moved in a given direction, and means operable in response to the actuation of said work supporting means for automatically shifting the valve to neutral position when the work supporting means has completed a series of intermittent movements.

"9. In metal working apparatus of the class described, shiftable work supporting means, tool supporting means reciprocable transversely with respect to said work supporting means, means for effecting intermittent movement of the work supporting means, fluid actuated mechanism for effecting reciprocation of the tool supporting means during successive dwells of the work supporting means, a fluid control valve operatively connected with said fluid actuated mechanism, and an electrical circuit including electrically operated means for shifting said control valve to automatically initiate the reciprocating movement of the tool supporting means, said circuit being controlled in accordance with a preselected position of said work supporting means.

"10. In metal working apparatus of the class described, shiftable work supporting means, tool supporting means reciprocable transversely with respect to said work supporting means, means for effecting intermittent movement of the work supporting means, fluid actuated mechanism for effecting reciprocation of the tool supporting means during successive dwells of the work supporting means, a fluid control valve operatively connected with said fluid actuated mechanism, an electrical circuit including electrically operated means for shifting said control valve to automatically initiate the reciprocating movement of the tool supporting means, said circuit being controlled in response to the movement of said work supporting means, means for controlling the reversal of the work supporting means, and means for rendering the electrically operated means functionally inoperative during the reversal of said work supporting means.

"11. In metal working apparatus of the class described, shiftable work supporting means, tool supporting means reciprocable transversely with respect to said work supporting means, means for effecting intermittent movement in a given direction to said work supporting means, fluid actuated mechanism for effecting reciprocation of the tool supporting means during successive dwells of the work supporting means, a shiftable fluid valve for controlling the displacement of fluid to said fluid actuated means, and an electrical circuit including an actuator for shifting the valve to automatically initiate each reciprocation of the tool supporting means, said circuit including a plurality of switches, one of said switches being operated in response to the movement of the work supporting means

and another switch being operated in response to the movement of the tool supporting means, whereby to govern the opening and closing of the circuit in timed relation with respect to the movements of the work and tool supporting means.

\* \* \* \* \*

"17. In boring machines and the like, a linearly reciprocable work support, a tool support reciprocable transversely with respect to the movement of said work support, means for effecting the reciprocation of said tool support, means for automatically controlling the speed of travel of said tool support, said means being adapted to effect rapid traverse of said tool support during a predetermined interval and a slower traverse during another interval, reversible actuating means operable progressively and intermittently in a given direction for imparting step by step movement of said work support in a given direction in timed relation with respect to the movement of said tool support and for returning said work support upon the completion of the step-by-step movement thereof, abutment means for preventing the overrunning of the work support and cooperating with said reversible actuating means in effecting the step-by-step movement of the work support, and clamping means on said work support for securing the work piece in proper position to be machined.

\* \* \* \* \*

"19. In boring machines and the like, a machine frame, a work support reciprocably mounted on said frame, a head frame reciprocably mounted upon said machine frame and adapted for movement in a direction transverse to the movement of the work support, a rotary tool driving spindle on said head frame, power means on said head frame for driving said spindle, a hydraulic actuator for imparting movement to said head frame whereby to cause a tool carried thereby to be moved into and out of operative association with a supported work piece, a reciprocable hydraulic actuator for moving said work support in opposite directions, means for effecting the successive interruption of the movement of the work support as said support is moved in a given direction, the hydraulic actuator associated with the work support cooperating with said interrupting means to locate said work support in preselected positions relative to a supported tool, fluid pumping mechanism, means carried by the work support for securing a work piece in position thereon, and valve means automatically operable for controlling the delivery of fluid to said actuators.

\* \* \* \* \*

"22. In boring machines and the like, a linearly reciprocable work support, a tool support reciprocable transversely with respect to the movement of said work support, means for effecting the reciprocation of said tool support, means for automatically controlling the speed of travel of said tool support, said means being adapted to effect rapid traverse of said tool support during a predetermined interval and a slower traverse during another interval, reversible actuating means operable progressively and intermittently in a given direction for imparting step-by-step movement of said work support in a given direction in timed relation with respect to the movement of said tool support and for returning said work support upon the completion of the step-by-step movement thereof, abutment means cooperating to positively stop and position the work support during said intermittent movement, and means on said work support for securing a work piece in proper position to be machined.

"23. In boring machines and the like, a linearly reciprocable work support, a tool support reciprocable transversely with respect to the movement of said work support, means for effecting the reciprocation of said tool support, means for automatically controlling the speed of travel of said tool support, said means being adapted to effect rapid traverse of said tool support during a predetermined interval and a slower traverse during another interval, reversible actuating means including a cylinder and piston construction operable progressively and intermittently in a given direction for imparting step-by-step movement of said work support in a given direction in timed relation with respect to the movement of said tool support and for returning said work support upon the completion of the step-by-step movement thereof, a stop device including mechanical means cooperating directly with the work support for preventing the overrunning thereof and cooperating with said reversible actuating means in effecting the step-by-step movement of the work support, and means for securing a work piece on said work support in proper position to be machined.

"24. In boring machines and the like, a linearly reciprocable work support, a tool

support reciprocable transversely with respect to the movement of said work support, hydraulic actuator means for effecting the reciprocation of the tool support, means for automatically controlling the speed of travel of said tool support, said means being adapted to effect rapid traverse of said tool support during a predetermined interval and a slower traverse during another interval, reversible actuating means including a cylinder and piston construction operable progressively and intermittently in a given direction for imparting step-by-step movement of said work support in a given direction in timed relation with respect to the movement of said tool support and for returning said work support upon the completion of the step-by-step movement thereof, a mechanical stop device cooperating directly with the work support for preventing the overrunning thereof and cooperating with said reversible actuating means in effecting the step-by-step movement of the work support, and means for securing a work piece on said work support in proper position to be machined.

"25. In boring machines and the like, a linearly reciprocable work support, a tool support reciprocable transversely with respect to the movement of said work support, means for effecting reciprocation of said tool support, means for automatically controlling the speed of travel of said tool support whereby to cause rapid traverse and slower traverse to said tool support at predetermined intervals during the cycle of operation thereof, reversible actuating means operable progressively and intermittently in a given direction for imparting step-by-step movement to said work support in a given direction in timed relation with respect to the movement of said tool support and for returning said work support upon the completion of the step-by-step movement thereof, abutment means for preventing the over-running of the work support and cooperating with said reversible actuating means in effecting the step-by-step movement of the work support, and means automatically operable after the dwell of the work support at its last position for reversing said support to its starting position.

"26. In a metal working apparatus, a reciprocable carriage for supporting and positioning a work piece and capable of progressive intermittent linear movement in a given direction, tool supporting means shiftable transversely with respect to the linear movement of the carriage, means including a plurality of spaced abutments adapted for successive engagement to positively interrupt the movement of the carriage in timed relation with the movement of the tool supporting means, said abutments providing successive positive stops for accurately positioning said work supporting means during each dwell thereof, and reversible actuating means for imparting linear movement to said carriage structure from a starting position into successive positions of engagement with said abutments to thereby effect a progressive intermittent linear movement and a return movement of said carriage, said reversible actuating means being operable to maintain said work support during the period of intermittent movement constantly advanced from said starting position.

"27. In metal working apparatus, a reciprocable carriage for supporting and positioning a work piece and capable of progressive intermittent linear movement in a given direction, a tool supporting means shiftable transversely with respect to the linear movement of the carriage, means including a plurality of spaced abutments adapted for successive engagement to positively interrupt the movement of the carriage in timed relation with the movement of the tool supporting means, said abutments providing successive positive stops for accurately positioning said work supporting means during each dwell thereof, and reversible fluid operated mechanism for imparting linear movement to said carriage structure from a starting position into successive positions of engagement with said abutments to thereby effect a progressive intermittent linear movement and a return movement of said carriage, said reversible fluid operated mechanism being operable to maintain said work support during the period of intermittent movement constantly advanced from said starting position.

\* \* \* \* \*

"30. In boring machines and the like, a linearly reciprocable work support, a tool support reciprocable transversely with respect to the movement of said work support, means for effecting the reciprocation of said tool support, means for automatically controlling the speed of travel of said tool support, said means being adapted to effect rapid traverse of said tool support during a predetermined interval and a

slower traverse during another interval, reversible actuating means operable progressively and intermittently in a given direction for imparting step-by-step movement of said work support in a given direction in timed relation with respect to the movement of said tool support and for returning said work support upon the completion of the step-by-step movement thereof, shiftable abutment means for preventing the overrunning of the work support and cooperating with said reversible actuating means in effecting the step-by-step movement of the work support, and means on said work support for securing a work piece in position to be machined.

"31. In metal working apparatus, a reciprocable carriage for supporting and positioning a work piece, a tool support reciprocable transversely with respect to the movement of said carriage, means for effecting the shifting of said tool support, means for controlling the speed of travel of said tool support in timed relation with the movement of said carriage, reversible actuating means operable progressively and intermittently in a given direction for imparting step-by-step movement to said carriage in a given direction in timed relation with respect to the movement of said tool support and for returning said carriage upon the completion of said step-by-step movement, means on the work support for properly locating a work piece in position to be acted upon by a supported tool, abutment means for preventing the overrunning of the carriage and cooperating with said reversible actuating means in effecting said step-by-step movement, and a single manually operable mechanism for controlling the movements of said carriage and tool support.

"32. In metal working apparatus, a reciprocable carriage for supporting and positioning a work piece, a tool support reciprocable transversely with respect to the movement of said carriage, means for effecting the shifting of said tool support, means for controlling the speed of travel of said tool support in timed relation with the movement of said carriage, reversible actuating means operable progressively and intermittently in a given direction for imparting step-by-step movement to said carriage in a given direction in timed relation with respect to the movement of said tool support and for returning said carriage upon the completion of said step-by-step movement, means on the work support for properly locating a work piece in position to be acted upon by a supported tool, abutment means for preventing the overrunning of the carriage and cooperating with said reversible actuating means in effecting said step-by-step movement, and means for preventing the shifting of the carriage until the tool support has withdrawn the tool supported thereby from the work.

"33. In boring machines and the like, a machine frame, a work support reciprocably mounted on said frame, a head frame reciprocably mounted upon said machine frame and adapted for movement in a direction transverse to the movement of the work support, a rotary tool driving spindle on said head frame, power means on said head frame for driving said spindle, a hydraulic actuator for imparting movement to said head frame whereby to cause a tool carried thereby to be moved into and out of operative association with a supported work piece, a reciprocable hydraulic actuator for moving said work support in opposite directions, means for effecting the successive interruption of the movement of the work support as said support is moved in a given direction, the hydraulic actuator associated with the work support cooperating with said interrupting means to locate said work support in preselected positions relative to a supported tool, fluid pumping mechanism, means carried by the work support for securing a work piece in position thereon, valve means automatically operable for controlling the delivery of fluid to said actuators, and means for preventing reciprocation of said head frame during the reversal of said work support.

"34. In metal working apparatus, a support for supporting and positioning a work piece, a rotary tool, a support for said rotary tool operatively associated therewith, one of said supports being linearly movable in parallelism with the axis of said supported tool and the other being linearly movable transversely of said tool axis, reversible actuating means operable progressively and intermittently in a given direction for imparting intermittent forward movement and reverse movement to said transversely movable support in timed relation with respect to the movement of the other support, means for automatically controlling the speed of relative axial movement between said tool and work supports, abutment means for preventing the overrunning of the transversely movable support and cooperating with said re-

versible actuating means in effecting the intermittent movement of said transversely movable support, and means for retaining a work piece in position upon said work support.

"35. In metal working apparatus, a support for supporting and positioning a work piece, a rotary tool, a support for said rotary tool operatively associated therewith, one of said supports being linearly movable in parallelism with the axis of said supported tool and the other being linearly movable transversely of said tool axis, reversible actuating means including a cylinder and piston construction operable progressively and intermittently in a given direction for imparting intermittent forward movement and reverse movement to said transversely movable support in timed relation with respect to the movement of the other support, means for automatically controlling the speed of relative axial movement between said tool and work supports, abutment means for preventing the overrunning of the transversely movable support and cooperating with said reversible actuating means in effecting the intermittent movement of said transversely movable support, and means for retaining a work piece in position upon said work support."

The plaintiffs contend that the patent is valid and that each of the claims in suit is infringed by the defendants' Oldsmobile boring machine.

The defendants' defenses are: (1) that all of the claims are invalid under Section 33, Title 35 U.S.C.A. because of unconscionable multiplicity; (2) that all of the claims are invalid because they define nothing but old and exhausted combinations completely lacking in invention over Schwarzler 395,592; (3) that the patent is void in its entirety because of failure seasonably to reissue to cure what plaintiffs have long known is an inoperative disclosure; (4) that claims 7 and 8 are invalid for failure to read on the disclosure of the patent; (5) that claims 1, 2, 7, 8, 17, 19, 22, 23, 24, 25, 26, 27, 30, 31, 32, 33, 34 and 35 are invalid on the prior art; (6) that claims 9, 10 and 11 are likewise invalid on the prior art; and (7) that each and every one of the claims in issue is not infringed.

The court is of the opinion that here, again, there has been an unnecessary multiplication and duplication of claims; for instance, the only difference between claims 26 and 27 is that 26 uses the words "actuating means" while 27 uses the words "fluid operated mechanism." But, again, the court feels the ends of justice will be best served if it refrains from striking down the patent on the ground of a multiplicity of claims.

The defendants' second defense must be sustained. The combination which the claims in issue purport to cover is not a new combination but is actually the same old combination that Schwarzler used as early as 1888, dressed up by the substitution of various obvious mechanical equivalents, including the substitution of hydraulic transmissions for mechanical transmissions.

Referring to the defendants' third defense, the defendants say that the hydraulic system, as illustrated in Barnes & Guirl 2,020,868, is clearly inoperative and of no utility because it includes a one-way or check valve in the pipe 92 (see Figure 17) between the tool head actuator 38 and the reversing valve 80 for such actuator, that the placing of a check valve at this point precludes the flow of fluid up to the actuator for raising the tool head, and that once the tool head has descended it is impossible to raise it again with the structure as shown. The plaintiffs refer to the specifications which point out that the hydraulic apparatus is "a commercial article known as 'oil gear' and is manufactured by The Oilgear Co." and they say that a person skilled in the art would know how to devise an operative machine in spite of the error in the drawing. The court does not believe that the defendants' third defense can be sustained.

The sixth element of claim 7 is "a main fluid valve for controlling the displacement of fluid to said hydraulic transmissions" and the sixth element of claim 8 is a "shiftable valve for controlling the displacement of fluid to said hydraulic transmissions." The defendants make the point that Barnes & Guirl 2,020,868 discloses no valve which controls the displacement of fluid to both transmissions (actuators) and that the claims are invalid for failure to read on the disclosure of the patent. It is a fact that the two hydraulic transmissions shown in the patent are controlled by separate and distinct valves 80 and 208 (See Figure 17). There is no single valve which serves to control both transmissions. The court is of the opinion that the defense must be sustained. If the claims

were entitled to broad constructions the ruling might be otherwise, but, they are not.

Coming to the defendants' fifth and sixth defenses, which are to the effect that the claims in suit are invalid on the prior art. It is observed that against claims 1, 2, 7, 8, 19 and 33, the defendants cite Parks & Thatcher 797,216 (1905-1905) and Ferris 1,995,638 (1926-1935). Parks & Thatcher is a patent on a grinding machine. In this patent, it is said on page 1:

"In this class of machines the grinding-wheel is mounted upon a cross-slide, which is advanced or fed forward after each stroke of the reciprocating carriage in order to bring the wheel into position to take a new cut.

"Certain features of the invention relate to the means for insuring an accurate and uniform positioning of the cross-slide in making successive cuts and in grinding duplicate pieces of work. For this purpose the cross-slide is positioned or its feed controlled by a stop against which the slide or a part fixed thereto is continually pressed during the operation of the grinding-wheel upon the work. In order that the slide may be forced against the stop with a uniform pressure and a resulting increase in the accuracy with which the slide is positioned, a fluid which is under constant pressure is employed for keeping the slide up to the stop.

"It is frequently desirable to move the grinding wheel back away from the work— as, for instance, in order to caliper the work at a certain point and to thereafter return the grinding-wheel accurately to position to continue to cut. To enable this to be done, means are provided which are under the control of the operator for moving the cross-feed slide back away from the positioning-stop and returning it to position against the stop."

The plaintiffs' chief complaint against Parks & Thatcher is that it is a patent on a grinding machine. Ferris is a patent on a milling machine. In this patent, it is said on page 1: "Another object is to provide a machine tool with a jump feed by means of which the table of the machine may be advanced rapidly step by step to different positions and accurately retained in each of those positions while the work is being operated upon by the tool." The court is of the opinion that the claims referred to are either anticipated by or fail to disclose invention over the two patents referred to.

Against claims 17, 22, 23, 24, 25, 26, 27, 30, 31, 32, 34 and 35, the defendants cite Parks & Thatcher 797,216 (1905–1905), Flanders 1,750,956 (1923-1930), and Ferris 1,995,638 (1926-1935). Flanders is a patent on "a machine for grinding chasers such as are used to cut threads in automatic lathes, screw machines and the like." Perhaps the most quotable description of the machine there disclosed is found in claim 3, which claim finds response in the disclosures of the patent. Claim 3 is as follows: "3. In a machine of the class described comprising a grinding wheel, a carriage moveable substantially parallel to the axis of said wheel, a slideway on said carriage, a slide movable on said way parallel to the plane of rotation of said wheel, means for clamping a chaser on said slide with its threads extending parallel to its direction of sliding motion, a shaft journaled longitudinally in said carriage, *a cam on said shaft, lever connections from said cam for reciprocating said slide on rotation of said shaft, a cam drum having a pair of cam elements thereon, a follower fixed to said carriage in operative engagement with one of said cam elements for causing a step by step motion of said carriage between successive reciprocations of said slide to present the cutting face of said wheel successively to adjacent threads of the chaser, another follower in operative engagement with said other cam element to advance and retract said wheel toward and from the chaser to cause said wheel to engage and then to clear the chaser, and means for driving said cam and said cam drum in proper timed relation.*" The italicized portion of claim 3 describes everything of consequence in Barnes & Guirl 2,020,868. A chief objection of the plaintiffs to Flanders is that it is a patent on a grinding machine. The court is of the opinion that the claims referred to are either anticipated by or fail to disclose invention over the three patents referred to.

Against claims 9, 10 and 11, the defendants cite an Atcheson graphite machine, built by Ingersoll Milling Machine Company and shipped November 10, 1927, and Harrison 1,840,231 (1927-1932). The Atcheson graphite machine has a rotatably indexable work support or fixture rather than a straight line indexing arrangement for the same. Element 3 of claims 9 and

10 reads as follows: "means for effecting intermittent movement of the work supporting means." Element 3 of claim 11 reads: "means for effecting intermittent movement in a given direction to said work supporting means." These elements are broad enough to cover either rectilinear or rotary indexing. The following elements of claim 10 do not find response in Atcheson graphite machine, and the last one of the two does not find response in the Harrison patent, but both elements would have been obvious to any mechanic: "means for controlling the reversal of the work supporting means," and "means for rendering the electrically operated means functionally inoperative during the reversal of said work supporting means." The fact is that Barnes & Guirl 2,020,868 is a step backward from the two-way operation disclosed in the Harrison patent. This Harrison patent also discloses a grinding machine with a hydraulic actuator for effecting movement of the tool carriage to and from the work for machining, together with a step by step indexing mechanism for shifting the tool along the work and an electrical control system for the whole. The chief objection of the plaintiffs to the Harrison patent is that it is a patent on a grinding machine. It has been observed that three of the prior art patents cited against Barnes & Guirl 2,020,868 are patents on grinding machines. They are machine tools and in the opinion of the court they are a part of the prior art to be considered on the question of the validity of Barnes & Guirl. The court is of the opinion that the claims referred to are either anticipated by or fail to disclose invention over the machine and patent referred to.

As has been stated, the only machine charged to infringe is defendants' Oldsmobile boring machine. It is charged to infringe each of the claims in suit. In claim 17, which is typical of a group of claims, consisting of claims 17, 22, 23, 24, 25, 30, 31 and 32, are found two elements which read as follows: "reversible actuating means operable progressively and intermittently in a given direction for imparting step by step movement of said work support in a given direction in timed relation with respect to the movement of said tool support and for returning said work support upon the completion of the step-by-step movement thereof," and "abutment means for preventing the overrunning of the work support and cooperating with said reversible actuating means in effecting the step-by-step movement of the work support." Neither of these elements finds response in defendants' machine. Defendants have no actuating means which operates progressively and intermittently in a given direction in the same way or for the same purpose as does the Barnes & Guirl work actuator 28-30 (Figure 17). Defendants have no means which imparts step-by-step movement to its work support in a given direction, in the sense of Barnes & Guirl or for the same purpose. Defendants have no abutment means cooperating with an actuating means to effect a step-by-step movement of the work support, which is like the Barnes & Guirl indexing cam drum 112 (Figure 16), either structurally or functionally. Defendants have no means whereby their work support is returned to its initial position after completion of any step-by-step movement as is of essence in the Barnes & Guirl disclosure. Defendants have no stop device cooperating directly with its work support, as does the indexing cam drum 112 (Figure 16) of Barnes & Guirl.

Claim 25 has an additional element reading as follows: "means automatically operable after the dwell of the work support at its last position for reversing said support to its starting position." This element finds no response in defendants' machine. In defendants' machine the work support is not automatically reversed to its starting position.

Claim 32 has an element reading as follows: "means for preventing the shifting of the carriage until the tool support has withdrawn the tool supported thereby from the work." This element finds no response in defendants' machine. Defendants have no means preventing the shifting of the work carriage until the tool is withdrawn from the work. On the contrary, defendants' work carriage is shifted at the end of each downward machining movement and prior to withdrawal of the tool.

In claim 35, which is typical of a group consisting of claims 35 and 34, are found two elements which read as follows: "reversible actuating means including a cylinder and piston construction operable progressively and intermittently in a given direction for imparting intermittent forward movement and reverse movement to said transversely movable support in timed relation with respect to the movement of the other support," and "abutment means for preventing the overrunning of the

transversely movable support and cooperating with said reversible actuating means in effecting the intermittent movement of said transversely movable support." These two elements do not find response in the defendants' machine. Defendants have no actuating means which operates progressively and intermittently in a given direction, in the same way or for the same purpose as does the Barnes and Guirl work actuator 28-30 (Figure 17). Defendants have no means which imparts intermittent forward movement to its work support in a given direction, in the sense of Barnes and Guirl or for the same purpose. Defendants have no abutment means cooperating with an actuating means to effect intermittent movement of the work support, which is like the Barnes and Guirl indexing cam drum 112 (Figure 16), either structurally or functionally.

In claim 1, which is typical of a group of claims, consisting of claims 1 and 2, is found an element reading as follows: "means operable in timed relation with respect to the movement of said work supporting means for controlling the actuation of said reversing mechanism." This element does not find response in defendants' machine because defendants have no means operable in timed relation with respect to the movement of the work support which controls the actuation of the reversing mechanism for the actuator which moves its work support. Defendants' control valves are operated to reverse the work support, in timed relation with respect to the movement of the *tool support* when the work support is at the end of its travel toward the right and in timed relation with the positioning movement of the *spindles* when the work support is at the end of its travel toward the left. Defendants' cycle of operations could not be effected by operating the control valves from the work support, as in Barnes and Guirl.

In claim 1 is also found the following element: "means for successively interrupting the movement of said work supporting means during the advancement thereof in a given direction and for securing said work support in a predetermined position during each successive dwell thereof in cooperation with said hydraulic transmission acting thereagainst." This element does not find response in defendants' machine because defendants have no means for successively or intermittently interrupting the movement of its work supporting

means, which is like the indexing cam drum 112 (Figure 16), of Barnes and Guirl, either structurally or functionally. Defendants do not successively or intermittently interrupt the movement of its work support, in the sense of Barnes and Guirl. Defendants do not have successive dwells of their work support during which the tool performs a complete machining cycle, as in Barnes and Guirl. Defendants do not perform successive machining operations with the movements of its work support interrupted at successive machining stations during its advancement in a given direction, as does Barnes and Guirl.

In claim 7, which is typical of a group of claims consisting of claims 7 and 8, is found an element reading as follows: "a main fluid valve for controlling the displacement of fluid to said hydraulic transmissions." This element does not find response in defendants' machine because defendants have no valve which controls the displacement of fluid to both transmissions (actuators). In claim 7 is also found the following element: "abutment means adapted to be engaged by the structure of the work support for successively interrupting the progressive movement of said work supporting means as said work supporting means moves in a given direction and functioning in timed relation with respect to the movement of said tool supporting means." This element does not find response in defendants' machine. Defendants have no means for successively interrupting the movement of their work supporting means, which is like the indexing cam drum 112 (Figure 16) of Barnes and Guirl, either structurally or functionally. Defendants do not successively interrupt the movement of their work support, in the sense of Barnes and Guirl. Defendants do not perform successive machining operations with the movement of its work support interrupted at successive machining stations during its advancement in a given direction, as does Barnes and Guirl. Defendants have no abutment means engaged by the structure of the work support, as in Barnes and Guirl. The following element, which is found only in Claim 7, does not find response in defendants' machine: "said hydraulic mechanism being connected with the work supporting means so as to urge said means against the abutment and thereby maintain a predetermined position of a supported work piece during the machining thereof."

The following element, which is found only in Claim 8, does not find response in defendants' machine: "means operable in response to the actuation of said work supporting means for automatically shifting the valve to neutral position when the work supporting means has completed a series of intermittent movements." Defendants have no means operable in response to the actuation of the work support for shifting any valve to neutral position. Defendants' control valve is shifted to neutral position by the tool support.

In each of Claims 19 and 33 is found an element reading as follows: "means for effecting the successive interruption of the movement of the work support as said support is moved in a given direction, the hydraulic actuator associated with the work support cooperating with said interrupting means to locate said work support in preselected positions relative to a supported tool." This element does not find response in defendants' machine. Defendants have no means for successively interrupting the movement of their work support, which is like the indexing cam drum 112 (Figure 16) of Barnes and Guirl, either structurally or functionally. Defendants do not successively interrupt the movement of its work support, in the sense of Barnes and Guirl. Defendants do not perform successive machining operations with the movement of its work support interrupted to locate the work support in preselected positions relative to the tool, as does Barnes and Guirl.

In Claim 33 there is found an element reading as follows: "means for preventing reciprocation of said head frame during the reversal of said work support." This element does not find response in defendants' machine. Reciprocation of defendants' tool head frame takes place equally during reversal and forward movement of the work support.

In Claims 26 and 27 is found an element reading as follows: "a reciprocal carriage for supporting and positioning a work piece and capable of progressive intermittent linear movement in a given direction." This element does not find response in defendants' machine. Defendants' work carriage is not operated in progressive intermittent linear movement in a given direction, in the sense of Barnes and Guirl. In said claims are also found the following element: "means including a plurality of spaced abutments adapted for successive engagement to positively interrupt the movement of the carriage in timed relation with the movement of the tool supporting means, said abutments providing successive positive stops for accurately positioning said work supporting means during each dwell thereof." This element finds no response in defendants' machine. Defendants have no means including a plurality of spaced abutments adapted for successive engagement by its work carriage, which is like the Barnes and Guirl indexing cam drum 112 (Figure 16) either structurally or functionally. Defendants do not successively interrupt the movement of their work carriage, in the sense of Barnes and Guirl. Defendants do not have abutments providing successive positive stops or dwells for positioning its work supporting means while the tool performs a machining cycle, as in Barnes and Guirl. In Claim 26 is found the following element: "reversible actuating means for imparting linear movement to said carriage structure from a starting position into successive positions of engagement with said abutments to thereby effect a progressive intermittent linear movement and a return movement of said carriage, said reversible actuating means being operable to maintain said work support during the period of intermittent movement constantly advanced from said starting position." And in claim 27 is found a like element, except that the words "fluid operated mechanism" are substituted for "actuating means." This element finds no response in defendants' machine. Defendants have no actuating means for moving their work carriage into successive positions of engagement with a plurality of spaced abutments, as in Barnes and Guirl. Defendants have no means for effecting a progressive intermittent linear movement and a return movement of its work carriage, in the sense of Barnes and Guirl.

In Claim 9, which is typical of a group of claims consisting of Claims 9, 10 and 11, are found two elements which read as follows: "means for effecting intermittent movement of the work supporting means," and "fluid actuated mechanism for effecting reciprocation of the tool supporting means during successive dwells of the work supporting means." These elements find no response in defendants' machine. Defendants have no means for effecting intermittent movement of their work supporting means which is like the Barnes and

Guirl combination of actuator 28-30 (Figure 17), indexing cam drum 112, and follower pin 136 (Figure 16), either structurally or functionally. Defendants have no actuator mechanism for effecting reciprocation of the tool support during successive dwells of the work support.

In Claim 10 is found an additional element reading as follows: "means for rendering the electrically operated means functionally inoperative during the reversal of said work supporting means." This element does not find response in defendants' machine. Defendants' electrically operated means is operative equally during reversal and forward movement of the work support,

No one of the claims is infringed. No one of them is entitled to a broad construction and even if they were they would not be infringed.

*10. Walker 1,493,301 for a "Power Control for Boring Machines," Issued May 6, 1924, on an Application Filed July 30, 1921, and Containing 43 Claims, of Which 6 Are in Suit.*

Walker 1,493,301 expired a few days after this suit was instituted. The plaintiffs concede they have never built the structure disclosed in it. They say, however, that they have used it and that they bought it after an inadvertent infringement of it. The patent discloses a double-end boring machine for boring the cam and crankshaft bearings of an engine block having an internally located bearing. To accomplish the boring of the internally located bearing the patentee locates certain of his tools (42 and 43 of Figure 18) inside the engine block and on bars disconnected from the main spindles and brings the spindles forward into feeding position without rotation of the same so as to avoid a clashing of the parts when the spindles are clutched onto such bars of the internally located tools.

Figures 18 and 19, as hereinafter set forth, are reproductions of certain of the patent drawings. Figure 18 is a top plan

FIGURE 19

view of a machine constituting a physical embodiment of the invention and with the work to be machined positioned thereon and shown in an irregular horizontal sectional view. Figure 19 is a diagrammatic view of the main parts of the machine spread out in one plane to facilitate an understanding of the relation of the several parts.

In Walker 1,493,301, the patentee says:

"The invention relates in general to a machine for causing a plurality of tools to function simultaneously and automatically in a timed cycle of succeeding operations and, specifically the invention relates to a self-controlled device for drilling, boring, reaming, facing and otherwise machining the bearings and bearing supports in a machined article where the parts to be machined are spaced apart in some definite preset relation, such for instance, as the aligned bearings in the crank casing of an automotive power plant.

"Selecting for illustration the machining of the bearings in an automotive case for a detailed description of one situation where the invention is particularly applicable, it is noted that in one form of such case it is required that there be arranged in a preset definite relation four sets of bearings or bearing supports with the axis of the bearings in each set disposed accurately in alignment. These sets are disposed in off-set relation and comprise three spaced apart cam shaft bearings; three spaced apart crank shaft bearings; three spaced apart water pump bearings and a generator shaft bearing.

\* \* \* \* \*

"One of the primary objects of this invention is to provide a simple form of machine which, when once set in operation, will effect the necessary boring, reaming and other machining operations without further attention on the part of the opera-

FIGURE 18

tor and which, at the same time will function in a manner to effect economy both in the lapsed time necessary to affect the sequence of operations and which will incidentally effect a saving in the power consumption necessary to do the required work.

"The machine is of the type in which the work to be operated upon is disposed in fixed position in preset relation to the operating tools, and with axially disposed sets of these tools disposed to engage and operate on the work simultaneously from opposite sides thereof and in a preset time relation. The present invention features a construction of such machines in which tool carrying heads can be moved rapidly to bring their tools into a position adjacent their machining positions and in which both the heads and their tools are caused to function at their approved working speed and the heads so governed that at the completion of the machining operations the heads are rapidly moved with their tools into an inoperative position to permit the ready removal of the machined article and the replacement in the machine of another article to be machined.

"Contributing to the objective for economy in lapsed time operation, another object of the invention is to provide an automatic control which may be readily varied to meet changes in conditions of the work operated upon, and which, when once set in operation, will complete its cycle of movement without further attention on the part of the operator and in which every article will be machined exactly as every other article was machined.

"Another object of the invention, and featuring economy in power consumption is to provide a time relation in the actuation of the several machining tools so that all of the machining work will be performed during the machining of the longest bearing.

\* \* \* \* \*

"In general it will be understood that the casing to be machined is first rough bored, and faced and then by replacing the boring tools with reaming or finishing tools, the bores and the end faces are reamed and otherwise finished. In each cycle of operation there are three succeeding operations, first the heads at opposite ends of the machine are advanced rapidly toward the crank case, the tools not rotating, and until the tools are within about ¼ inch from the parts to be machined, second the heads are advanced slowly towards the crank

case, the tools rotating and otherwise functioning and, third the heads with the tools not rotating are returned rapidly to their original position ready to have the cycle of operations repeated.

"In the drawings \* \* \* there is disclosed a tablelike bed casting 25, the top 26 of which provides a support for the work \* \* \* to be machined. In the present disclosure this work is one of the crank cases usual in automotive power plants and includes three cam shaft bearings lettered from left to right b', b'', b''', three crank shaft bearings c', c'', c''', three water pump shaft bearings d', d'', d''', and a single generating shaft bearing e, the several sets of multiple bearings being in alignment as is well known in such constructions.

"On top of the casting are four large projections 27, 28, 29, 30 constituting tool guiding members and which are accurately lined, bored and bushed with replaceable hard steel bushings and which constitute the guides in which the several boring bars and other tools rotate and slide while functioning to drill, bore, ream, face and otherwise machine the different bearings.

"The case to be machined is located in position on the top 26 by four steel pins 31 projecting upwardly from the top of the bed casting and by two pilot pins 32 which project upwardly from the members 28 and 29 and engage in recesses in the top of the case \* \* \*. The crank case is securely fastened in its located position by two clamps 33 carried by the members 27 and 30.

"Large hollow brackets 34 and 35 are demountably bolted to opposite longitudinal ends of the casting 25 with their upper surfaces machined to form tracks 36 \* \* \* to form supports for longitudinally slidable heads 37 and 38, hereinafter referred to specifically as the left hand head 37 and the right hand head 38. Each head is provided with a plurality of driving shafts which connect with tools carried in the adjacent guiding members 27 and 30.

\* \* \* \* \*

"The outside bearings are machined from opposite sides of the casing, and the internal bearings, such as the bearings b'' and c'', are machined by means of tools 42 and 43 which are guided in the member 29 and are coupled to their driving elements in a manner more particularly described in my copending application above identified.

\* \* \* \* \*

"In the operation of the machine the heads are both advanced rapidly from an inoperative position, with the several tools clear of the case, into position with the tools adjacent their machining engagement with the casing. This movement is provided by means of a pair of head advancing shafts, a left head advancing shaft 58 and a right head advancing shaft 59 which extend in opposite direction from the gear box 57. The shafts 58 and 59 are in screw threaded engagement with the lower parts 60 of each of the heads. The portion of the head advancing shaft * * * which is within the path of travel of its corresponding head is provided with a screw 61 which works in a long nut 62 rotatably mounted in bearings 63 carried in opposite ends 64 of the head. The nut 62 is held against longitudinal movement in its head by means of collars 65. The shafts 58 and 59 extend into opposite sides of the gear box and it will be understood that when the shafts are rotated by the mechanism hereinafter described in the gear box and with the nut held against rotation by means hereinafter described, the turning screw 61 acting on the held nut will cause the head controlled thereby to be advanced at high speed in either of its longitudinal directions depending upon the direction of rotation of the shafts.

"The part of the main drive shaft in each head is operatively connected to the adjacent nut through a short auxiliary head driving shaft 66 which is journalled in the lower part of the head, and is connected to the shaft by means of a right angled spiral gear driving connection 67 and to the nut by means of an endless spiral gear connection 68."

The claims in suit are the following:

"1. In a device for machining a plurality of openings having different lengths of bore and differently positioned in an article of manufacture, the combination with means for securing the article in place and power means for driving the machine, of two sets of tools operatively connected to be driven from the power means and disposed to act on the article simultaneously from opposite sides thereof, means for advancing certain of the tools rapidly and simultaneously into position adjacent their operative engagement with the parts to be machined, means for stopping said rapid movement and for causing said tools to function automatically at the termination of said rapid movement, said tools having a rate of feed while functioning to cause all the machining to be completed at the termination of the machining of the opening, having the longest bore, thereby tending to maintain the load on the power means uniform during the machining operation.

"2. In a device for machining a plurality of openings having different lengths of bore and differently positioned in an article of manufacture, the combination with means for securing the article in place and power means for driving the machine, of a plurality of tools operatively connected to be driven from the power means, means for advancing certain of the tools rapidly and simultaneously into position adjacent their operative engagement with the parts to be machined, means for stopping said rapid movement and for causing said tools to function automatically at the termination of said rapid movement, said tools having a rate of feed while functioning to cause all the machining to be completed at the same time thereby tending to maintain the load uniform on the power means.

"3. In a device for machining or boring an article of manufacture, the combination with a power means, a plurality of tools, means actuated by the power means for advancing the tools bodily and rapidly from an inoperative towards an operative engagement with the article, means for driving the tools from the power means, and means controlled by the bodily movement of the tools into operative engagement with the article for reducing the speed of the bodily advancing means and automatically connecting the tools with the driving means to cause the tools to machine the article.

"4. In a device of the class described, the combination of a work support, a tool disposed in preset relation to said support, mechanical means for advancing the tool bodily towards said support, means acting on the tool to prevent it from rotating during said advance, means operatively connected with the tool at the termination of said advance for causing it automatically to function for a preset length of travel and means operatively connected to the tool at the termination of said functioning action automatically to return the same idly to its initial position.

"5. In a device of the class described, the combination of a work support, a tool disposed in preset relation to said support, means for advancing the tool bodily towards said support, means acting on the tool to prevent it from rotating during said

advance, means operatively connected with the tool at the termination of said advance for causing it to function for a preset length of travel, means operatively connected to the tool at the termination of said functioning action to return the same to its initial position, and means acting on the tool during said returning movement to prevent it from rotating.

\* \* \* \* \* \*

"26. In a device of the class described, the combination with a head containing tool driving mechanism, head advancing mechanism, feeding means operatively connected to the head, advancing mechanism for advancing the head rapidly to a preset point while the tool driving mechanism remains idle, means controlled automatically by the arrival of the head at said point for causing said rapid head advancing feeding means to become inoperative and causing the tool driving mechanism to become operative for feeding the head at a relatively slow speed."

The plaintiffs contend that the patent is valid; that claims 1 and 2 are each infringed by defendants' 2-way 8-station machine and defendants' Pontiac duplex machine; and that claims 2, 3, 4, 5 and 26 are each infringed by defendants' Oldsmobile boring machine.

The defendants' defenses a r e: (1) That all the claims in issue are invalid under Section 33, Title 35 U.S.C.A., because of their nebulous and misleading language and functionality; (2) that claims 1 and 2 are invalid on the ground of aggregation; (3) that claims 4 and 5 are invalid for failure to read on the disclosure; (4) that each and every one of the claims in issue is invalid on the prior art; and (5) that none of the machines accused constitutes an infringement of the claims in issue.

The court does not believe that defendants' first defense can be sustained. The worst offenders amongst the claims are 1 and 2. Claim 1 ends as follows: "said tools having a rate of feed while functioning to cause all the machining to be completed at the termination of the machining of the opening having the longest bore, thereby tending to maintain the load on the power means uniform during the machining operation." Claim·2 ends as follows: "said tools having a rate of feed while functioning to cause all the machining to be completed at the same time thereby tending to maintain the load uniform on the power means." The conclusion of each

quotation is of course a statement of a function and, incidentally, one that does not necessarily follow from what has theretofore been stated. But the court will assume that all the claims in suit are valid so far as defendants' first defense is concerned.

The court does not believe that claims 1 and 2 are invalid on the ground of aggregation, if by "aggregation" is meant anything other than want of invention.

The last element of claim 4 is: "means operatively connected to the tool at the termination of said functioning action automatically to return the same idly to its initial position." and the last two elements of claim 5 are: "means operatively connected to the tool at the termination of said functioning action to return the same to its initial position, and means acting on the tool during said returning movement to prevent it from rotating." It will be observed that the word "idly" in the last element of claim 4 is the equivalent of the last element of claim 5. The last element of claim 4 including the word "idly" and the last element of claim 5 do not find response in the disclosures of the patent. Walker 1,493,301 discloses no "means acting on the tool during said returning movement to prevent it from rotating," and claims 4 and 5 are accordingly invalid.

Against claims 1 and 2 the defendants cite: A Ford drilling and reaming machine built by Foote-Burt Co. and shipped December 26, 1916; Jacobs 585,763 (1896-1897); Udall 1,568,935 (1919-1926); and Mowat 967,219 (1906-1910).

The construction and sale of the Foote-Burt Co. drilling and reaming machine in 1916 was stipulated. All the elements of claims 1 and 2 find response in this machine except that it had no provision for rapid approach movement of the tool prior to the feed. It did have provision for feed movement and for rapid return. The court holds, with defendants, that it was an obvious mechanical expedient to provide rapid approach portions in certain grooves in the cam drums, if desired, like the rapid return portions already present.

Jacobs 585,763 (1896-1897) discloses a boring machine with the automatic cycle of rapid approach, feed and rapid return. Here is everything that Walker discloses. True Walker calls for means for advancing only "certain of the tools rapidly." But to convert Jacobs to correspond to this idiosyncrasy of Walker would require only that

certain slopes be eliminated from the cams of Jacobs. Inventive genius would not be required to do that.

That which has been said of Jacobs 585,-763 (1896-1897) may also be said of Udall 1,568,935 (1919-1926) and Mowat 967,219 (1906-1910).

In the court's opinion, claims 1 and 2 disclose no invention over the machines and patents cited.

Against claims 3, 4, 5 and 26 the defendants cite: Rich 1,355,167 (1918-1920); an article in the "American Machinist" of March 25, 1920; an article in "Machinery" of April, 1910; and Yeomans 1,309,389 (1918-1919).

Rich 1,355,167 is assigned on its face to Brown and Sharpe Manufacturing Company and a machine manufactured by that company in accordance with the disclosures of the patent is described in the "American Machinist." The patent and the article describe the arrangement by means of which adjustably mounted dogs on the table of the Rich machine may be utilized to accomplish any desired cycle of table movements and correlated automatic starting and stopping of the spindle. In Rich 1,355,-167 is found the following language:

"It is the primary object of the invention to provide an improved mechanical control for the work supporting table and cooperating parts which will adapt the machine to do any of the forms of milling outlined above. To this end a feature of the invention consists in transmitting motion to the work supporting table through a mechanical feed train including mechanism for changing the speed and for changing the direction of travel of the table, which may be so controlled by tripping devices, such as tripping dogs, connected to move with or in unison with the support, that the table may be reversed when traveling at a slow speed or at a fast speed, and the speed of the support may be changed during its travel in each direction. The mechanism for changing the direction of travel of the support and the mechanism for imparting a fast or slow feed to the support, are preferably so arranged in the train that motion is transmitted to the support from one of these mechanisms through the other. This enables the feed to be readily changed from fast to slow and from slow to fast at any desired point or points in the travel of the support in either direction by proper adjustment of the tripping dogs, and without affecting the mechanism for reversing or stopping the support, the operation of which may be independently controlled by the corresponding tripping dogs.

"In doing some classes of work it is desirable that the rotation of the cutter spindle be stopped during the return travel of the finished work past the cutter in order to avoid marking the milled surfaces. To secure this result without interfering with the automatic operation of the machine, mechanism is provided for stopping and starting the spindle, which may be so controlled that the spindle stops as the work support is automatically reversed, and again starts before or at the same time that an unfinished piece of work is presented to the cutter. The spindle stopping and starting mechanism is preferably thus controlled by the speed changing mechanism, or by the speed changing and the reversing mechanisms for the work support through connections which when active will cause the spindle to be stopped as the support is reversed, and to be started as the change is made from the fast to the slow feed."

Here is everything that claims 3, 4, 5 and 26 of Walker 1,493,301 disclose. The only difference between Walker and Rich is that Walker shifts the spindle while Rich shifts the work support—a mere reversal of parts. Both Rich 1,355,167 issued October 12, 1920, on an application filed March 8, 1918, and the "American Machinist" article of March 25, 1920, antedate the Walker companion patent No. 1,493,000, filed November 20, 1920, which patent the plaintiffs contend shows conception by Walker on the last mentioned date.

In the April, 1910, issue of "Machinery" is described a vertical cylinder boring machine made by Baker Bros., Inc. This machine was described as automatic. The operator loaded the work and threw a starting lever, whereupon the machine executed a cycle of forward feed movement for boring and then rapid return to starting position at which point the machine came to rest. Also included in the automatic cycle was an automatic starting of the spindles at the beginning of the forward feed movement and automatic stopping of such spindles upon completion of the feed movement. Here was everything that Walker 1,493,301 has except the forward rapid traverse movement, and it would not take inventive genius to put that in after one had the other movements.

Yeomans 1,309,389 (1918-1919) discloses a cycle of rapid approach, forward feed and

rapid return. The feed drive for advancing the tool and the rotary drive for rotating the tool are geared together. During the feeding movement the spindles are turning and during the rapid traverse movements they are not. The machine is not automatic. It is referred to as manual. But the broad idea of Walker is there.

In the court's opinion claims 3, 4, 5 and 26 disclose no invention over the prior art to which reference has been made.

Coming to the defendants' fifth and final defense, that none of the accused machines constitutes an infringement of the claims in issue, and considering first a group of claims 1 and 2, of which group claim 1 may be regarded as typical, it is seen that the second element of claim 1 is "power means for driving the machine." This element does not find response in defendants' special duplex machine at Pontiac for the reason that that machine has no single power means for synchronously advancing its tool heads and rotating its tool spindles, as is of the essence in the Walker combination. The defendants use two separate motors for driving their two tool head actuator pumps and their two sets of tools. The fourth element of claim 1 reads as follows: "means for advancing certain of the tools rapidly and simultaneously into position adjacent their operative engagement with the parts to be machined," This element does not find response in the special duplex machine at Pontiac because that machine does not have means for rapidly advancing certain of its tools while leaving other tools stationary as is of the essence of the Walker combination. Defendants' tools are all advanced rapidly toward the work. The sixth element of claim 1 reads as follows: "said tools having a rate of feed while functioning to cause all the machining to be completed at the termination of the machining of the opening having the longest bore, thereby tending to maintain the load on the power means uniform during the machining operation." This element does not find response in defendants' special duplex machine at Pontiac. Defendants' tools do not complete all of the machining at the same time. The load on the power means is not maintained uniform during the machining operation in the sense of Walker. The special duplex machine at Pontiac does not infringe either claim 1 or claim 2.

The second element of claim 1, which has been quoted above, does not find response in defendants' two-way 8-station hand index machine. That machine has no single power means for synchronously advancing its tool heads and rotating its tool spindles. It uses five separate power motors for driving its two tool head actuator pumps, its two sets of spindles, and its tapping head. The third element of claim 1, which reads as follows, "two sets of tools operatively connected to be driven from the power means and disposed to act on the article simultaneously from opposite sides thereof," does not find response in defendants' two-way 8-station hand index machine. That machine has no tools which are driven from the power means which drives the machine, as specified in Walker. The sixth element of claim 1, which has been quoted above, does not find response in defendants' two-way 8-station hand index machine. In that machine the tools do not complete all the machining at the same time. The load on the power means is not maintained uniform during the machining operation in the sense of Walker. The two-way 8-station hand index machine does not infringe either claim 1 or claim 2.

Element 2 of claim 1, which has been quoted above, does not find response in defendants' Oldsmobile boring machine. That machine has no power means for synchronously advancing its tool heads and rotating its tool spindles, which is the same as, or the equivalent of, the single motor power means disclosed by Walker and which is essential for the Walker functioning. Defendants' machine uses ten independent power motors for driving its work fixture actuator pump, its tool head actuator pump, and its eight spindles. Element 3 of claim 1, which has been quoted above, does not find response in the Oldsmobile boring machine. That machine does not have two sets of tools driven from the same power means as in Walker, or acting on the same work simultaneously from opposite sides thereof, as disclosed in Walker, so as to tend to maintain the load uniform. Each of the eight tools in the Oldsmobile boring machine is driven by an independent motor and all tools act on the work from the same side. The fourth element of claim 1, above quoted, does not find response in the Oldsmobile boring machine. That machine does not have means for advancing certain of its tools while leaving other tools stationary, as is of the essence in the Walker combination. The tools of the Oldsmobile boring machine are

all mounted on a single slide and are all advanced or retracted together. The sixth element of claim 1, which has been quoted above, does not find response in defendants' Oldsmobile boring machine. The tools of that machine do not complete all the machining at the same time. On the contrary, its tools complete the machining of the small ends of the connecting rods before starting the machining of the large ends. The load on the power means is not maintained uniform during the machining operation in the sense of Walker. The Oldsmobile boring machine does not infringe either claim 1 or claim 2. The first element of claim 3, "a power means," finds no response in the Oldsmobile boring machine. As has been stated, that machine has no single power means for synchronously advancing its tool heads and rotating its tool spindles as is of the essence in the Walker combination. It uses ten separate power motors for driving its work fixture actuator pump, its tool actuator pump, and its eight spindles. The fourth element of claim 3, which reads as follows, "means for driving the tools from the power means," finds no response in the Oldsmobile boring machine. That machine has no means for driving the tools from the same power means which actuates the tool advancing means. The fifth and final element of claim 3, reading as follows, "means controlled by the bodily movement of the tools into operative engagement with the article for reducing the speed of the bodily advancing means and automatically connecting the tools with the driving means to cause the tools to machine the article," finds no response in said Oldsmobile boring machine. That machine has no means which at any time connects the tools with the driving means which actuates the tool advancing means, as in Walker. The eight tools of the Oldsmobile boring machine are driven by eight motors which are separate and independent of the driving means which actuates the tool advancing means. The Oldsmobile boring machine does not infringe claim 3.

Claim 4 is typical of a group of claims consisting of claims 4 and 5. The fourth element of these claims, reading as follows, "means acting on the tool to prevent it from rotating during said advance" finds no response in defendants' Oldsmobile boring machine. The third element of claim 4 reads as follows: "mechanical means for advancing the tool bodily towards said support." The third element of claim 5 is the same, except that the word "mechanical" is omitted. Defendants' Oldsmobile boring machine uses hydraulic tool advancing means, with the result that the third element of claim 4 finds no response in said machine while the third element of claim 5 does find response. The Oldsmobile boring machine does not infringe either claim 4 or claim 5.

The fifth element of claim 26, which reads as follows, "means controlled automatically by the arrival of the head at said point for causing said rapid head advancing feeding means to become inoperative and causing the tool driving mechanism to become operative for feeding the head at a relatively slow speed," finds no response in defendants' Oldsmobile boring machine. That machine does not use its tool driving mechanism for advancing its head. It uses entirely separate motors for driving its tools and for driving the pump which provides feed for its head. The Oldsmobile boring machine does not infringe claim 26.

11. *Barnes & Guirl 2,042,379 for a "Metalworking Apparatus," Issued May 26, 1936, on an Application Filed February 14, 1931, and Containing 44 Claims, of Which 10 Are in Suit.*

The machine disclosed in Barnes & Guirl 2,042,379 was intended for the rough boring of the cam and crankshaft bearings of a crankcase or engine block. The primary purpose was to provide an automatic machine for rough boring a plurality of interior holes arranged in axial alignment. In such case, the primary problem was to accomplish the entry of the tools into position to initiate the boring. Once the tools were in position for boring, the boring operation proceeded in a normal and conventional manner. The boring tool bits for the camshaft line were mounted on a single boring bar. In order to get them into position to start the boring, the work was first positioned with the holes eccentric to the boring bar, and the boring bar was positioned with the tools pointing in a predetermined direction. The boring bar was then pushed into place, and then the work was shifted so that the holes in it were concentric with the bar. Thereupon, rotation of the bar was initiated, as well as a slow forward feeding movement thereof.

In this patent, the patentees say:

"Our invention contemplates the provision of a material working apparatus, such

as a boring machine set forth above, in which a reciprocable spindle or boring head is employed for driving a plurality of cutting tools, and a work supporting device is provided which is adapted to be shifted into one position to permit the convenient insertion of the tools within the apertures of a work piece, and in another shifted position adapted to locate the work piece in position to be acted upon by the boring tools.

\* \* \* \* \* \*

"Another object of the present invention is to provide in combination with a material working machine of the type set forth above having rotary work driving spindles, means for positively indexing at least one of said spindles to a predetermined position so as to enable the clearance of a cutting tool of the boring bar driven by said spindle as said tool is inserted within the work piece, and we further propose to control the operation of this indexing mechanism in timed relation with the cycle of reciprocation of the boring head."

Figure 20, hereinafter set forth, is a front elevational view of a material working apparatus or boring machine, which is representative of one embodiment of the invention, the boring or spindle heads of said machine being disclosed in their starting position:

device and having a radially projecting cutting member, a work supporting means relatively shiftable transversely with respect to said tool for governing the alignment of the tool and the cylindrical surface of a supported work piece, means for effecting the reciprocation of said driving device to carry the rotary tool toward and away from the work piece, and means for automatically locating and maintaining said projecting member in a predetermined radial position during a predetermined interval of its reciprocation, whereby to enable said projecting cutter member to clear the work during said interval of its reciprocation.

"18. In metal working apparatus for boring a cylindrical surface of a work piece, a driving device for rotary tools, a tool adapted to be driven by said device having a radially projecting cutting element, means for supporting a work piece in position to be acted upon by the tool and relatively shiftable transversely thereof to govern the alignment of the tool and the cylindrical surface of the work, means for imparting reciprocation to said driving device, and latch means for circumferentially locating and maintaining said projecting element in a predetermined radial position during an interval of the reciprocation thereof whereby to permit the projecting

**FIGURE 20**

The claims in issue are:

"17. In metal working apparatus for boring a cylindrical surface of a work piece, a driving device for rotary tools, a rotary tool adapted to be driven by said

cutting element to clear the work during said interval of its reciprocation.

"19. In metal working apparatus for boring a cylindrical surface of a work piece, a driving device for rotary tools, a ro-

tary tool adapted to be driven by said device and having a cutting member radially projecting therefrom a work supporting means relatively shiftable transversely of said tool to govern the alignment of the tool and the cylindrical surface of the work, means for effecting the reciprocation of said driving device to carry the rotary tool toward and away from the work piece, means for locking and maintaining the tool eccentrically in a predetermined circumferential position, whereby to enable said cutting member to clear the work during said interval of its reciprocation, and means for controlling the functioning of said tool locking means in timed relation with the reciprocation of said tool.

"20. In a boring machine for machining a cylindrical surface in a work piece, a spindle head including a prime mover and a rotary tool driving means actuated thereby, means for reciprocably supporting said spindle head, a boring bar adapted to be driven by said tool driving means, work supporting means shiftable from one position to another to eccentrically locate the cylindrical surface of the work with respect to said boring bar and thereby enable the movement of the boring bar through the work without causing a cutting action thereon, hydraulic mechanism for reciprocating the spindle head toward and away from the supported work piece, hydraulic means for shifting said work support, and control means for said last mentioned actuator to govern the shifting of the work support for eccentrically positioning the cylindrical surface of the supported work piece with respect to said boring bar so that the boring bar may be axially moved within the work piece without making a cut and to govern a shifting of the support to clamp and position said work piece to be acted upon by the boring bar.

\* \* \* \* \* \*

"29. In a boring machine for machining a cylindrical surface of a work piece, a work support, a boring tool disposed in preset relation with respect to said support, means for rotating said boring tool, said boring tool having a radially disposed cutting element, power means for advancing said tool toward the support to effect a cutting operation upon the work, said tool and work support being relatively shiftable transversely of each other to effect the eccentric positioning of the tool and the cylindrical surface of said work to enable a movement of the cutting element through

the work without a cutting action, means operable automatically upon the completion of the machining operation to secure the cutting element of the boring tool in a predetermined radial position, and means for effecting a reversal of the tool when said tool has been secured in said position.

\* \* \* \* \* \*

"38. In a metal working apparatus for boring a cylindrical surface and the like, a spindle support, a rotary spindle in said support for carrying a tool having a laterally projecting cutter, a work supporting carriage shiftable relatively transversely of said spindle for locating a work piece in at least two definite positions with respect to the axis of said spindle, power means for effecting relative reciprocation between said work support and said spindle in a direction parallel to the spindle axis, and means for controlling said relative reciprocation, the shifting of the carriage transversely of the spindle, and the angular position of said spindle to effect the clearance of said cutter with respect to said cylindrical surface during an interval of said relative reciprocation.

"39. In metal working apparatus for boring a cylindrical surface and the like, a spindle support, a rotary spindle in said support for carrying a tool having a laterally projecting cutter for machining the surface, a work supporting carriage shiftable relatively transversely of said spindle for locating a work piece in at least two definite positions with respect to said spindle, hydraulic power means for effecting relative reciprocation between said work support and said spindle in a direction parallel to the spindle axis, and means for controlling said relative reciprocation, the shifting of the carriage transversely of the spindle, and the angular position of said spindle to effect the clearance of said cutter with respect to said cylindrical surface during an interval of said relative reciprocation.

\* \* \* \* \* \*

"42. In metal working apparatus for boring a cylindrical surface in a work piece, a rotary spindle, a reciprocable driving device for said spindle, a tool having a laterally projecting cutter carried by said spindle, means for reciprocably supporting said device, power means coupled with said device for imparting reciprocation thereto, a work supporting carriage for locating a work piece in at least two definite positions with respect to said spindle and

shiftable transversely thereof, and means for controlling the reciprocation of said spindle, the shifting of the carriage, and the angular positioning of said spindle to effect the clearance of said cutter with respect to said cylindrical surface during an interval of its reciprocation.

"43. In boring apparatus, a driving device for a rotary spindle, a spindle driven by said device adapted to carry a tool having a laterally projecting cutter, a work supporting means, means for shifting the work supporting means and the tool spindle relatively transversely of the tool to govern the alignment of the tool and the work, means for shifting the tool spindle and the work supporting means relatively axially of the tool to govern the operative engagement of the tool with the work, means for locking the tool spindle in predetermined angular position, and interlocking control connections between the means for shifting the tool spindle and work supporting means relatively axially of the tool and the locking means whereby said shifting means cannot operate in a given manner unless said locking means is in position to hold the spindle in said predetermined angular position.

"44. In a boring machine, a rotary boring spindle, a boring tool projecting laterally at one end of said spindle, means for rotating said spindle, means for stopping the rotation of the spindle with the tool projecting in a predetermined radial direction, a work support, means for procuring relative transverse movement between the spindle and support in a direction such that the spindle axis is displaced from the axis of the bore of the work piece in a direction opposite the projection of the tool, and means for procuring relative reciprocative movement between the support and the spindle parallel with the axis of the spindle while the spindle is in displaced position whereby to permit the passing of the tool through the bore of the work piece without contacting the same."

The plaintiffs contend that the patent is valid and that all of the claims in suit are infringed by defendants' Oldsmobile boring machine.

The defendants' defenses may be summarized as follows: (1) The entire patent is invalid under Section 33, Title 35 U.S.C.A., because of an inordinate multiplication and duplication of claims; (2) claims 17, 19, 29, 38, 39 and 42 are void under the statute mentioned, because they fail to define a structure as distinguished from a mere result; (3) the entire patent is invalid for failure to disclaim claims 18, 20, 43 and 44, which claims were anticipated by cam and crankshaft boring machines of plaintiffs' own manufacture; (4) the claims in suit are invalid on the prior art; and (5) no one of the claims in suit is infringed.

Because of the conclusions reached on other issues, the court finds it unnecessary to decide the question raised by the defendants' first defense.

The court is of the opinion that defendants' second defense must be sustained. Claims 17, 19, 29, 38, 39 and 42 which attempt to cover automatic control call merely for "means" for carrying out the desired cycle automatically. They make no attempt to set forth any particular mechanism for accomplishing the automatic operation.

The defendants' third defense has heretofore been considered and a conclusion reached adverse to the defendants.

On the fourth defense, that the claims in suit are invalid on the prior art, defendants cite a Nash Motors Company boring machine built by Ingersoll Milling Machine Company and shipped August 19, 1930, Reo Motor Car Company boring machine built by the W. F. & John Barnes Company and shipped February 2, 1929, and Paige Motor Car Company boring machine built by the plaintiff W. F. & John Barnes Company and shipped December 5, 1927. Other instances of prior art machines and patents employing or disclosing mechanism for stopping a tool spindle in predetermined angular position, which were referred to, are Topham 1,774,737 (1925-1930), Sellers 961,542 (1909-1910), a Graham-Paige machine for chamfering cylinder bores (June 13, 1929), and a LeBlond crank shaft turning machine.

The Ingersoll Milling Machine Company's cam and crank shaft boring machine built for the Nash Motors Company of Racine, Wisconsin, is by the defendants claimed to be a complete anticipation of the disclosures of the patent now under consideration. Every element of every claim of this patent in suit finds a response in this machine. There does not appear to be any question but that this machine is a complete anticipation, if its date is early enough. It has been stipulated in this case that the machine in question was shipped and sold by the Ingersoll Milling Machine

Company to the Nash Motors Company on August 19, 1930. The application for the patent in suit was filed on February 14, 1931. There is evidence in the record that employees of Ingersoll Milling Machine Company discussed the use of an automatic cam and crank shaft boring machine before February 17, 1930. Drawings of such a machine, made by one Wiley and bearing date February 17, 1930, are in evidence. The evidence discloses that these drawings of February 17, 1930, together with another drawing dated March 4, 1930, were made by Wiley for a proposal to the Oakland Motor Car Company, which proposal did not, however, result in a sale to that customer. Shortly thereafter the additional drawings of March 27, 1930, were made for a proposal to Nash Motors Company of Milwaukee, Wisconsin, and on April 4, 1930, Wiley made a sketch of a hydraulic circuit for the machine, together with a description thereof. These Wiley drawings were used in a proposal of April 15, 1930, to Nash Motors Company of Racine, which proposal did eventuate in the sale of the machine in question. The customer's purchase order was dated April 16, 1930, and this was followed by issuance at the Ingersoll Milling Machine Company of the shop specifications which are in evidence. These specifications were turned over to the Ingersoll production department and on April 26, 1930, one Bowen made a second circuit sketch, which is in evidence, replacing the one by Wiley of the sales engineering department. Thereafter, the production department proceeded with the making of working drawings and building of the machine. During the latter period, Bowen made a third circuit drawing on May 19, 1930. Upon completion of the machine, photographs and moving pictures were taken of it, and it was tested and shipped to the customer on August 19, 1930. The evidence discloses that all of the salient features, including even the details of the structure of this machine, are found in the Wiley drawings of February 17, 1930. The Ingersoll Milling Machine Company is entitled to that date as date of conception of the Nash Motors Company boring machine. The earliest drawings which the plaintiffs have produced are those of April 20, 1930, and upon the oral argument there was contention made upon behalf of the plaintiffs that those sketches were a reduction to practice. The court is of the opinion that that contention cannot be sustained. The plaintiffs are entitled to that date, April 20, 1930, as date of conception. It does not appear that there was diligence on behalf of the patentee down to the date of constructive reduction to practice,—the filing date of February 14, 1931. It appears from the evidence that the work which the patentees, Barnes & Guirl, did was all paper work, and that was turned over to the patent attorneys for preparation of an application in June, 1930. It does not affirmatively appear from the evidence that diligence was exercised in respect of the application for the patent in suit, and it does affirmatively appear from the evidence that material relating to other proposed applications were by the same client transmitted to the same patent counsel after the material relating to the patent in suit and that patent applications on that other material were by counsel prepared and filed prior to the filing of the application for the patent in suit. The court is of the opinion that the defendants have established earlier dates both for conception and for reduction to practice in respect of the cam and crank shaft boring machine built by the Ingersoll Milling Machine Company and shipped to the Nash Motors Company on August 19, 1930. The court has reached the conclusion just expressed after considering the facts that Bowen and Oberhoffken, employees of Ingersoll Milling Machine Company, filed a patent application on the Nash machine in October, 1930, that on March 8, 1933, the Patent Office declared an interference between the application of Bowen and Oberhoffken and the application which ripened into the Barnes & Guirl patent in suit, that, after extensive negotiations and examinations of each other's proofs, Bowen and Oberhoffken and Ingersoll Milling Machine Company executed a concession of priority to Barnes & Guirl conceding that Barnes & Guirl were prior inventors, and that the Patent Office awarded the interference counts to Barnes & Guirl.

The plaintiff, W. F. & John Barnes Company, sold two cam and crank shaft boring machines at dates prior to the filing of the application for the patent here in question. The first of these machines was the cam and crank shaft boring machine for Paige Motor Company shipped on December 5, 1927, and the second was the cam and crank shaft boring machine for Reo Motor Company shipped on February 2, 1929. Both of these earlier cam and crank shaft boring machines are of the same general style as that shown in the

patent in suit. Each of them comprises a bed with a fixture on it embodying a platen which is pulled upward by a hydraulic actuator. In each instance, retractable stops are provided for interrupting the upward movement of the platen so that the holes in the work will be located eccentrically of the boring bars for entry of the latter, and thereafter the retractable stops are withdrawn for completion of the upward movement of the work. In each machine the boring bars are revolved by a drive motor on a head which is fed forwardly by a hydraulic mechanism to accomplish the cutting feed of the bars. In the case of the earlier of the two machines, the boring bars are actually carried on a second head which is moved into and out of cutting position by a hand-wheel. In the second of the two prior art machines, the boring bars are carried on the spindles of a single head just as in the case of the machine of the patent in suit. Both of the machines differ from that of the patent in suit primarily in that a hand-wheel was provided for turning the boring bars to predetermined angular position rather than providing an automatic control for the complete cycle, including a mechanism for automatically turning the boring bars to, and locating the same in, the desired predetermined angular position.

The court is of the opinion that these earlier cam and crank shaft boring machines of plaintiffs' own manufacture anticipate those claims in suit which are not limited to automatic control, namely 18, 20, 43 and 44, while the remaining claims 17, 19, 29, 38, 39 and 42, which claim merely "means" for making the plaintiffs' earlier machines automatic do not disclose invention over the earlier machines.

In Topham 1,774,737 (1925-1930) is found the following language: "The present invention relates to driving and stopping mechanism adapted for use on machines which it is necessary or desirable to stop at a certain or substantially certain point in a cycle of operations, or at a certain or substantially certain angular position of the main shaft or one of the other shafts of the machine." The disclosure of Sellers 961,542 (1909-1910) is adequately described by claim 1 thereof, which is as follows: "1. A boring and facing machine for boiler headers having in combination a series of spindles each spindle having a boring tool secured to it and a facing tool extending out radially from it, the facing tools of the series of spindles being set parallel to each other; means for rotating and feeding said spindles, a work holding table and *means for shifting said table transversely to said spindles so as to enable the facing tools to be entered into and withdrawn from the header.*" The italicized portion of the claim is particularly pertinent in connection with the study of the patent in suit now under consideration. The Graham-Paige machine for chamfering cylinder bores of June 13, 1929, employed a tool spindle with radially projecting cutters on it which had to be stopped in predetermined angular position to accomplish the entry and withdrawal of the same from the work.

Coming to defendants' fifth and final defense, the only machine accused under Barnes & Guirl 2,042,379 is defendants' Oldsmobile boring machine. That machine presents a different problem and solution from that of the machine of the patent in suit. In the accused there is no problem of entering tools into position to bore a plurality of spaced aligned holes. On the contrary, the boring tools approach individual holes in coaxial relation thereto rather than being offset and threaded through various obstructions into position as in the machine of the patent in suit. It is true that in the accused machine there is an automatic positioning of the tools in predetermined angular position, and also a lateral offset of the positioned tools and work. This, however, is done at the end of the cutting operation in order to clear the tools from the work for purposes of withdrawal of the same without leaving a scratch on the finished work.

The claims in issue can be read as a matter of words on the accused machine but there is no response in substance. The Oldsmobile machine is simply an inclined-way boring machine of a type found in the prior art at least as early as Morgan 1,523,-360, equipped with a mechanism for clearing the tools from the finished work upon completion of the boring operation in accordance with the disclosures of the prior art, namely, Kenyon 1,564,483 (1920-1925), Kempton 1,826,178 (1925-1931), Marsh 1,-320,162 (1918-1919), and Ellis 1,547,108 (1924-1925). Short quotations from these patents indicate clearly that this idea was an old one. In Kenyon 1,564,483, it is said: "When the operator starts to reverse the tools, particularly the front tool for cutting, the face of the pulley, the backward movement causes the triangular latch member to rotate a short distance so as to decrease

the distance between its feed and the bracket, and that *permits the tool to drop down still further so as to clear the work altogether.*" (Italics supplied.)

In Kempton 1,826,178, it is said: "We have also found that in withdrawing the grinding wheel axially from the finished surface of the work, marks and scratches are made near the end of the surface, thereby injuring the finish and lowering the quality of the product. Particularly is this true where cast iron is ground, and where the ground surface is of considerable length. Another *object of the invention therefore is to provide means for automatically withdrawing the grinding wheel laterally from the surface of the work before withdrawing the grinding wheel axially into its inoperative position.*" (Italics supplied.)

In Marsh 1,320,162, it is said: "When the carriage is drawn toward the spindle, and just when the tool 24 reaches the proper point within the shell 9, the dog 64 rides upon onto the block 69 and swings the lever 66 over, opening the valve 57 and thereby admitting the compressed air to the cylinder 52, and pressing the cutting tool 24 into action. This action continues until the dog 64 reaches the farther end of the block 69, drops down beyond it, allows the lever 66 to swing back, the valve closes, the compressed air is shut off from the cylinder, and the tension spring 71 (Fig. 6) *draws the tool rest forward and the tool 24 out of cutting action.*" (Italics supplied.)

In Ellis 1,547,108, it is said:

"A further *object of the invention is to provide means automatically moving the cutting member or equivalent tool radially inward when the tool is to be withdrawn from a finished bearing.*"

"When the rotation of boring bar is stopped, or when the cutting member passes through the work, spring 26 automatically moves the sleeve back to the position of Figure 4, with cutting member 18 in its inner radial position, *so that the tool may be removed without cutting or scoring the work.*" (Italics supplied.)

The defendants contend that the reason for the presence in the patent in suit of so many claims which can, as a matter of words, be applied to the accused machine, has been made plain in the record in this case. They point out that the file wrapper of the patent in question reveals that the first of the claims in issue was inserted in the application on December 22, 1934, nearly four years after the filing of the original application. There was no original claim in the application which covered either broadly or narrowly the combination of angular positioning of the tool and lateral separation of the tool and work. The date of December 22, 1934, is significant in view of the fact that plaintiffs have stipulated that the W. F. & John Barnes Company received a set of blue prints from the Ford Motor Company in November, 1934, of a so-called "Niles Machine," which defendant Ex-Cell-O Corporation rebuilt for the Ford Motor Company to incorporate an automatic spindle positioning and work separation arrangement which was, in so far as the issues of this case are concerned, substantially like that of the Oldsmobile machine. In other words, this Niles Machine employed substantially the same arrangement as that of the accused Oldsmobile machine for clearing the tools from the work at the end of the boring operation in order to avoid a scratch or dragout line upon withdrawal of the tools through the finished bore. The defendants contend that it was this knowledge of defendants' Niles Machine which caused the plaintiffs to enlarge their then pending patent application by filing the belated claims which are now in issue, in an effort to embrace defendants' machine as a matter of words. The evidence does disclose that the plaintiffs filed the claims in suit after they had knowledge of one of defendants' machines which embodied the features of the accused machine.

\* \* \* \* \*

Counsel for the defendants may prepare, in writing, and present, on or before July 7, 1943, drafts of findings of fact, conclusions of law, and a judgment order not inconsistent with the views herein set forth. Counsel for the plaintiffs may, on or before July 21, 1943, present, in writing, their criticisms and observations, if any they have, in respect of the drafts presented by counsel for the defendants. Counsel for the defendants may, on or before July 28, 1943, present, in writing, such, if any, reply as they may deem necessary or desirable. This having been done, the making of findings of fact, conclusions of law, and a judgment order will be taken by the court without further argument.